## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

**JEREMY W. SCHULMAN**
6116 Executive Boulevard, Suite 425
North Bethesda, Maryland 20852

*Plaintiff,*

     v.

Case No. 485341-V

**AXIS SURPLUS INSURANCE COMPANY**

     Serve on:
     Kathleen A. Birrane
     Insurance Commissioner
     200 St. Paul Place
     Suite 2700
     Baltimore, MD 21202

     AXIS U.S. Insurance
     Attn: Claims Administrator
     11680 Great Oaks Way
     Suite 500
     Alpharetta, GA 30022

     and

**ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY**

     Serve on:
     Kathleen A. Birrane
     Insurance Commissioner
     200 St. Paul Place
     Suite 2700
     Baltimore, MD 21202

     Endurance American Specialty Insurance
     Company
     750 3rd Avenue
     New York, NY 10017

     and

**RECEIVED**

DROP BOX    APR 0 6 2021

Clerk of the Circuit Court
Montgomery County, Md.

1

**PROSIGHT SYNDICATE 1110 AT LLOYD'S**

> Serve on:
> Kathleen A. Birrane
> Insurance Commissioner
> 200 St. Paul Place
> Suite 2700
> Baltimore, MD 21202
>
> ProSight Syndicate 1110 at Lloyd's
> c/o ProSight Specialty Insurance
> Solutions, LLC
> 412 Mt Kemble Avenue #300C
> Morristown, NJ 07960
>
> *Defendants.*

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jeremy W. Schulman ("Mr. Schulman" or "Plaintiff"), by and through undersigned counsel, brings this action against Defendants AXIS Surplus Insurance Company ("Axis"), Endurance American Specialty Insurance Company ("Endurance," together with Axis, the "Primary Carriers"), and ProSight Syndicate 1110 at Lloyd's ("ProSight") (collectively, with the Primary Carriers, "Defendants" or the "Carriers"). In support thereof, Mr. Schulman alleges as follows:

## NATURE OF THE ACTION

1.      Mr. Schulman brings this action to recover nearly $20 million in compensatory damages and related injunctive and declaratory relief, arising out of the Carriers' unconscionable conduct in belatedly repudiating their obligations under insurance policies benefitting Mr. Schulman, abruptly and without cause reversing a separate 2017 agreement to cover Mr. Schulman's legal defense costs related to a criminal proceeding pursued by the U.S. Department

2

of Justice.  Both the insurance policies and the parties' subsequent agreement applying those policies plainly require the Carriers to pay Mr. Schulman's attorney's fees and expenses incurred in relation to the Department of Justice matter.  The Carriers' newfound refusal to do so, after performing under both sets of agreements for the past four years, constitutes anticipatory breach of contract, breach of contract, detrimental reliance, and a lack of good faith.  Because the Carriers have acted unconscionably, they are fully answerable on these causes of action and are required not only to pay Mr. Schulman compensatory damages, but also his legal fees incurred in bringing this action.

2.      The Defendant Carriers issued $20 million in lawyers professional liability insurance (the "Policies") to Shulman, Rogers, Gandal, Pordy & Ecker, P.A (the "Firm"), a Maryland law firm where Mr. Schulman formerly served as an equity shareholder.  The Policies expressly obligate the Carriers to cover amounts incurred by the current and former attorneys of the Firm—including Mr. Schulman —to defend and settle claims brought against them for alleged wrongful acts in the performance of professional services.

3.      The Primary Carriers, acting at all times for themselves and on behalf of all three Carriers, previously acknowledged their obligations to Mr. Schulman under the Policies with respect to a January 27, 2017 U.S. Department of Justice ("DOJ") grand jury subpoena issued by the United States District Court for the District of Maryland and served upon the Firm, which arose in connection with an ongoing DOJ criminal investigation into Mr. Schulman brought by the United States Attorney for the District of Maryland (the "Subpoena").

4.      In fact, as early as June 2017, the Primary Carriers accepted and acknowledged not only to the Firm—but expressly to Mr. Schulman in writing—that they consented to Mr. Schulman's choice of defense counsel for the Subpoena and any related proceedings, and

3

guaranteed to Mr. Schulman they would cover and pay a majority portion of his defense fees and expenses incurred in connection with the proceedings—a promise the Primary Carriers honored pursuant to the Policies for nearly four years.

5.      However, in a complete about face beginning in late 2020, the Primary Carriers altogether ceased making defense reimbursements to Mr. Schulman or responding to his counsel's continued requests for payment. In fact, the Primary Carriers have outright ignored Mr. Schulman's demands for defense coverage since at least December 2020 and have left Mr. Schulman with more than $180,000 in outstanding and unpaid invoices through 2020's year end, and many hundreds of thousands of dollars more for legal work performed in 2021.

6.      What is worse, and can only be characterized as a venal attempt to exploit Mr. Schulman's perceived vulnerability while he is battling a major (yet entirely specious) federal criminal case, the Primary Carriers have belatedly attempted to manufacture an excuse for their bad faith failure to honor their Policy obligations to Mr. Schulman over the past six months (and counting), by issuing a brazen March 12, 2021 coverage denial in response to the return of a December 2, 2020 indictment charging Mr. Schulman in connection with the previously accepted Subpoena and DOJ Investigation (the action captioned *United States of America v. Schulman*, No. PX 20-CR-434 (D. Md.) (the "Indictment," with the Subpoena, the "DOJ Claim"). The purported coverage denial letters baldly claim, in direct contravention of the Primary Policy and the parties' subsequent second agreement, that the "criminal" nature of the Indictment somehow disqualifies this matter as a "Claim" eligible for coverage under the Policies.

7.      The Carriers' refusal to act in good faith to provide Mr. Schulman with continued defense coverage on a current basis (as is his right under the Policies) has left Mr. Schulman alone to face criminal allegations and mounting defense fees, while simultaneously now requiring him

4

to incur the significant added expense of pursuit of this coverage claim. Had the Carriers genuinely and in good faith disputed Mr. Schulman's right to coverage, they could have and would have asserted their position four years ago when the matter could have been addressed in an orderly fashion without prejudicing Mr. Schulman's rights. Instead, the Carriers agreed to pay his defense costs, induced Mr. Schulman's reliance on such agreement by paying those costs for nearly four years, and then abruptly attempted to withdraw coverage while Mr. Schulman and his approved defense counsel were in the middle of defending an active criminal prosecution. This is unconscionable conduct, warranting severe consequences for the Carriers, including, **inter alia,** an award of attorney's fees incurred to pursue this action.

