

DIS/JFL: USAO 2020R00764

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.  PX 20CR434** |
| | * | |
| **JEREMY WYETH SCHULMAN,** | * | **(Conspiracy to Commit Mail, Wire** |
| | * | **and Bank Fraud, 18 U.S.C. § 1349;** |
| **Defendant** | * | **Mail Fraud, 18 U.S.C. 1341; Wire** |
| | * | **Fraud, 18 U.S.C. § 1343; Bank** |
| | * | **Fraud, 18 U.S.C. § 1344; Conspiracy** |
| | * | **to Commit Money Laundering, 18** |
| | * | **U.S.C. § 1956(h); Money** |
| | * | **Laundering, 18 U.S.C. § 1957;** |
| | * | **Aiding and Abetting, 18 U.S.C. § 2;** |
| | * | **Forfeiture, 18 U.S.C. §§ 981(a)(1)(C)** |
| | * | **and 982(a)(1), 21 U.S.C. § 853(p), and** |
| | * | **28 U.S.C. § 2461(c))** |
| | * | |

*******

## INDICTMENT

## COUNT ONE
**(Conspiracy to Commit Mail, Wire and Bank Fraud)**

The Grand Jury for the District of Maryland charges that:

### Introduction

At all times material to this Indictment, unless otherwise indicated:

1.      Defendant **JEREMY WYETH SCHULMAN** ("**SCHULMAN**") was a citizen of

the United States who resided in Bethesda, Maryland, and was licensed to practice law in the State

of Maryland.

2.      Law Firm A was a law firm based in Maryland, in which **SCHULMAN** was a

shareholder.

1

3.      **Abdiaziz Hassan Amalo** ("**Amalo**") was a citizen of the United States who resided in Maryland.

4.      **Co-Conspirator 1**, a person whose identity is known to the Grand Jury, was a dual Somali and Canadian citizen who resided outside the United States and maintained relationships with government officials in Somalia.   **Co-Conspirator 1** controlled two companies, Trading Company 1 and Trading Company 2, which maintained bank accounts in South Africa and the United Arab Emirates, respectively.

5.      The Republic of Somalia was the central government in Somalia until it collapsed in or around 1991 after the commencement of civil war.

6.      The Transitional Federal Government of Somalia ("Transitional Government of Somalia" or "TFG") was an interim government established in Somalia in approximately 2004, as Somalia's civil war ended, until in or about 2012.

7.      The Federal Government of Somalia ("Permanent Government of Somalia") was the permanent government of Somalia established in or about 2012.

8.      The Central Bank of Somalia was Somalia's monetary authority and was responsible for overseeing the country's financial system, including its currency, and maintaining assets belonging to the government of Somalia.    The title of the official who led the Central Bank of Somalia was "Governor."

9.      Former Governor 1 resided in the United States and was a relative of **Amalo**. Former Governor 1 was the Governor of the Central Bank of Somalia at the time the civil war began in Somalia in 1991.   He left Somalia in approximately 1991 and never returned to live there.

2

10.     Former Governor 2 was the Governor of the Central Bank of Somalia from at least in or about 2009 until in or about 2010.    Former Governor 2 became the Governor of the Central Bank of Somalia again in or about 2014.

11.     Former Governor 3 was appointed Governor of the Central Bank of Somalia in or about February 2013.    In or about September 2013, Former Governor 3 resigned.

12.     Former Governor 4 succeeded Former Governor 3 as the Central Bank of Somalia Governor in or about September 2013.    Former Governor 4 resigned on or about October 30, 2013.

13.     Individual 1 resided in Maryland and was a relative of **Amalo** and Former Governor 1.   Individual 1 also was a professional Somali translator.

14.     Currency Printer A was a company based in the United Kingdom that, among other things, printed official currencies for central banks and currency issuing authorities around the world.    Currency Printer A had printed currency for the Central Bank of Somalia before the Somali civil war.

15.     Bank Holding Company A was a holding company based in New York City that owned banks and financial service companies around the world, including Bank A-1 and Bank A-2.

16.     Bank A-1 was a bank based in the United States that was owned, through other subsidiaries, by Bank Holding Company A.    Deposits at Bank A-1 were insured by the Federal Deposit Insurance Corporation.    Bank A-1 was an "insured bank" as that term is defined in Title 12, United States Code, Section 1813(h), and a "financial institution" as that term is defined in

3

Title 18, United States Code, Section 20, and used in Title 18, United States Code, Sections 1344 and 3293.

17.   Bank A-2 was a bank based in Switzerland that was owned, through other subsidiaries, by Bank Holding Company A.

18.   Bank B was a bank based in Italy.

19.   The Office of the New York State Comptroller (the "NY Comptroller") was an agency of the State of New York.   The Central Bank of Somalia maintained accounts at various financial institutions in New York that were placed under the NY Comptroller's control, pursuant to New York's Abandoned Property Law, after the Republic of Somalia collapsed in the early 1990s and the accounts had become dormant.