8.      Accordingly, Mr. Schulman now brings this action for declaratory relief, breach of contract, detrimental reliance, anticipatory breach of contract, lack of good faith, and compensatory and punitive damages—to ensure that, going forward, Mr. Schulman's defense costs are fully covered and paid so that he can mount the defense to the DOJ Claim specifically guaranteed to him under the Policies.

## PARTIES & RELEVANT NON-PARTIES

9.      Plaintiff Jeremy W. Schulman is an individual domiciled in Maryland. Mr. Schulman is a former equity shareholder of the Firm, where he worked until 2017, and an "Insured Individual" under the Policies.

10.     The non-party Firm is a Maryland law firm organized as a professional association with its head office located at 12505 Park Potomac Avenue, 6th Floor, Potomac, MD 20854. Mr. Schulman formerly served in his professional capacity as an equity shareholder of the Firm in its Potomac office.

11.     Upon information and belief, Defendant AXIS Surplus Insurance Company is an insurance carrier incorporated under the laws of Illinois with its principal place of business in Georgia. Axis is a surplus lines insurer approved by the Maryland Insurance Administration to issue insurance policies in the surplus lines insurance market. Upon information and belief, Axis transacts such surplus lines insurance business in the State of Maryland, including through the issuance of a policy at issue in this action to the Firm, a Maryland professional association.

12.     Upon information and belief, Defendant Endurance American Specialty Insurance Company is an insurance carrier incorporated under the laws of Delaware with its principal place of business in New York. Upon information and belief, Endurance is a surplus lines insurer approved to issue insurance policies in the surplus lines insurance market and transacts such surplus lines insurance business in the State of Maryland, including through the issuance of a memorandum of insurance at issue in this action to the Firm, a Maryland professional association.

13.     Upon information and belief, Defendant ProSight Syndicate 1110 at Lloyd's is a foreign underwriting syndicate or consortium that is organized and registered under the laws of the United Kingdom, with its principal place of business in the United Kingdom. Upon information and believe, ProSight transacts business in the State of Maryland, including through the issuance of a certificate of insurance at issue in this action to the Firm, a Maryland professional association.

14.     All Defendants have designated and agreed under the Policies, in accordance with Section 4-206 of the Maryland Insurance Code, that the Superintendent, Commissioner or Director of Insurance, or his/her designee, will serve as each of their true and lawful attorney upon whom any lawful process may be served in any state where action or suit arising under the Policies is

6

brought against them by any beneficiary under the Policies. *See* Ex. A at Primary Policy, End. No. 9; MOI, Clause (a); Excess Certificate, "Service of Suit Clause (U.S.A.)" End.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Section 1-1501 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland.

16.     This Court has personal jurisdiction over the Defendants pursuant to Section 6-102(a) and 6-103(b)(1), (2), (3), (4), and (6) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland.

17.     Venue is proper in this Court pursuant to Section 6-201 of the Courts and Judicial Proceedings Articles of the Annotated Code of Maryland.

18.     Venue is further proper in this Court as it relates to foreign Defendant ProSight, who agreed that it will submit to the jurisdiction of a Court of competent jurisdiction within the United States. *See* Ex. A at Service of Suit Clause (U.S.A.) End.

## FACTUAL BACKGROUND

### A.     THE POLICIES

19.     Defendants issued the Policies to the Firm, which provide a total of $20 million in primary and "follow-form" excess claims-made lawyers professional liability coverage, insuring the Firm and its current and former partners—including Plaintiff—for the policy period of August 22, 2016 to August 22, 2017 (the "Policy Period").

20.     Axis and Endurance co-insured the primary layer of coverage on a fifty percent quota share basis.

7

21.     Axis issued AXIS Pro LP Lawyers Professional Liability Insurance Policy Number EBN 782641/01/2016 to the Firm, which is subject to a $10,000,000 aggregate limit of liability, of which Axis's quota share obligation is $5,000,000 (the "Primary Policy").

22.     Endurance issued Memorandum of Insurance Number LPL10005398002 to the Firm, through which Endurance coinsures the Primary Policy in accordance with the exact terms and conditions thereof (the "MOI").

23.     The MOI obligates Endurance for $5,000,000 of the $10,000,000 Primary Policy aggregate limit of liability, which represents Endurance's fifty percent quota share.

24.     ProSight issued an excess policy of insurance to the Firm pursuant to Certificate Number PL201600002300, which is subject to a $10 million limit of liability, excess of $10 million (the "Excess Certificate").

25.     The Excess Certificate expressly "follows form" to the Primary Policy meaning that, aside from its attachment point and limits of liability (and unless otherwise specified in endorsement), it incorporates and is subject to all terms, conditions, definitions, and exclusions set forth in the Primary Policy, including those discussed below.

26.     A true and correct copy of the full package of Policies, including the Primary Policy as well as the MOI and the Excess Certificate, is attached as **Exhibit A**.[1]

27.     The Policies cover the Firm as an **"Insured"** as well as **"Insured Individuals,"** which the Primary Policy defines to mean "any one or more natural persons who are past, present or future . . . directors, officers, principals, shareholders, partners, or members of the **Firm**," and which includes Mr. Schulman.

---

[1] Each of the Policies listed and described herein as included within Exhibit A is incorporated by reference into this Complaint.

8

28.     Pursuant to the Insuring Agreement of the Policies, the insurer agrees to pay, in excess of a $100,000 self-insured retention, "on behalf of the **Insureds** all **Loss** . . . resulting from **Claims** for **Wrongful Acts** committed before the expiration of the **Policy Period** that are first made against any **Insured** during the **Policy Period**."