20.   The Federal Reserve Bank of New York ("FRB NY") was one of 12 regional Federal Reserve banks that operated under the oversight of the Board of Governors in Washington, D.C., which was an independent governmental entity created by the United States Congress to serve as the central bank of the United States.   FRB NY, among other things, held assets for foreign central banks, including gold and currency held for the Central Bank of Somalia.

### The Scheme to Defraud

21.   Between in or about July 2009 and in or about July 2014, **SCHULMAN**, **Amalo** and others attempted to and did fraudulently obtain control over money and gold that was the property of the Central Bank of Somalia.   These Somali sovereign assets, worth hundreds of millions of dollars, were held in accounts that had been frozen since approximately 1991 due to civil war and political instability in Somalia.   Beginning in July 2009, **SCHULMAN**, **Amalo** and others engaged in a scheme to defraud, which scheme and artifice would affect at least one

financial institution, namely Bank A-1, in which they attempted to unfreeze the accounts and take control of the accounts based on fraudulent, material misrepresentations about their authority to act on behalf of the Somali government.

22.     To carry out the scheme to defraud, **SCHULMAN** and **Amalo** created a series of forgeries and other false documents.   **SCHULMAN** presented these and other documents to at least one financial institution, namely Bank A-1, and other banks and entities in the United States and elsewhere, and **SCHULMAN** falsely claimed that these and other documents authorized him to obtain control of the Somali assets.   As part of this scheme, **SCHULMAN** obtained control of over $12.5 million of Somali sovereign assets between July 2010 and July 2014.

23.     **SCHULMAN**, **Amalo** and others agreed to enrich themselves from the scheme to defraud by taking a portion of these fraudulently obtained assets in fees and commissions before sending the remainder to the Somali government.   Specifically, **SCHULMAN** caused Law Firm A—which **SCHULMAN** had also deceived through false and fraudulent documents—to retain approximately $3.3 million of the Somali funds for fees and expenses.   **SCHULMAN** personally received hundreds of thousands of dollars of additional compensation from Law Firm A based on that revenue.   **SCHULMAN** also caused Law Firm A to transfer more than $690,000 of the Somali sovereign assets to a company controlled by **Amalo**, a portion of which **Amalo** kept for his own benefit, and a portion of which **Amalo** wired overseas to enrich **Co-Conspirator 1**.

**The Conspiracy**

24.    Beginning at least as early as in or about July 2009, and continuing through at least in or about July 2014, in the District of Maryland and elsewhere, the defendant,

**JEREMY WYETH SCHULMAN,**

together with other persons known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree to commit the following offenses:

a.    to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and material omissions, which scheme and artifice would affect at least one financial institution, and for the purpose of executing and attempting to execute the scheme to defraud, to place in any post office or authorized depository for mail any matter or thing whatever to be sent or delivered by the Postal Service, and to deposit and cause to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, and to take or receive therefrom, any such matter or thing, and to knowingly cause to be delivered by mail or such carrier according to the direction thereon, in violation of Title 18, United States Code, Section 1341;

b.    to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and material omissions, which scheme and artifice would affect at least one financial institution, and for the purpose of executing and attempting to execute the scheme to defraud, to knowingly transmit and cause to be transmitted by means of

6

wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343; and

c.     to knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud a financial institution as that term is defined by Title 18, United States Code, Section 20, and to obtain any of the moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, said financial institution, by means of materially false and fraudulent pretenses, representations, promises and material omissions, in violation of Title 18, United States Code, Section 1344.

### Manner and Means of the Conspiracy and Scheme to Defraud

25.     The manner and means by which the defendant **SCHULMAN** and others, including **Amalo** and **Co-Conspirator 1**, sought to accomplish the objects of the conspiracy included, among other things, the following:

a.     **SCHULMAN** and **Amalo** Agree to the Scheme

26.     In or about 1991, as Somalia descended into civil war, Former Governor 1, who was then the Governor of the Central Bank, contacted various financial institutions and other entities around the world that were holding financial assets and currency belonging to the Republic of Somalia.   Before fleeing Somalia, Former Governor 1 instructed these entities to "freeze" the assets of Somalia, that is, to prevent any withdrawals or other transactions until a stable Somali government returned to power.

27.     In or about June 2009, **Amalo** contacted **SCHULMAN** and explained that, based on his relationship to Former Governor 1, he could identify the Somali assets that had been frozen since the outset of the civil war ("the Frozen Somali Assets").   **Amalo** and **SCHULMAN**

7

subsequently collaborated to take control of the Frozen Somali Assets and profit by taking a percentage of the assets for themselves.

28.     In or about July 2009, **SCHULMAN**, **Amalo**, Former Governor 1 and another individual met at Law Firm A, where **SCHULMAN** learned that Former Governor 1 was no longer the Governor of the Central Bank of Somalia and did not hold any position in the Transitional Government of Somalia.