29.     "**Claim**" is defined in the Primary Policy to include, among other things:

　　1.  any of the following:

　　　　a.  a written demand against any **Insured** for monetary or non-monetary relief;

　　　　b.  a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading;

　　　　c.  a written demand for arbitration or mediation;

　　　　d.  a formal civil administrative or civil regulatory proceeding against any Insured, including, but not limited to, a **Disciplinary Proceeding**, commenced by the filing of a notice or charges or similar document or by the entry of a formal order of investigation or similar document;

30.     "**Wrongful Act**," under the Primary Policy, is defined to mean, among other things, "any actual or alleged:  1. act, error or omission; 2. breach of contract for **Professional** Services; 3. breach of fiduciary duty; . . . committed or attempted, or allegedly committed or attempted, solely in the performance of or failure to perform **Professional Services** by any **Insured** . . . ."

31.     The Primary Policy also defines "**Professional Services**," to include "services provided to others by an Insured," including:

　　1.  in the conduct of any business by or on behalf of the Firm in its professional capacity as an attorney,

　　. . .

　　but only if such services are performed in the name or on behalf of the Firm and some or all of the fee, if any, accruing from such

9

services (regardless of whether such fee is actually collected) inures to the benefit of the Firm.

32.    "**Loss**" is defined within the Primary Policy as "the amount(s) which the **Insureds** become legally obligated to pay on account of a **Claim**," and includes, among other things, "damages, judgments, any award of pre-judgment or post-judgment interest, settlement amounts, costs and fees awarded pursuant to judgments, and **Claim Expense**."

33.    "**Claims Expense**" under the Primary Policy means:

reasonable and necessary legal fees and expenses (other than regular or overtime wages, salaries, fees, benefits, or other compensation of the **Insured Individuals** or the **Firm**'s overhead expenses) incurred by or on behalf of the Insured in defending, settling, appealing or investigating **Claims**, and the premiums for appeal, attachment or similar bonds. The **Company**, however, shall have no obligation to apply for or furnish such bonds.

34.    The "Defense and Settlement" provision of the Primary Policy provides it is the insured's "duty to investigate, defend, and select counsel to defend a covered **Claim** made against the **Insured** alleging a **Wrongful Act**," yet expressly directs that the insurer "will, upon written request, pay **Claim Expense** owed under this policy on a current basis."

35.    Nothing in the Policies affords the Carriers the right to unilaterally terminate payment of Claims Expense on a current basis.

36.    The Primary Policy also contemplates that "all Claims arising from the same **Wrongful Act** and/or all **Interrelated Wrongful Acts** shall be deemed one **Claim** for the purpose of applying the Limit of Liability and Retention."

37.    In turn, "**Interrelated Wrongful Acts**" under the Primary Policy means:

any or all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes.

10

38.     Further, the **"Multiple Claims"** provision of the Primary Policy provides:

All **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful Acts**
will be deemed to have been made on the earlier of the date the first of those **Claims**
is made against any **Insured** or the first date the **Company** receives the **Insured's**
written notice of the fact, circumstance, situation, event, transaction, cause or
**Wrongful Act** which underlies such **Claim**. The provisions of the policy in effect
on that date will apply.

39.     The Primary Policy excludes "any criminal, dishonest, malicious or deliberately
fraudulent act, error or omission by an Insured," only "if evidenced by any judgment, final
adjudication, alternate dispute resolution proceeding or written admission by an Insured."

40.     As noted above, the Endurance MOI is issued upon the same terms of the Primary
Policy, and the Excess Certificate expressly adopts and incorporates all Primary Policy terms,
conditions and exclusions cited above.

**B.      THE UNDERLYING INVESTIGATION, SUBPOENA, AND RESULTING
INDICTMENT**

41.     During Mr. Schulman's tenure as an equity shareholder rendering his professional
legal services on behalf of the Firm, Mr. Schulman served as a trusted advisor and advocate on
behalf of the Somali people and nation, in efforts to assist the government's recovery from more
than two decades of civil war.

42.     Upon information and belief, in late January 2017, the United States Department of
Justice gave notice to the Firm of the criminal Investigation conducted by the United States
Attorney's Office for the District of Maryland. This notice attached the grand jury Subpoena issued
by the District Court for the District of Maryland dated January 27, 2017. A true and correct copy
of the notice and Subpoena is attached hereto as **Exhibit B**.

43.     The Subpoena sought certain information, documents and records from the Firm specifically regarding Mr. Schulman and his work for the Firm on behalf of the Somali people and nation. *See* Ex. B at Section A.5.

44.     The Subpoena included requests for documents and information specifically respecting certain of the Firm's clients whom Mr. Schulman assisted, including, among others, a number of Somali officials, the Federal Government of Somalia, the Transitional Federal Government of Somalia and the Central Bank of Somalia. *See* Ex. B at Sections B.1-B.3.

45.     At all times, Mr. Schulman cooperated with the Firm and the U.S. Attorney's Office respecting the Subpoena and Investigation.

46.     Nonetheless, the years-long Investigation into Mr. Schulman and his Somali representations on behalf of the Firm continued, and on December 2, 2020, the United States Attorney for the District of Maryland and the U.S. Department of Justice returned an Indictment against Mr. Schulman. A true and correct copy of the Indictment in the action captioned *United States of America v. Schulman*, No. PX 20-CR-434 (D. Md.) is attached hereto as **Exhibit C** .

47.     The Indictment arose in connection with, and directly as a result of, the Investigation, and alleges that, "[a]t all times material to this Indictment," Mr. Schulman "was licensed to practice law in the State of Maryland" and was a partner of the Firm. *See* Ex. C.

48.     The Indictment further alleges that Mr. Schulman, in his capacity as a partner on behalf of the Firm, represented individuals and entities in recovering frozen Somali assets based on allegedly forged and false documentation and representations.

49.     The Firm and Mr. Schulman were compensated, according to the Indictment's allegations, pursuant to retention agreements and fixed-fee arrangements, and from revenue

12

generated from recovered assets worth hundreds of millions of dollars, which Mr. Schulman and co-conspirators allegedly obtained through improper means.

50.     As alleged in the Indictment, between July 2010 and 2014, Mr. Schulman purportedly improperly obtained $12.5 million on behalf of his Somalia-related clients, from which Mr. Schulman caused the Firm to retain $3.3 million in revenue (and from which Mr. Schulman is alleged to have personally received hundreds of thousands of dollars of additional compensation) and caused the Firm to transfer hundreds of thousands of dollars more to an individual client and an alleged co-conspirator.