29.     **SCHULMAN** and **Amalo** agreed to take control of the Frozen Somali Assets. They did so by making false representations about their authority to the institutions that held the Frozen Somali Assets (the "Target Institutions").   In furtherance of the scheme, **SCHULMAN** and **Amalo** agreed that **SCHULMAN** would hold himself out as representing the Transitional Government of Somalia (or an agency or division thereof) and that Law Firm A would be paid a percentage of the Frozen Somali Assets that it recovered before returning the balance of the funds to the Somali government.   **Amalo** would be paid a commission and **SCHULMAN** stood to benefit through additional compensation he would receive from Law Firm A.   **SCHULMAN** drafted a memorandum to a potential collaborator that stated that the recoverable assets could be worth more than $300 million.

    b.     <u>**SCHULMAN** and **Amalo** Use Forged and Fraudulent Documents to Attempt to Obtain Control of the Frozen Somali Assets</u>

30.     In or about July 2009, **Amalo**, with **SCHULMAN'S** assistance, created a forged document purporting to show that the Prime Minister of the Transitional Government of Somalia had "re-affirmed" that Former Governor 1 was the Governor of the Central Bank of Somalia (the "2009 Forged TFG PM Letter").   **SCHULMAN**, knowing that Former Governor 1 was not the Governor of the Central Bank of Somalia, sent the 2009 Forged TFG PM Letter to Currency Printer

A, Bank A-2 and other entities.   SCHULMAN falsely represented to these entities that the 2009 Forged TFG PM Letter gave him authority, as the attorney for Former Governor 1, to take control of the Frozen Somali Assets on behalf of the Central Bank of Somalia.   Contrary to what was stated in the 2009 Forged TFG PM Letter, however, the Transitional Government of Somalia in fact had never recognized Former Governor 1 as the Central Bank Governor.

31.   In or about December 2009, the Transitional Government of Somalia issued Presidential Decree No. 214, a Somali-language document that provided that Former Governor 1 had been appointed as an "advisor" to the Transitional Government of Somalia President. SCHULMAN wrote an English-language document titled "Authority of Commissioner of Economic Recovery & Banking Affairs" that stated that Presidential Decree No. 214 established that Former Governor 1 was appointed not merely as an advisor but as the "Commissioner of Economic Recovery & Banking Affairs," with "full authority to direct and control the assets of the Central Bank of Somalia."   On or about December 15, 2009, SCHULMAN emailed this document to Amalo and wrote, "Ideally, the President would sign and seal this document." SCHULMAN and Amalo, however, never obtained any signed or sealed document from the President providing Former Governor 1 with the title or powers set forth in the "Authority of Commissioner of Economic Recovery & Banking Affairs" document drafted by SCHULMAN.

32.   SCHULMAN and Amalo thereafter caused Individual 1, a professional Somali translator and relative of Amalo, to create a false English-language translation of Presidential Decree No. 214 (the "2009 Fraudulent Decree Translation").   The 2009 Fraudulent Decree Translation fraudulently inflated the authority assigned to Former Governor 1 using the false title of "Director" rather than the "Commissioner" title SCHULMAN had previously sought for

9

Former Governor 1.   In particular, **SCHULMAN** caused to be inserted a clause into the 2009 Fraudulent Decree Translation that falsely described Former Governor 1 as a "Director with the responsibility and authority to recover the national assets of the country."

33.     **SCHULMAN** and **Amalo** used the 2009 Fraudulent Decree Translation in furtherance of the scheme.   Beginning in or about February 2010, **SCHULMAN** attempted to gain control of the Frozen Somali Assets by sending the 2009 Fraudulent Decree Translation via private and commercial mail carriers and interstate and foreign wires to various Target Institutions, including Bank A-1, Bank A-2, the NY Comptroller and Bank B.   For example, on or about March 19, 2010, **SCHULMAN** sent a letter via Federal Express to Bank A-1, attaching the 2009 Fraudulent Decree Translation.

34.     In reliance on the documents provided by **SCHULMAN**, in or about July 2010, Bank A-2 released to an Interest on Lawyer Trust Account of Law Firm A the full balance of the Central Bank of Somalia account, in the amount of approximately $36,000.   Shortly thereafter, **SCHULMAN** caused Law Firm A to transfer approximately $18,000 to a bank account in the name of "Central B of Somal, Inc.," which was a Nevada corporation controlled by **Amalo**. Neither **SCHULMAN** nor **Amalo** remitted any of these funds to Somalia.

35.     **SCHULMAN** continued to assert authority over the Frozen Somali Assets based on the 2009 Fraudulent Decree Translation despite its legitimacy being questioned by Currency Printer A and the Central Bank of Somalia.