51.     The Indictment charges Mr. Schulman with multiple counts of conspiracy to commit mail, wire, and bank fraud; wire fraud; bank fraud; mail fraud; conspiracy to commit money laundering; and money laundering.

52.     Per the Indictment, if Mr. Schulman were convicted of these counts, the United States seeks forfeiture of "any property constituting, or derived from, proceeds obtained directly or indirectly" as a result of the offenses, expressly including, a "money judgment in an amount equal to the proceeds" obtained therefrom. Additionally, the United States seeks the "forfeiture of substitute property up to the value of the forfeiture property described" as a result of "any act or omission" of Plaintiff. *See* Ex. C.

## C.     THE PRIMARY CARRIERS' ACKNOWLEDGMENT OF DEFENSE COVERAGE AND AGREEMENT TO PAY

53.     In or around late January 2017, during the Policy Period, the Firm received notice of the Subpoena.

54.     On or about January 31, 2017, the Firm promptly and timely reported its receipt of the Subpoena to the Carriers during the Policy Period as a Claim against Mr. Schulman under the Policies.

13

55.     Mr. Schulman subsequently advised the Firm that he had retained the law firm of Akin Gump Strauss Hauer & Feld LLP ("Akin") to represent him in connection with the Subpoena and any related proceedings. Mr. Schulman informed the Firm that Paul Butler, Esq. of Akin would serve as lead counsel on the matter and communicated Mr. Butler's hourly rates.

56.     The Firm thereafter advised Mr. Schulman that the Primary Carriers agreed to reimburse Mr. Schulman for seventy percent of defense fees incurred by him and to pay reasonable expert fees, subject to prior approval and the retention, and that such agreement would extend until there was a guilty plea or conviction, neither of which has occurred.

57.     Between January 27, 2017 and May 20, 2017, during which time Mr. Schulman proceeded to memorialize Akin's retention and prepare a defense to the Subpoena, none of the Carriers communicated to Mr. Schulman to provide any reservation of rights or objection respecting his defense retention.

58.     Mr. Schulman, however, sought a direct line of communication with the Carriers to assist in managing his defense coverage. He accordingly wrote directly to the Carriers during the Policy Period on or about May 20, 2017 requesting defense payment, and notifying them specifically, that:

      a.  He had "been advised by the Firm that it has timely tendered a claim on my behalf" in connection with the Investigation and Subpoena, and that the Firm had further advised him of the Primary Carriers' agreement to reimburse 70% of his Akin defense fees "in connection with the investigation and any related proceedings.";

      b.  He understood from the Firm that the Carriers have reserved rights under Policies based specifically on the definition of "Loss" and specified Exclusions, "including criminal or dishonest conduct 'if evidenced by any judgement, final adjudication, alternative dispute resolution proceeding or written admission by an Insured.'"; and

      c.  He had not been provided copies of any written documentation or correspondence to date, and requested the Primary Carriers provide all such

14

copies of correspondence concerning the claim to him, along with contact information "to ensure timely payment of Akin Gump's fees and expenses."

59.    On or about June 22, 2017, the Primary Carriers responded to Mr. Schulman by letter, expressly confirming and acknowledging their prior and continued agreement to cover and pay seventy percent of Akin's fees incurred in Mr. Schulman's defense.

60.    The Primary Carriers' June 22, 2017 response did not attach or provide any prior correspondence relating to the Subpoena.  Instead, the response summarily stated that the Primary Carriers had previously taken the position that "no Claim for a Wrongful Act had been made within the meaning of the policy" and that "defense counsel was retained prior to consulting with [the Primary Carriers], as required"—but noted that "a compromise was reached with the insured firm on these issues," and confirmed that the Primary Carriers "have *agreed to cover* 70% of defense fees and 100% of costs incurred with respect to this matter under a reservation of rights."

61.    This June 22 letter further explicitly stated that the Primary Carriers "also agreed that this arrangement would apply to separate counsel to be retained for individual attorneys involved in this matter, including Akin Gump on your behalf."

62.    The Primary Carriers enclosed with this June 22 letter to Mr. Schulman a supplemental coverage position letter dated June 22, 2017, which nowhere mentions or reserves rights respecting either of the issues the Primary Carriers represented to Plaintiff had been resolved.

63.    Instead, the Primary Carriers' June 22 supplemental coverage position reserves rights respecting the definition of "Loss" and its purported right to recoup defense fees and costs in connection with two Exclusions under the Policies if such exclusions are later determined to be applicable to the matter, including the exclusion barring criminal or dishonest conduct only if determined by final adjudication or admission of an Insured.

15

64. Subsequent to Mr. Schulman's retention of Akin and during the pendency of the DOJ Claim, one of the approved Akin attorneys on Mr. Schulman's defense team, and a key member of the legal team with considerable relevant background and knowledge about the case, departed his employment at Akin for a new law firm. He continued his representation of Mr. Schulman at reduced billing rates. Akin informed the Carriers of this counsel's ongoing role in Mr. Schulman's defense.

## D. THE PRIMARY CARRIERS' BASELESS REPUDIATION AND CONTINUED FAILURE TO HONOR THE POLICIES AND THEIR DEFENSE COVERAGE OBLIGATION

65. The Primary Carriers initially upheld their partial coverage acknowledgment and agreement to cover Mr. Schulman's defense expenses on a current basis.

66. In fact, from 2017 through December 2020, Akin, on Mr. Schulman's behalf, promptly sent its invoices to the Primary Carriers' representatives and the Primary Carriers, as obligated under the Policies and their express subsequent agreement, paid for seventy percent of such defense fees and 100% of costs incurred through early 2020, in excess of $700,000.

67. In the meantime, the DOJ investigation continued, and current and former Akin attorneys continued preparing Mr. Schulman's defense. As always, Akin, on behalf of Mr. Schulman, sent his defense invoices to the Primary Carriers' representatives for reimbursement.

68. Beginning in December 2020, without explanation, however, the Primary Carriers stopped responding to Akin's written requests for defense payment, having failed to make complete payment for costs incurred through year end.