36.     For example, on or about May 24, 2010, a senior attorney of Currency Printer A emailed **SCHULMAN** and informed **SCHULMAN** that the senior attorney had contacted a senior Central Bank of Somalia official who was unaware of the appointment of **SCHULMAN**'s firm,

denied that Law Firm A was entitled to act on behalf of the Central Bank of Somalia, and confirmed that Former Governor 1 had not been Governor since the early 1990s.   The senior attorney of Currency Printer A also attached to this email two letters on Somali government letterhead, showing Former Governor 2's position as Governor and showing Former Governor 1's removal from his advisor position.   On or about that same day, **SCHULMAN** forwarded those letters to **Amalo**, writing "[W]e need to discuss ASAP."

37.   Further, on or about June 7, 2010, **SCHULMAN** received a letter from the Central Bank of Somalia titled, "Warning Against Fabricated Information" (the "2010 Warning Letter"), stating, among other things, that Former Governor 1 had never been appointed as "Director of Financial Asset Recovery and Banking Affairs," that the 2009 Fraudulent Decree Translation included deceptive or incorrect information, and that it would not be difficult for Law Firm A to obtain a correct translation of Presidential Decree No. 214.

38.   **SCHULMAN** nevertheless continued to use the 2009 Fraudulent Decree Translation after he received the 2010 Warning Letter.   In or about July 2010, **SCHULMAN** attempted to assert authority over funds held at a Target Institution in Europe based on the 2009 Fraudulent Decree Translation.   **SCHULMAN** also caused the 2009 Fraudulent Decree Translation to be sent to the NY Comptroller on or about January 24, 2013, accompanied by **SCHULMAN's** sworn declaration, in which he "affirm[ed] under the penalties of perjury" that the contents were "true to the best of [his] knowledge, information and belief."   In the declaration, **SCHULMAN** falsely stated that [Former Governor 1] was "Somalia's Director of Financial Asset Recovery and Banking Affairs," and "[p]ursuant to Presidential Decree No. 214, [Former

Governor 1] is tasked with the 'responsibility and authority to recover the national assets' of Somalia…."

39.     **SCHULMAN** also used the 2009 Fraudulent Decree Translation to obtain support from Law Firm A to execute an engagement letter between Law Firm A and Former Governor 1 in or about February 2010 (the "February 2010 Engagement Letter").   In the February 2010 Engagement Letter, **SCHULMAN** falsely identified Former Governor 1 as the "Director of Financial Asset Recovery and Banking Affairs" and referenced and attached the 2009 Fraudulent Decree Translation.   Furthermore, in or about March 2010, **SCHULMAN** caused Law Firm A to register with the United States Department of Justice as an agent of the Transitional Government of Somalia under the Foreign Agent Registration Act, Title 22, United States Code, Section 611 *et seq.* ("FARA").   **SCHULMAN** caused Law Firm A to again falsely identify Former Governor 1 as the "Director of Financial Asset Recovery and Banking Affairs" and to attach the 2009 Fraudulent Decree Translation to its FARA submission.   In doing so, **SCHULMAN** concealed from a senior member of Law Firm A's management and others at Law Firm A that **SCHULMAN** and **Amalo** created the 2009 Fraudulent Decree Translation, and that **SCHULMAN** knew that Former Governor 1 had merely been appointed as an advisor to the Transitional Government of Somalia.

40.     In or about August 2010, **SCHULMAN** and **Amalo** also created additional forged documents in an attempt to defraud Bank B, which held more than $1.5 million in Frozen Somali Assets.   From on or about August 9, 2010 to on or about August 11, 2010, **Amalo** emailed to **SCHULMAN** three versions of a draft forged letter purporting to be from the Attorney General of the Somali Republic ("AG"), all of which contained signs that they were forgeries and all of

which **SCHULMAN** rejected as unsatisfactory.   On or about August 12, 2010, **SCHULMAN** accepted the fourth draft of the forged letter, congratulated **Amalo** on his "great work," and emailed it to Bank B on or about August 13, 2010 ("the August 2010 Forged AG Letter").   **Amalo** wrote to **SCHULMAN**, "I'm Glad We Got this time right.   Make the Magic happen on these banks now LOL!!"

41.     On or about September 7, 2010, Bank B notified **SCHULMAN** that the August 2010 Forged AG Letter was insufficient.   **SCHULMAN** thereafter obtained another forgery from **Amalo**, which **SCHULMAN** emailed to Bank B on or about September 16, 2010 ("the September 2010 Forged AG Letter").

42.     In 2011 and 2012, **SCHULMAN** and **Amalo** continued in their efforts to obtain control over the Frozen Somali Assets.   Among other things, **SCHULMAN** caused Law Firm A to file supplemental semi-annual FARA registration statements throughout 2011 and 2012, all of which falsely identified Former Governor 1 as the "Director of Financial Asset Recovery and Banking Affairs."