69. On or about December 2, 2020, the Department of Justice and U.S. Attorney for the District of Maryland returned the Indictment against Mr. Schulman. Mr. Schulman timely sent notice to the Carriers.

16

70.     In reliance on the Policies and the subsequent 2017 agreement, Mr. Schulman's same defense team of current and former Akin attorneys continue to generate fees and expenses in mounting a defense to the Indictment on Mr. Schulman's behalf—fees which the Primary Carriers have refused to pay or even acknowledge.

71.     In fact, despite Mr. Schulman having incurred in excess of $1.2 million in defense fees and expenses in connection with the DOJ Claim through December 2020, and many hundreds of thousands of dollars more in the first quarter of 2021, and the Primary Carriers' obligation and promises to pay, the Primary Carriers have paid *nothing* for costs incurred past early 2020. Their payment remains outstanding on submitted invoices totaling in excess of $180,000 in covered defense fees and expenses through December 2020, and an additional $408,000 in defense fees and expenses incurred in 2021.

72.     On or about March 12, 2021, after months of silence, the Primary Carriers wrote to Mr. Schulman's defense counsel, attempting to deny coverage.

73.     By the March 12 denial letter, the Primary Carriers acknowledge the Indictment and Subpoena as arising from the same circumstances or alleged Wrongful Act or Interrelated Wrongful Acts, and thus accept the Indictment as made under the Policies for the same 2016-2017 Policy Period as the Subpoena. They nonetheless purport to deny coverage in reliance on the baseless assertion that the Indictment does not constitute a "Claim" under the Primary Policy because none of the "Claim" definition subparts of the Primary Policy address criminal proceedings.

74.     The Primary Carriers' attempted denial is in knowing and direct contravention to the Primary Policy's express definition of "Claim," which provides that qualifying under "any" of

17

its subparts will be sufficient, including "a written demand against any **Insured** for monetary or non-monetary relief," which the Indictment clearly fits within.

75.    At no point during the pendency of the DOJ Claim did the Primary Carriers object to Mr. Schulman's choice of Akin as defense counsel or to the reasonableness or necessity of any legal fees incurred in connection therewith.

### COUNT I
### (Breach of Contract — Duty to Pay Claims Expense Against the Primary Carriers)

76.    Mr. Schulman repeats and re-alleges each and every one of foregoing factual allegations as if alleged in full in Count I, except as they may be inconsistent with the specific allegations contained in Count I.

77.    The Primary Policy constitutes a valid and enforceable contract in which Mr. Schulman has a lawful interest.

78.    The MOI constitutes a valid and enforceable contract in which Mr. Schulman has a lawful interest.

79.    Mr. Schulman is an Insured under the Primary Policy and MOI.

80.    Pursuant to the Primary Policy and MOI, the DOJ Claim, including the Subpoena and the Indictment, constitute a covered Claim for Wrongful Acts committed before the expiration of the Policy Period, and together as the DOJ Claim, constitute a single Claim arising from the same Wrongful Act or Interrelated Wrongful Acts.

81.    Pursuant to the Primary Policy and MOI, Mr. Schulman's defense fees and expenses incurred in the DOJ Claim constitute covered Claims Expense, and covered Loss.

82.    Mr. Schulman, through the Firm and directly, gave timely notice of the DOJ Claim under the Policies.

83.    Mr. Schulman made demand for coverage, in writing, including for payment on a current basis of his Claims Expense incurred for the DOJ Claim.

84.    Mr. Schulman has sustained, and is continuing to sustain, Loss covered under the Primary Policy and MOI in the form of covered Claims Expense.

85.    Mr. Schulman has fully complied with all terms, conditions and prerequisites to coverage set forth in the Policies, or has been excused from compliance with such terms, conditions, or prerequisites as a result of the Primary Carriers' breaches and/or other conduct.

86.    Under the Primary Policy and MOI, accordingly, the Primary Carriers are required to pay Mr. Schulman's Claims Expense on a current basis for the DOJ Claim, including for the Indictment.

87.    The Primary Carriers, did, in fact, for the period of 2017 through early 2020, partially honor their obligation under the Primary Policy and MOI to pay Claims Expense, and paid Mr. Schulman seventy percent of his defense fees and 100 percent of his expenses—an amount exceeding $700,000—as covered under the Primary Policy.

88.    Since making a partial payment in December 2020 on invoices incurred months earlier, however, the Primary Carriers have not honored their commitment to pay, and have refused to accept full responsibility under the Primary Policy and MOI for any payment toward the DOJ Claim, including the Indictment, in violation of their contractual obligations.

89.    Thus, the Primary Carriers have materially breached, and actively continue to materially breach, their obligations under the Primary Policy and MOI to pay Claims Expense on a current basis.

90. As a result of this material and continuing breach, Mr. Schulman has suffered damages and will continue to suffer damages in an amount greater than $75,000 to be determined in this action.

WHEREFORE, on this Count I, Mr. Schulman requests that the Court enter an order and judgment in his favor and against the Primary Carriers awarding Mr. Schulman (1) compensatory and consequential damages in an amount greater than $75,000 to be determined in this action, up to not less than $20 million, (2) in the alternative, permanent injunctive relief requiring the Primary Carriers to pay Akin's and associated defense fees and expenses incurred in relation to the DOJ Claim; (3) pre- and post-judgment interest on the amount of the judgment; and (4) any such other and further relief as in law and justice he is entitled to receive.

**COUNT II**
**(Breach of Contract – Advancement Agreement Against the Primary Carriers)**

91. Mr. Schulman repeats and re-alleges each and every one of foregoing factual allegations as if alleged in full in Count II, except as they may be inconsistent with the specific allegations contained in Count II.

92. Regardless of the Primary Carriers' obligation under the Primary Policies to pay Claims Expense, the Primary Carriers' agreement to pay a portion of Mr. Schulman's defense fees and expenses as incurred from the Akin firm in connection with the DOJ Claim (the "Advancement Agreement") constitutes a valid and enforceable contract in which Mr. Schulman has a lawful interest.

93. The amounts Mr. Schulman has incurred and paid or will incur with respect to the DOJ Claim constitute reimbursable defense fees and expenses the Primary Carriers agreed to pay under the Advancement Agreement.