43.     In or about March 2013, **Amalo**, with **SCHULMAN's** assistance, created a forged appointment letter purporting to be from the Prime Minister of the Permanent Government of Somalia ("PM") falsely showing that the PM had appointed Individual 2, an acquaintance of **Amalo**'s who at times held governmental positions in Somalia, as the new "Director of Financial Asset Recovery and Banking Affairs" (the "2013 Forged PM Letter").   **Amalo** also created a related forged power of attorney letter purporting to show that Individual 2, in his capacity as the fictitious Director of Financial Asset Recovery and Banking Affairs, retained Law Firm A as his legal representative (the "2013 Forged POA").

44.     In or about April 2013, **SCHULMAN**, knowing that the 2013 Forged PM Letter and the 2013 Forged POA were forgeries, attempted to defraud Bank A-1 and the NY Comptroller by sending them those documents and requesting access to Frozen Somali Assets under their control.

        c.     Introduction of **Co-Conspirator 1**

45.     In addition, by in or about April 2013, **SCHULMAN** and **Amalo** had been introduced to **Co-Conspirator 1**, who had close connections to the new Permanent Government of Somalia.   **SCHULMAN**, **Amalo** and **Co-Conspirator 1** agreed that **Co-Conspirator 1** would use his political connections to assist **SCHULMAN** and **Amalo** in obtaining control over the Frozen Somali Assets, and that **Co-Conspirator 1** would be paid a commission.

        d.     **SCHULMAN** Executes a Contract with Former Governor 3 on Behalf of Law Firm A

46.     In or about July 2013, **SCHULMAN** caused Law Firm A to execute a contract with Former Governor 3, which provided that Law Firm A would assist the Central Bank of Somalia in recovering the Frozen Somali Assets (the "July 2013 Contract").   The July 2013 Contract and a related power of attorney agreement were signed by **SCHULMAN** and Former Governor 3.   The July 2013 Contract provided that Law Firm A would receive: (1) a fixed fee of $25,000 per month; (2) a sliding scale bonus of 2% - 5% of all assets recovered; and (3) reimbursement for all costs and expenses.   The July 2013 Contract also provided that Law Firm A would set aside 6% of all assets recovered for "mutually agreed costs and expenses reasonably incurred by or on behalf of the Central Bank in furtherance of the efforts to recover frozen funds" (the "6% Set-Aside").

47.     At around the time that **SCHULMAN** executed the July 2013 Contract, press reports described significant corruption allegations against Former Governor 3.   On or about July

2, 2013, **SCHULMAN**, through **Amalo**, sent a memorandum to the President of Somalia, in which **SCHULMAN** recommended that, in light of the aforementioned press reports, "it may be advisable for another senior official of the Government . . . to counter-sign our agreement rather than for [Former Governor 3] to do so." **SCHULMAN** added that Former Governor 3's "association with the asset recovery project could bring with it unwanted controversy." **SCHULMAN** attached a "proposed revised version of the engagement agreement" to be signed by another senior Permanent Government of Somalia official.

48.     Former Governor 3 resigned as Governor of the Central Bank of Somalia in or about September 2013 and was replaced by Former Governor 4. **SCHULMAN**, **Amalo** and **Co-Conspirator 1** pressured Former Governor 4 to ratify the July 2013 Contract or execute a new contract with Law Firm A. Former Governor 4, however, did not ratify the July 2013 Contract, and **SCHULMAN** did not obtain a version of the July 2013 Contract signed by any official other than Former Governor 3.

> e.     **SCHULMAN** Obtains Somali Funds Based on Fraudulent Documents and a 25B Certification that Does Not Give Him Authority to Obtain Those Funds

49.     In or about June 2013, Bank A-1 and the NY Comptroller each requested that **SCHULMAN** furnish a certification pursuant to Section 25B of the Federal Reserve Act, which is a document issued by the United States Department of State ("the State Department") that identifies specific persons who are authorized to control assets held by foreign governments or foreign central banks in any U.S. Federal Reserve bank or any federally-insured bank. The transfer of such property by the Federal Reserve Bank or federally-insured bank to the State Department's recognized representative of a foreign country is then presumed to be lawful under

15

Title 12, United States Code, Section 632. Although the NY Comptroller is not a federally-insured bank, it nevertheless conditioned its release of Frozen Somali Assets, at least in part, on a legitimate 25B certification.

50. On or about September 16, 2013, the State Department issued a 25B certification establishing that the President of Somalia was "the sole representative of Somalia with full authority to receive, control, and dispose of" the property "received by any Federal Reserve Bank or any insured bank, from or for the account of the Central Bank of Somalia" (the "25B Certification").

51. On or about September 19, 2013, **SCHULMAN** provided a copy of the 25B Certification to the NY Comptroller, and wrote: "I am happy to report that we have just obtained the 25B Certification from the State Department. It is attached. I am also reattaching [the President's] letter affirming my delegated authority over all Somali assets located in the United States." In response, the NY Comptroller requested that **SCHULMAN** provide a version of the 25B Certification with a seal from the State Department.