94.     Mr. Schulman timely submitted and continues to timely submit his defense fees and expenses incurred from Akin in connection with the DOJ Claim to the Primary Carriers for reimbursement.

95.     Mr. Schulman has fully complied with all terms, conditions and prerequisites set forth in the Advancement Agreement, or has been excused from compliance with such terms, conditions, or prerequisites as a result of the Primary Carriers' breaches and/or other conduct.

96.     Thus, under the Advancement Agreement, the Primary Carriers are required to pay their agreed-to share of seventy percent of Mr. Schulman's defense fees and 100 percent of his defense expenses incurred from Akin in defense of the DOJ Claim.

97.     The Primary Carriers acknowledged, accepted and honored their obligations under the Advancement Agreement from 2017 through early 2020.

98.     Since partial payment in December 2020 on costs incurred months earlier, however, the Primary Carriers have not paid, and refuse to accept responsibility for payment, of any amounts under the Advancement Agreement relating to the Indictment in violation of their contractual obligations.

99.     Thus, the Primary Carriers have materially breached and continue to materially breach their obligation to pay their share of Mr. Schulman's as-incurred defense fees and expenses.

100.    As a result of this material breach, Mr. Schulman has suffered and will continue to suffer damages in an amount greater than $75,000 to be determined in this action.

WHEREFORE, on this Count II, Mr. Schulman requests that the Court enter an order and judgment in his favor and against the Primary Carriers awarding Mr. Schulman (1) compensatory and consequential damages in an amount greater than $75,000 to be determined in this action, (2) in the alternative, permanent injunctive relief requiring the Primary Carriers to pay Akin's and

associated defense fees and expenses incurred in relation to the DOJ Claim; (3) pre- and post-judgment interest on the amount of the judgment; and (4) any such other and further relief as in law and justice he is entitled to receive.

## COUNT III
### (Anticipatory Breach of Contract Against All Carriers)

101.  Mr. Schulman repeats and re-alleges each and every one of foregoing factual allegations as if alleged in full in Count III, except as they may be inconsistent with the specific allegations contained in Count III.

102.  The Policies are valid and enforceable contracts in which Mr. Schulman has a lawful interest.

103.  The Advancement Agreement is a valid and enforceable contract in which Mr. Schulman has a lawful interest.

104.  Mr. Schulman is an Insured under the Policies.

105.  Mr. Schulman, through the Firm and directly, gave timely notice of the DOJ Claim under the Policies.

106.  Pursuant to the Policies, the DOJ Claim, including the Subpoena and the Indictment, constitute a covered Claim for Wrongful Acts committed before the expiration of the Policy Period, and together as the DOJ Claim, constitute a single Claim arising from the same Wrongful Act or Interrelated Wrongful Acts.

107.  Mr. Schulman is entitled to full coverage under the Policies for all amounts he will incur in his continued defense or will pay in resolution of the DOJ Claim, excepting only in the event of a final adjudication or admission of culpability respecting criminal conduct, as covered Loss under the Policies.

22

108.    Mr. Schulman is also entitled under the Advancement Agreement to payment for the Primary Carriers' agreed portion of his as-incurred defense fees and expenses in connection with the DOJ Claim unless and until there is a guilty plea or conviction, neither of which has occurred.

109.    Mr. Schulman has fully complied with all terms, conditions and prerequisites set forth in the Policies and the Advancement Agreement, or has been excused from compliance with such terms, conditions, or prerequisites as a result of the Carriers' breaches and/or other conduct.

110.    Thus, under the Policies, the Carriers are required to cover any Loss incurred by Mr. Schulman with respect to the DOJ Claim, including Plaintiff's Claims Expense on a current basis and any Loss to be paid in resolution thereof, subject only to their respective attachment points and limits of liability.

111.    Under the Advancement Agreement, the Primary Carriers are required to pay their agreed-to share of seventy percent of Mr. Schulman's defense fees and 100 percent of his defense expenses incurred from Akin in defense of the DOJ Claim.

112.    The Primary Carriers have not paid the full amount of Mr. Schulman's covered Claims Expense for 2020, nor have Primary Carriers paid anything at all since December 2020 in connection with the Indictment. By their definite, positive and unconditional actions and inactions, they have refused to accept responsibility under the Policies and Advancement Agreement to pay amounts owed toward the DOJ Claim, and they have improperly repudiated those agreements.

113.    As the Excess Certification expressly adopts and incorporates all terms of the Primary Policy, Mr. Schulman has every reasonable basis to anticipate that ProSight will follow the Primary Carriers' refusal to accept responsibility under the Policies to pay covered amounts owed toward the DOJ Claim, and ProSight has failed to inform Mr. Schulman that it will not

adhere to the Primary Carriers' baseless legal position despite, on information and belief, being on notice of that position.

114. Thus, all Carriers have anticipatorily and materially breached their obligation to provide defense and indemnity coverage for the DOJ Claim by their definite, positive and unconditional actions and inactions, rendering all Carriers immediately liable for the full scope of anticipated defense fees and expenses for the duration of the pending criminal case against Mr. Schulman, an amount expected to exceed $18,000,000.

115. As a result of these anticipatory breaches, Mr. Schulman has suffered and will continue to suffer damages up to the full limits of liability owed under the Policies, in an amount greater than $75,000, to be determined in this action.

WHEREFORE, on this Count III, Mr. Schulman requests that the Court enter an order and judgment in his favor and against all Carriers awarding Mr. Schulman (1) compensatory and consequential damages in an amount greater than $75,000 to be determined in this action, (2) in the alternative, permanent injunctive relief requiring the Carriers to pay Akin's and associated defense fees and expenses incurred in relation to the DOJ Claim; (3) pre- and post-judgment interest on the amount of the judgment; and (4) any such other and further relief as in law and justice he is entitled to receive.

## COUNT IV
### (Declaratory Relief Against All Carriers)

116. Mr. Schulman repeats and re-alleges each and every one of foregoing factual allegations as if alleged in full in Count IV, except as they may be inconsistent with the specific allegations contained in Count IV.