52. Also on or about September 19, 2013, **SCHULMAN** emailed FRB NY: "Attached are the signed 25B certification and a copy of the recent letter from [the President] which speaks to my authority. I look forward to working with you in the coming days to manage Somalia's reclamation of its accounts."

53. That same day, **SCHULMAN** also emailed the 25B Certification to Bank A-1, writing that he purportedly had "delegated authority over all Somali assets located in the United States." Relying on the 2013 Forged PM Letter, the 2013 Forged POA, and the 25B Certification,

Bank A-1 transmitted approximately $7.4 million of Frozen Somali Assets to Law Firm A's trust account between on or about September 25, 2013, and on or about October 7, 2013.

54.     By no later than on or about October 9, 2013, State Department and FRB NY lawyers advised **SCHULMAN** that the 25B Certification did not permit the Permanent Government of Somalia President to delegate his authority to any third person, including **SCHULMAN**.   On or about October 9, 2013 at 3:24 p.m., a State Department lawyer wrote to **SCHULMAN**, "Based on the [25B Certification], any communications regarding Somalia's Central Bank funds held at [FRB NY] will need to come directly from the President of Somalia." **SCHULMAN** responded to the State Department lawyer with questions on or about 3:59 p.m. that same day.

55.     Nevertheless, at approximately 4:00 p.m. on October 9, 2013, **SCHULMAN** emailed a version of the 25B Certification with the State Department seal to the NY Comptroller. **SCHULMAN** did so without disclosing that he had just been told by the State Department that—contrary to his previous representations to the NY Comptroller—he did not have authority under the 25B Certification to take control of Frozen Somali Assets.

56.     Later that same day, a FRB NY lawyer rejected **SCHULMAN's** request for control over the Frozen Somali Assets at FRB NY.   **SCHULMAN** then sent an email to the State Department lawyer at approximately 6:50 p.m. that evening stating that FRB NY had "explained the issue fully" regarding the lack of delegation authority under the 25B Certification.   On or about October 10, 2013, **SCHULMAN** also acknowledged in an email to a Permanent Government of Somalia official that only the Permanent Government of Somalia President was authorized to control the Frozen Somali Assets under the 25B Certification and that the FRB NY

had made it clear to **SCHULMAN** that it would only take instructions regarding the disposition of Somali assets directly from the President through diplomatic channels.

57.     Despite **SCHULMAN's** acknowledgements to the State Department and the Permanent Government of Somalia official regarding his lack of delegation authority, on or about October 15, 2013, **SCHULMAN** emailed the NY Comptroller to follow up on his request to obtain control over the Frozen Somali Assets based on his purported delegated authority under the 25B Certification.   Based on, among other things, the 2009 Fraudulent Decree Translation and **SCHULMAN's** assertion of delegated authority under the 25B Certification, the NY Comptroller released approximately $4.8 million to a Law Firm A trust account in or about November 2013.

> f.     The Conspirators Enrich Themselves with a Share of the
> Fraudulently Recovered Frozen Somali Assets

58.     In or about December 2013, **SCHULMAN** caused Law Firm A to transfer approximately $9 million (of the approximately $12.2 million of Frozen Somali Assets obtained by then from Bank A-1 and the NY Comptroller) to an account in the name of the Central Bank of Somalia.   Based on the terms of the July 2013 Contract—including the 6% Set-Aside for undefined "mutually agreed costs and expenses"—**SCHULMAN** caused Law Firm A to retain approximately $3.3 million, including approximately $1.9 million that Law Firm A recognized as revenue to the firm.   **SCHULMAN** received more than $880,000 from Law Firm A at the end of 2013, an increase of more than $400,000 from his compensation the previous year.   A significant portion of Schulman's compensation in 2013 was based on his role in bringing the Somalia-related revenue to Law Firm A.

59.     **SCHULMAN** used fraudulent means to ensure that his co-conspirators would profit from the scheme.   In or about October 2013, Law Firm A retained Law Firm B, a global

law firm with an office in Washington D.C., to perform a legal analysis of potential payments by Law Firm A to **Amalo** and **Co-Conspirator 1**.   The payments were to be made from the 6% Set-Aside.   In order to obtain a favorable analysis from Law Firm B, **SCHULMAN** concealed from Law Firm B significant information regarding **SCHULMAN's** lack of legitimate authority over the Frozen Somali Assets.   **SCHULMAN** also concealed from Law Firm A's finance personnel that he had sought written approval from the Permanent Government of Somalia or the Central Bank of Somalia to pay **Amalo** and **Co-Conspirator 1** with the funds in the 6% Set-Aside and had been denied.   Specifically, Former Governor 2 responded to **SCHULMAN's** request by email on or about March 12, 2014, writing "I don't approve anything related to this subject."