117. The Policies are valid and enforceable contracts under which Mr. Schulman has a lawful interest.

24

118.    Mr. Schulman is an Insured under the Policies.

119.    Pursuant to the terms of the Policies, and subject only to the applicable $100,000 self-insured retention, Axis and Endurance must each pay up to $5,000,000 and ProSight must pay up to $10,000,000 for any Loss—including Claims Expense—incurred by or on behalf of Plaintiff resulting from Claims for Wrongful Acts committed before the expiration of the Policy Period that are first made against Plaintiff during the Policy Period.

120.    Mr. Schulman, through the Firm and directly, gave timely notice to the Carriers under the Policies of the Subpoena and Indictment, and the Primary Carriers accepted them together as made during the Policy Period.

121.    Pursuant to the terms of the Policies, Claim is defined to include, among other things, "a written demand against any Insured for monetary or non-monetary relief."

122.    Pursuant to the terms of Policies, the Subpoena and the Indictment each constitute a Claim for Wrongful Acts committed before the expiration of the Policy Period, and together as the DOJ Claim, constitute a single Claim arising from the same Wrongful Act or Interrelated Wrongful Acts.

123.    Pursuant to the terms of the Policies, the Carriers also must pay Claims Expense owed under the Policies, "upon written request" from an Insured and "on a current basis."

124.    Mr. Schulman's defense fees and expenses incurred from Akin current and former attorneys in defense of the DOJ Claim constitute Claim Expense under the Policies.

125.    Mr. Schulman made demand for coverage, in writing, including for payment on a current basis of his Claims Expense incurred in connection with the DOJ Claim.

126.    The Carriers' obligation to pay Mr. Schulman's Loss, including Claims Expense, is not exempted by any exclusion in the Policies.

127.   Mr. Schulman has fully complied with all terms, conditions and prerequisites to coverage set forth in the Policies, or has been excused from compliance with such terms, conditions, or prerequisites as a result of the Carriers' breaches and/or other conduct.

128.   The Primary Carriers expressly acknowledged their obligation to pay at least a portion of Mr. Schulman's Claims Expense under the Policies, agreeing to cover seventy percent of Akin's defense fees and 100 percent of expenses, and the Primary Carriers paid this majority portion of Mr. Schulman's Claims Expense incurred in connection with the DOJ Claim from 2017 through early 2020.

129.   The Primary Carriers now unreasonably dispute the nature and full extent of their defense and indemnity obligation under the Policies and have failed to fulfill their obligation to pay any of Mr. Schulman's Claims Expense incurred in the DOJ Claim since at least December 2020.

130.   The Excess Certification expressly adopts and incorporates all terms of the Primary Policy, and ProSight has failed to definitively act to inform Mr. Schulman that it will honor Mr. Schulman's entitlement to coverage in contravention of the Primary Carriers' baseless legal position once Mr. Schulman's losses reach ProSight's Excess Certificate's point of attachment. This is despite, on information and belief, ProSight being on notice of the Primary Carriers' erroneous position and of the likelihood that Mr. Schulman's defense expenses will erode ProSight's $10 million attachment point.

131.   The controversy between Mr. Schulman and all Carriers is thus ripe for judicial decision. Antagonistic claims are present between the parties concerning Mr. Schulman's rights and the Carriers' obligations under the Policies respecting defense and indemnity coverage associated with the DOJ Claim and particularly the Indictment, and inevitable litigation will ensue.

26

132.    The issuance of declaratory relief by this Court in favor of Mr. Schulman and against the Carriers in this single action will resolve this controversy and prevent redundant litigation and judicial inefficiency.

WHEREFORE, on this Count IV, Mr. Schulman requests that the Court enter an order and judgment in his favor and against the Carriers declaring that: (1) (a) the DOJ Claim, including the Indictment constitutes a Claim under the Policies; (b) Mr. Schulman's defense fees and expenses incurred from current and former Akin attorneys in connection with the DOJ Claim constitute Claims Expense under the Policies; (c) the Indictment alleges monetary and non-monetary relief that constitutes Loss under the Policies; (d) the Policies obligate the Carriers to pay Mr. Schulman's Claims Expense incurred in connection with the DOJ Claim on a current basis, including for the Indictment, subject only to their respective attachment points and limits of liability; and (e) the Carriers are obligated to provide indemnity coverage for any Loss incurred by Mr. Schulman in resolution of the DOJ Claim absent a final adjudication or admission of criminal culpability, subject to the attachment points and limits of liability of the Policies; (2) pre- and post-judgment interest; and (4) any such other and further relief as in law and justice he is entitled to receive.

**COUNT V**
**(Detrimental Reliance Against the Primary Carriers)**

133.    Mr. Schulman repeats and re-alleges each and every one of foregoing factual allegations as if alleged in full in Count V, except as they may be inconsistent with the specific allegations contained in Count V.

134.    Mr. Schulman expressly sought coverage from the Primary Carriers under the Primary Policy and MOI for the DOJ Claim, including coverage for his defense costs and expenses incurred therein.

135.    The Primary Carriers consented to Mr. Schulman's retention of Akin in connection with his defense to the Subpoena and any related proceedings.

136.    The Primary Carriers represented and promised to Mr. Schulman through a clear and definite writing that they would both cover and pay seventy percent of his as-incurred Akin defense expenses and 100 percent of his as-incurred Akin defense expenses in connection with the DOJ Claim.

137.    The Primary Carriers, in fact, actualized this clear and definite promise to cover and pay Mr. Schulman's defense costs from 2017 through early 2020, by honoring their representations regarding advancement of as-incurred defense costs to Plaintiff and reimbursing in excess of $700,000 in fees and expenses toward Plaintiff's defense of the DOJ Claim.

138.    As a result of, and in reliance on, the Primary Carriers representations regarding coverage and advancement, Mr. Schulman reasonably and actually incurred and continues to incur significant legal expenses billed by current and former Akin attorneys in connection with the DOJ Claim.

139.    Had Mr. Schulman understood that the Primary Carriers would abruptly stop paying his defense costs after three years of paying amounts they agreed and acknowledged were owed under the Policies and the Advancement Agreement—he would have had the opportunity to, among other things, reconsider his defense strategy, budget and retention.