60.   In order to facilitate **Amalo** and **Co-Conspirator 1**'s payment, **SCHULMAN** and **Amalo** also worked together to create a fraudulent invoice from Haden Global Services LLC ("Haden Global Services"), a Maryland corporation controlled by **Amalo**.   This fraudulent invoice purported to show that **Amalo** and **Co-Conspirator 1** had worked a total of 2,284 hours and were owed $673,784 based on a rate of $295 per hour (the "Fraudulent Haden Global Services Invoice").

61.   The Fraudulent Haden Global Services Invoice contained entries reflecting work that **Amalo** did not actually perform and that **SCHULMAN** knew were false.   For example, **Amalo**'s entries on June 28, June 29 and June 30, 2013, billed Law Firm A for **Amalo**'s time purportedly spent "Coordinat[ing] 25B and European AR [asset recovery] efforts"; "Work[ing] on memo . . . re: 25B issues"; and "Continued work on memo . . . re: 25B issues."

19

62.     Importantly, the Fraudulent Haden Global Services Invoice also omitted that **Amalo**, together with **SCHULMAN**, was fraudulently trying to obtain Somali funds and had created and transmitted numerous forgeries and fraudulent documents as part of that scheme.

63.     **Amalo** emailed **SCHULMAN** the Fraudulent Haden Global Services Invoice, which **SCHULMAN** caused to be sent to Law Firm A's finance personnel on or about March 30, 2014.   **SCHULMAN** and **Amalo** thereby billed Law Firm A for services that were not actually performed by Haden Global Services and concealed from Law Firm A their involvement in the fraud.

64.     On or about March 31, 2014, Law Firm A sent a wire transfer to Haden Global Services in the amount of $673,784, which amounted to approximately 5.5% of the Frozen Somali Assets obtained by Law Firm A.

65.     In or about April 2014, at the direction of **Co-Conspirator 1**, **Amalo** transferred approximately $320,000 from the Haden Global Services account to two overseas bank accounts.

66.     On or about June 25, 2014, **SCHULMAN** emailed Bank A-1 and requested that additional Frozen Somali Assets in the amount of approximately $300,000 be released to Law Firm A.   On or about July 1, 2014, Bank A-1, relying on the documentation **SCHULMAN** had previously provided, including **SCHULMAN's** assertion of authority in connection with the 25B Certification, wired an additional $300,000 of Frozen Somali Assets to a Law Firm A trust account. **SCHULMAN** caused Law Firm A to retain all those funds for itself and its vendors.

67.     On or about July 9, 2014, **SCHULMAN** caused Law Firm A to wire approximately $18,000 to the Haden Global Services account.

18 U.S.C. § 1349

## COUNTS TWO THROUGH FOUR
### (Wire Fraud)

The Grand Jury for the District of Maryland further charges that:

1.     Paragraphs 1 through 23 and 25 through 67 of Count One are incorporated here.

### Execution of the Scheme to Defraud

2.     On or about each of the dates set forth below, in the District of Maryland and elsewhere, the defendant,

### JEREMY WYETH SCHULMAN,

for the purpose of executing the scheme to defraud described above, and attempting to do so, did knowingly and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud affecting at least one financial institution, namely Bank A-1, and to defraud the NY Comptroller, Law Firm A and others, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, and did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, as follows:

| Count | Approximate Date | Description of Electronic Communications and Transactions |
|-------|-----------------|----------------------------------------------------------|
| 2 | January 24, 2013 | Email from Maryland to New York that **SCHULMAN** caused to be sent to the NY Comptroller, which attached a sworn declaration in which **SCHULMAN** falsely stated that Former Governor 1 was "Somalia's Director of Financial Asset Recovery and Banking Affairs," and "[p]ursuant to Presidential Decree No. 214, [Former Governor 1] is tasked with the 'responsibility and authority to recover the national assets' of Somalia…." |

| Count | Approximate Date | Description of Electronic Communications and Transactions |
|-------|------------------|-----------------------------------------------------------|
| **3** | April 19, 2013 | Email from Maryland to New York that **SCHULMAN** caused to be sent to a financial institution, namely Bank A-1, enclosing, among other documents, the 2013 Forged PM Letter and the 2013 Forged POA, and writing, "In light of this submission, I trust your office now has all of the documentation that it requires to promptly provide us with the applicable account records and access to the funds on deposit at [Bank A-1]." |
| **4** | March 31, 2014 | Wire transfer in the amount of $673,784 from a bank account controlled by Law Firm A in Maryland to a bank account controlled by Haden Global Services, which was transmitted interstate through the Fedwire Funds Service. |

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNT FIVE
### (Bank Fraud)

The Grand Jury for the District of Maryland further charges that:

1.       Paragraphs 1 through 23 and 25 through 67 of Count One are incorporated here.

2.       Between in or about 2010 and in or about 2014, in the District of Maryland and elsewhere, the defendant,

### JEREMY WYETH SCHULMAN,

did knowingly and intentionally execute, and attempted to execute, a scheme and artifice to defraud one or more financial institutions, as that term is defined in Title 18, United States Code, Section 20, namely Bank A-1, as described above, and to obtain any of the moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, said financial institution, by means of materially false and fraudulent pretenses, representations, promises and material omissions.