140.    Instead, Mr. Schulman detrimentally relied on the Primary Carriers' acknowledgement of coverage and promise to pay, and has been left to foot the bill for outstanding defense fees in excess of $1 million while he continues to incur significant legal fees generated from the same tenured defense team that has not been fully compensated due to the Primary Carriers' repudiation of their agreement to pay.

141.    An injustice can only be avoided by the enforcement of the Primary Carriers' promise to cover and/or pay their agreed portion of Mr. Schulman's defense fees and expenses.

WHEREFORE, on this Count V, Mr. Schulman requests that the Court enter an order and judgment in his favor and against the Primary Carriers (1) prohibiting the Primary Carriers from refusing to honor their agreement to pay and awarding Mr. Schulman compensatory damages as a result of his detrimental reliance on the promises and representations of the Primary Carriers, in an amount greater than $75,000 to be determined in this action; (2) in the alternative, permanent injunctive relief requiring the Primary Carriers to pay Akin's defense fees and expenses incurred in relation to the DOJ Claim; as well as (3) pre-judgment and post-judgment interest, costs, attorney's fees, and any such other and further relief as in law and justice he is entitled to receive.

**COUNT VI**
**(Lack of Good Faith Against the Primary Carriers)**

142.    Mr. Schulman repeats and re-alleges each and every one of foregoing factual allegations as if alleged in full in Count VI, except as they may be inconsistent with the specific allegations contained in Count VI.

143.    Maryland statutory, regulatory and common law, including but not limited to Section 3-1701 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, requires the Primary Carriers to act in good faith toward its insureds in connection with the adjustment, handling and settlement of insurance claims.

144.    The Primary Carriers have failed to honor their obligations to Mr. Schulman as an Insured for the DOJ Claim made under the Primary Policy and MOI.

145.    Mr. Schulman, through the Firm and directly, gave timely notice of the DOJ Claim under the Policies.

29

146.    The Primary Carriers acknowledged that there was defense coverage for the DOJ Claim and promised to Mr. Schulman they would pay a majority portion of his as-incurred defense fees and expenses incurred in connection therewith. But after years of making payment, the Primary Carriers arbitrarily and capriciously backed out of these commitments.

147.    Since at least December 2020, the Primary Carriers have refused to acknowledge Mr. Schulman's continued demand for defense coverage and reimbursement of his defense costs on a current basis, having failed to make any payments past a delinquent December 2020 payment on costs incurred months earlier in 2020.

148.    Lacking good faith and operating with actual malice, the Primary Carriers have further unreasonably and unjustifiably refused to acknowledge material policy provisions known to them that establish the Indictment constitutes a Claim under the Policies.

149.    Rather, after promising to pay—and paying— Mr. Schulman's defense costs in connection with a grand jury subpoena issued in connection with a criminal investigation, in a complete lack of good faith, the Primary Carriers now knowingly and falsely assert, months after they ceased making payments to Mr. Schulman as agreed, that the Policy's definition of "Claim" does not encompass criminal proceedings.

150.    The Primary Carriers' actions are capricious and have demonstrated a deliberate indifference to Mr. Schulman's rights under the Policies and to the Primary Carriers' conspicuous obligations to Mr. Schulman under the Primary Policy, including their obligation to pay on a current basis Claims Expense requested by any Insured for Claims for Wrongful Acts committed prior to the expiration of the Policy Period. The Primary Carriers' conduct demonstrates an utter lack of good faith with respect to Mr. Schulman's claims for coverage.

151.    The Primary Carriers' actions further demonstrate a deliberate indifference to Mr. Schulman's rights under the Advancement Agreement and to the Primary Carriers' obligations to Mr. Schulman under same, including their promise to pay seventy percent of Mr. Schulman's Akin defense fees and 100 percent of Mr. Schulman's Akin defense expenses on a current basis for the DOJ Claim. The Primary Carriers' conduct demonstrates an utter lack of good faith with respect to the promise made to Mr. Schulman.

152.    Mr. Schulman has suffered, and continues to suffer, severe prejudice as a result of the Primary Carriers' bad faith actions in relation to his defense of the Indictment.

WHEREFORE, on this Count VI, Mr. Schulman requests that the Court enter an order and judgement in his favor and against the Primary Carriers finding that the Primary Carriers have acted without good faith in violation of Section 3-1701 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland and/or Maryland common law, and awarding Mr. Schulman (1) compensatory damages in an amount greater than $75,000 to be determined in this action as well as his attorney's fees and costs incurred by him to prosecute this claim against the Primary Carriers; (2) punitive damages in an amount to be determined in this action; (3) an award of pre-judgment and post-judgment legal interest on the amount of the judgment; and (4) any such other and further relief as in law and justice he is entitled to receive.

Date: April 6, 2021

Respectfully Submitted,

Jeff M. Schwaber/tSs

Jeffrey M. Schwaber
STEIN SPERLING BENNETT DE JONG
DRISCOLL PC
1101 Wootton Parkway
Suite 700
Rockville, MD 20852
(Tel): 301-340-2020

jschwaber@steinsperling.com

*Attorneys for Plaintiff Jeremy Wyeth
Schulman*

Of counsel:

Robin L. Cohen, Esq.
(*pro hac vice* application to be filed)
Jillian M. Raines, Esq.
(*pro hac vice* application to be filed)
COHEN ZIFFER FRENCHMAN &
McKENNA LLP
1350 Avenue of the Americas
25th Floor
New York, NY 10019

32

## DEMAND FOR JURY TRIAL

Plaintiff Jeremy W. Schulman, by his undersigned counsel, respectfully demand a jury trial for all triable issues of right by a jury.

Respectfully Submitted,

Jeffrey M. Schwaber
STEIN SPERLING BENNETT DE JONG
DRISCOLL PC
1101 Wootton Parkway
Suite 700
Rockville, MD 20852
(Tel): 301-340-2020

jschwaber@steinsperling.com

*Attorneys for Plaintiff Jeremy Wyeth Schulman*

Of counsel:

Robin L. Cohen, Esq.
(*pro hac vice* application to be filed)
Jillian M. Raines, Esq.
(*pro hac vice* application to be filed)
COHEN ZIFFER FRENCHMAN &
McKENNA LLP
1350 Avenue of the Americas
25th Floor
New York, NY 10019

33