18 U.S.C. § 1344
18 U.S.C. § 2

## COUNT SIX
**(Mail Fraud)**

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 23 and 25 through 67 of Count One are incorporated here.

### Execution of the Scheme to Defraud

2.      On or about March 19, 2010, in the District of Maryland and elsewhere, the defendant,

### JEREMY WYETH SCHULMAN,

for the purpose of executing and attempting to execute the scheme to defraud described above, which scheme and artifice would affect at least one financial institution, namely Bank A-1, did knowingly aid, abet and cause matters to be placed and deposited in any post office and authorized depository for mail, any matter and thing, which was to be sent and delivered by private and commercial interstate carrier, in accordance with the directions thereon, to wit: a letter sent by Federal Express from Law Firm A in Maryland to Bank A-1 in New York that falsely stated that Former Governor 1 was "Somalia's Director of Financial Asset Recovery and Banking Affairs," and "[p]ursuant to Presidential Decree No. 214, [Former Governor 1] is tasked with the 'responsibility and authority to recover the national assets' of Somalia."

18 U.S.C. § 1341
18 U.S.C. § 2

## COUNT SEVEN
**(Conspiracy to Commit Money Laundering)**

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 23 and 25 through 67 of Count One are incorporated here.

2. From in or about at least July 2010, up to and including in or about July 2014, in the District of Maryland and elsewhere, the defendant,

**JEREMY WYETH SCHULMAN**,

and others known and unknown, did knowingly combine, conspire, confederate and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1957, to wit: to knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property that was of a value greater than $10,000, such property having been derived from specified unlawful activity, namely, mail, wire fraud and bank fraud, in violation of Title 18, United States Code, Sections 1341, 1343, and 1344, respectively.

18 U.S.C. § 1956(h)

## COUNTS EIGHT THROUGH ELEVEN
### (Money Laundering)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 23 and 25 through 67 of Count One are incorporated here.

2.      On or about the date set forth below, in the District of Maryland and elsewhere, the defendant,

### JEREMY WYETH SCHULMAN,

did knowingly engage in, and attempt to engage in, and aided and abetted, monetary transactions in and affecting interstate commerce in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, namely, mail fraud, wire fraud and bank fraud, in violation of Title 18, United States Code, Sections 1341, 1343, and 1344, respectively, in the following amounts:

| Count | Approximate Date | Transaction |
|---|---|---|
| 8 | April 7, 2014 | Wire transfer of $85,000 from the Haden Global Services account in Maryland to a correspondent bank account in New York for onward transmission to an account in South Africa in the name of Trading Company 1. |
| 9 | April 7, 2014 | Wire transfer of $75,000 from the Haden Global Services account in Maryland to a correspondent bank account in New York for onward transmission to an account in the United Arab Emirates in the name of Trading Company 2. |
| 10 | April 14, 2014 | Wire transfer of $95,000 from the Haden Global Services account in Maryland to a correspondent bank account in New York for onward transmission to an account in South Africa in the name of Trading Company 1. |

| Count | Approximate Date | Transaction |
|:-----:|:---------------:|-------------|
| **11** | April 14, 2014 | Wire transfer of $65,000 from the Haden Global Services account in Maryland to a correspondent bank account in New York for onward transmission to an account in the United Arab Emirates in the name of Trading Company 2. |

18 U.S.C. § 1957
18 U.S.C. § 2

### FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.         Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1) and (a)(2); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of any of the offenses set forth in Counts One through Eleven of this Indictment.

### Mail Fraud, Wire Fraud and Bank Fraud Forfeiture

2.         Upon conviction of the offenses set forth in Counts One through Six of this Indictment, the defendant,

### JEREMY WYETH SCHULMAN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2) and Title 28, United States Code, Section 2461(c), any property, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses, including, but not limited to, a money judgment in an amount equal to the proceeds the defendant obtained as a result of the offenses set forth in Counts One through Six.

**Money Laundering Forfeiture**

3.      Upon conviction of the offenses set forth in Counts Seven through Eleven of this Indictment, the defendant,

**JEREMY WYETH SCHULMAN,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real or personal, involved in such offenses, and any property traceable to such property, including, but not limited to, a money judgment in amount equal to the property involved in the money laundering offenses set forth in Counts Seven through Eleven.

**Substitute Assets**

4.      If, as a result of any act or omission of any defendant, any of the property described above as being subject to forfeiture:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c), to seek forfeiture of substitute property up to the value of the forfeitable property

described above.

18 U.S.C. §§ 981(a)(1)(C), 982(a)(1)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

_____
ROBERT K. HUR
United States Attorney
District of Maryland


_____
JOSEPH BEEMSTERBOER
Acting Principal Deputy Chief
Fraud Section
Criminal Division
U.S. Department of Justice

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

_____
Date  12/2/20

31