## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JEREMY W. SCHULMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 8:21-cv-1252-PWG |
| | § | |
| AXIS SURPLUS INSURANCE | § | |
| COMPANY, ENDURANCE AMERICAN | § | |
| SPECIALTY INSURANCE COMPANY, | § | |
| and PROSIGHT SYNDICATE 1110 AT | § | |
| LLOYD'S, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF JEREMY W. SCHULMAN'S
## <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Jeffrey M. Schwaber (Bar # 06095)
STEIN SPERLING BENNETT DE JONG
DRISCOLL PC
1101 Wootton Parkway
Suite 700
Rockville, MD 20852
(301) 340-2020
(301) 354-8110
jschwaber@steinsperling.com

-and-

Robin L. Cohen *(pro hac vice pending)*
Jillian M. Raines *(pro hac vice pending)*
COHEN ZIFFER FRENCHMAN &
MCKENNA LLP
1350 Avenue of the Americas, 25th Floor
New York, NY 10019
(212) 584-1890
(212) 584-1891
rcohen@cohenziffer.com
jraines@cohenziffer.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**PAGE**

SUMMARY ................................................................................................................. 1

PRELIMINARY STATEMENT ................................................................................. 2

STATEMENT OF UNDISPUTED FACTS ............................................................... 5

I.   The Policies ...................................................................................................... 5

II.  The Underlying DOJ Claim .............................................................................. 8

    A.  The 2017 Criminal Investigation and Grand Jury Subpoena .................... 8

    B.  The Resulting 2020 Indictment ................................................................. 9

III. The Primary Carriers Acknowledge Coverage and Agree to Pay Mr. Schulman's Claim Expenses Pursuant to the Advancement Agreement ......................... 11

IV.  The Primary Carriers Stop Paying Claim Expenses and Issue Belated, Erroneous Coverage Disclaimer ............................................................................... 14

STANDARDS APPLICABLE TO THIS MOTION ................................................. 16

I.   Maryland Law Applies .................................................................................... 16

II.  Standards Applicable to Motions for Summary Judgment .............................. 16

III. Standards Applicable to Insurance Policy Interpretation and Application ....... 17

ARGUMENT ............................................................................................................ 18

I.   The DOJ Claim Constitutes a "Claim" for "Wrongful Acts" Under the Policies, Triggering the Primary Carriers' Obligation to Pay 100% of Mr. Schulman's Claim Expenses on a Current Basis ........................................... 18

    A.  The DOJ Claim Constitutes a "Claim" Under the Policies ..................... 19

    B.  The DOJ Claim Alleges "Wrongful Acts" Under The Policies, Which Do Not Limit Coverage to Civil Wrongdoing ............................. 23

    C.  The Policies Require Advancement of 100% of Claim Expenses on a Current Basis ........................................................................................ 27

II.  In the Alternative, the Primary Carriers Are Estopped From Continuing to Breach the Advancement Agreement, Which Guarantees Coverage and Payment for Mr. Schulman's Claim Expenses ................................................. 28

    A.  Mr. Schulman Relied on the Primary Carriers' Definite Promise in the Advancement Agreement to His Detriment .................................... 29

    B.  Circumstances Justify Deciding Estoppel as a Matter of Law ............... 32

CONCLUSION ......................................................................................................... 35

## **TABLE OF AUTHORITIES**

**Cases**

**Page(s)**

2011 WL 4543363 (D. Md. Sept. 28, 2011) ................................................................16

*Allstate Ins. Co. v. Reliance Ins. Co.*,
   786 A.2d 27 (Md. Ct. Spec. App. 2001) ...........................................................29

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................................17

*Aspen Ins. UK, Ltd. v. Fiserv, Inc.*,
   2010 WL 5129529 (D. Colo. Dec. 9, 2010)......................................................27

*Astellas US Holding, Inc. v. Starr Indem. & Liab. Co.*,
   2018 WL 2431969 (N.D. Ill. May 30, 2018) ....................................................20

*Cap. City Real Est., LLC v. Certain Underwriters at Lloyd's London*,
   788 F.3d 375 (4th Cir. 2015) .............................................................................16

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)......................................................................................16, 17

*Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*,
   656 A.2d 779 (Md. 1995) .............................................................................18, 26

*Clendenin Bros. v. U.S. Fire Ins. Co.*,
   889 A.2d 387 (Md. 2006) ..................................................................................17

*Conduent State Healthcare, LLC v. AIG Specialty Ins. Co.*,
   2019 WL 2612829 (Del. Super. Ct. June 24, 2019) .........................................24

*Drutz v. Scottsdale Ins. Co.*,
   2012 WL 665984 (D. Md. Feb. 28, 2012) ...................................................17, 19

*Dutta v. State Farm Ins. Co.*,
   769 A.2d 948 (Md. 2001) ..................................................................................18

*Expo Properties, LLC v. Experient, Inc.*,
   956 F.3d 217 (4th Cir. 2020) .............................................................................26

*Fin. Indus. Regulatory Auth., Inc. v. Axis Ins. Co.*,
   951 F. Supp. 2d 826 (D. Md. 2013)..................................................................19

*Gallup, Inc. v. Greenwich Ins. Co.*,
   2015 WL 1201518 (Del. Super. Ct. Feb. 25, 2015).........................................26

*Gil Enter., Inc. v. Delvy*,
    79 F.3d 241 (2d Cir. 1996).........................................................................20

*Graham v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    474 F. App'x 956 (4th Cir. 2012) .............................................................26

*Haines v. St. Paul Fire & Marine Ins. Co.*,
    428 F. Supp. 435 (D. Md. 1977)..........................................................33, 34

*Joseph P. Bornstein, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    828 F.2d 242 (4th Cir. 1987) ....................................................................23

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941)...................................................................................16

*MBIA Inc. v. Federal Ins. Co.*,
    652 F.3d 152 (2d Cir. 2011).......................................................................21

*MFS, Inc. v. Tidewater Ins. Assocs., Inc.*,
    1992 WL 297444 (D. Md. Sept. 24, 1992) ...............................................17

*Minuteman Int'l, Inc. v. Great Am. Ins. Co.*,
    2004 WL 603482 (N.D. Ill. Mar. 22, 2004)........................................20, 22

*Morden v. XL Specialty Ins.*,
    177 F. Supp. 3d 1320 (D. Utah 2016),
    *rev'd in part on other grounds*, 903 F.3d 1145 (10th Cir. 2018)............22

*Moscarillo v. Pro. Risk Mgmt. Servs., Inc.*,
    398 Md. 529 (2007) ...................................................................................26

*Nationwide Mut. Ins. Co. v. Regency Furniture, Inc.*,
    963 A.2d 253 (Md. Ct. Spec. App. Jan. 6, 2009)......................................33

*Nautilus Ins. Co. v. 200 W. Cherry St., LLC*,
    383 F. Supp. 3d 494 (D. Md. 2019) ..........................................................18

*Pac. Indem. Co. v. Interstate Fire & Cas. Co.*,
    488 A.2d 486 (Md. 1985) .....................................................................17, 19

*Patriarch Partners, LLC v. AXIS Ins. Co.*,
    2017 WL 4233078 (S.D.N.Y. Sept. 22, 2017)..........................................22

*Pavel Enters., Inc. v. A.S. Johnson Co., Inc.*,
    674 A.2d 521 (Md. 1996) .....................................................................29, 31

*Scottsdale Ins. Co. v. Lynnhaven Inlet Fishing Pier Corp.*,
  113 F. App'x 526 (4th Cir. 2004) ...........................................................................17

*Syracuse Univ. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
  2013 WL 3357812 (N.Y. Sup. Ct. Mar. 7, 2013),
  *aff'd*, 112 A.D.3d 1379 (N.Y. App. Div. 2013) ............................................. *passim*

*U.S. Bank Nat. Ass'n v. Indian Harbor Ins. Co.*,
  68 F. Supp. 3d 1044 (D. Minn. 2014),
  *amended sub nom. U.S. Bank Nat'l Ass'n v. Indian Harbor Ins. Co.*,
  2015 WL 12778848 (D. Minn. Mar. 19, 2015) ......................................................26

*Warfield-Dorsey Co. v. Travelers Cas. & Sur. Co. of Illinois*,
  66 F. Supp. 2d 681 (D. Md. 1999) .........................................................................17

*Weaver v. Axis Surplus Ins. Co.*,
  639 Fed. Appx. 764 (2d Cir. 2016).........................................................................20

*Westchester Fire Ins. Co. v. Schorsch*,
  186 A.D.3d 132 (N.Y. Sup. Ct. Aug. 20, 2020) ............................................... 27-28

**Other Authorities**

Federal Rule of Civil Procedure 56(c) .................................................................1, 16

Local Rule 105.2.c .....................................................................................................1

Demand, *Merriam-Webster.com Dictionary*, *available at* https://www.merriam-
  webster.com/dictionary/demand .........................................................................20

Relief, *Merriam-Webster.com Dictionary*, *available at* https://www.merriam-
  webster.com/dictionary/relief ..............................................................................22

Plaintiff Jeremy W. Schulman ("Plaintiff" or "Mr. Schulman") respectfully submits this Motion for Partial Summary Judgment on Counts I, II, IV, and V of his Complaint[1] pursuant to Federal Rule of Civil Procedure 56 and Local Rule 105.2.c (the "Motion").

## SUMMARY

This case involves Plaintiff's entitlement to insurance coverage under clear and unambiguous policy language and his reasonable reliance on a separate letter agreement from Defendants assuring Plaintiff of a level of such coverage that permitted him to retain and use a top tier law firm to protect and defend against unproven and covered allegations of criminal misconduct brought against him by the Department of Justice. After years of providing the guaranteed protection, however, Defendants inexcusably and belatedly repudiated their policy obligations and the agreement, leaving Plaintiff to face enormous unpaid counsel bills alone, and severely prejudicing a defense upon which Plaintiff's very freedom and livelihood depends.

Thus, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 105.2.c, Plaintiff moves for summary judgment against Defendants AXIS Surplus Insurance Company ("AXIS") and Endurance American Specialty Insurance Company ("Endurance," and together with AXIS, the "Primary Carriers") on Count I (Breach of Contract—Duty to Pay Claims Expense Against the Primary Carriers), Count II (Breach of Contract—Advancement Agreement Against the Primary Carriers), and Count V (Detrimental Reliance Against the Primary Carriers), and against the Primary Carriers and ProSight Syndicate 1110 at Lloyd's ("ProSight" and, together with the Primary Carriers, "Defendants" or "Insurers") on Count IV (Declaratory Relief Against All Carriers) of his Complaint. Specifically, Plaintiff requests summary judgment in his favor, finding that: (i) the DOJ Claim (as defined herein) against Mr. Schulman falls within the grant

---

[1] "Compl." references herein refer to Plaintiff's Complaint dated Apr. 6, 2021 (ECF Dkt. No. 2).

of coverage under Insurers' policies, requiring Insurers to pay all of Mr. Schulman's defense costs on a current basis, subject to each Insurer's respective limits of liability and attachment points; or (ii) in the alternative, that the Primary Carriers are estopped from reneging on their separate advancement agreement promising to cover and pay seventy percent (70%) of Mr. Schulman's defense fees and 100 percent (100%) of costs in connection with the DOJ Claim.

## PRELIMINARY STATEMENT

Plaintiff makes this Motion to remedy the Primary Carriers' wrongful disclaimer of defense coverage to Mr. Schulman after nearly four years of honoring clear policy obligations requiring Insurers to pay Mr. Schulman's reasonable defense costs in connection with a January 27, 2017 grand jury subpoena (the "Subpoena"), which arose in connection with an ongoing Department of Justice ("DOJ") criminal investigation, and the subsequent December 2, 2020 indictment returned against Mr. Schulman in connection with that DOJ investigation and Subpoena (the action captioned *United States of America v. Schulman*, No. PX 20-CR-434 (D. Md.) (the "Indictment," and together with the Subpoena, the "DOJ Claim").

Mr. Schulman served as an equity shareholder for many years at the Maryland law firm Shulman, Rogers, Gandal, Pordy & Ecker, P.A. (the "Firm"). The Firm paid substantial premiums for lawyers professional liability insurance policies from Defendants (the "Policies") to protect both the Firm and its attorneys from potential claims alleging *any* wrongful act, error or omission in the course of providing professional legal services to clients. When Mr. Schulman's professional representation of various Somalian clients became the subject of the criminal DOJ Claim, the Firm (on its own behalf and on behalf of Mr. Schulman) tendered notice to the Insurers. The Primary Carriers honored their contractual policy obligations for nearly four years, as set forth in a June 22, 2017 writing to Mr. Schulman memorializing the agreement "to cover" and pay for Mr. Schulman's defense in the DOJ Claim (the "Advancement Agreement").

2

The Advancement Agreement expressly reassured Mr. Schulman that, although the Primary

Carriers had *previously* taken the position to the Firm that "no Claim for a Wrongful Act had

been made" in connection with the Subpoena and DOJ investigation, a compromise had been

reached and the Primary Carriers "agreed to cover" Mr. Schulman's cost of defense under the

policies for the law firm of Akin Gump Strauss Hauer & Feld LLP ("Akin"), at the negotiated

amount of 70% of Akin's rates and 100% of costs with respect to the matter going forward.  This

came in direct response to Mr. Schulman's express request to confirm his coverage for the

Subpoena, DOJ investigation, and any related proceedings.

Critically, although the Primary Carriers did maintain certain boilerplate reservations of

rights in acknowledging and paying for Mr. Schulman's defense in the DOJ Claim—nowhere did

the Advancement Agreement or any other writing to Mr. Schulman contain any assertion that the

Policies do not cover allegations of criminal conduct.  To the contrary, in fact, the Primary

Carriers acknowledged an exclusion in the Policies that could potentially limit coverage for

criminal wrongdoing ***only in the event a judgment, final adjudication or admission*** establishes

such criminal conduct against an insured—none of which have occurred here.

Mr. Schulman has detrimentally relied on this acknowledgment of coverage and the

Primary Carriers' Advancement Agreement since 2017.  Mr. Schulman's defense counsel at

Akin regularly submitted fees and costs incurred and the Primary Carriers paid.  Yet, amidst Mr.

Schulman's mounting of a vigorous defense, the Primary Carriers abruptly reversed course and

without any explanation, stopped paying Mr. Schulman's defense fees, including for work billed

months *before* Mr. Schulman was, in fact, indicted on December 2, 2020.  Then, in March 2021,

the Primary Carriers manufactured an excuse for this belated breach of their obligations under

the Policies and the Advancement Agreement, by issuing a coverage disclaimer to Mr. Schulman

that asserted for the first time that no coverage existed for the DOJ Claim because the Indictment does not constitute a "Claim" under the Policies, which, according to the Primary Carriers, do not insure alleged *criminal* wrongdoing.

Putting aside the Primary Carriers' revisionist history, the Primary Carriers are wrong. The Policies cover "any . . . written demand against any Insured for monetary or non-monetary relief" for "any actual or alleged . . . act, error or omission . . . committed or attempted, or allegedly committed or attempted" by an Insured.  That is, the Policies do no limit coverage to claims for alleged civil wrongdoing only.  Further—and the Primary Carriers agree—the Indictment alleges related wrongful acts and thus is interrelated, and considered a single claim, with the **criminal** Subpoena and DOJ investigation, which the Primary Carriers already acknowledged as covered.  The notion is nonsensical that the criminal nature of the Indictment somehow transforms the DOJ Claim from a covered to an uncovered claim, and the Primary Carriers' belated coverage disclaimer to Mr. Schulman is belied by the Policies' plain language.

The Primary Carriers' late-hour repudiation also fails to explain why the Primary Carriers stopped paying Mr. Schulman's defense costs even *prior* to the return of the Indictment.  In fact, to date, the Primary Carriers are outstanding on invoices from 2020 in excess of at least $180,000, including for work predating the Indictment, and Mr. Schulman's fees incurred to date exceed $2,000,000 and are continuing.  Prejudice to Mr. Schulman continues to increase as he has been left to face the unproven DOJ Claim without the coverage he was guaranteed in the height of his need to mount an effective defense and retain his counsel (who remain unpaid).

Accordingly, because the Primary Carriers are in clear breach of the Policies and their separate written Advancement Agreement to pay Mr. Schulman's Claim Expenses, Mr. Schulman seeks summary judgment from this Court, finding that:  (i) the DOJ claim against Mr.

4

Schulman is covered by the Policies, requiring Insurers to pay 100% of Mr. Schulman's Claim Expenses on a current basis, subject only to each Insurer's respective limits of liability and attachment points; or (ii) in the alternative, on account of Mr. Schulman's detrimental reliance, the Primary Carriers are estopped from reneging on their separate written Advancement Agreement to pay 70% of Mr. Schulman's defense fees and 100% of his defense costs.

## STATEMENT OF UNDISPUTED FACTS

### I.      The Policies

The Firm purchased a total of $20,000,000 in "follow-form" lawyers professional liability insurance from Insurers for the policy period from August 22, 2016 to August 22, 2017. These Policies are attached hereto as **Exhibit 1**.  Defendant Axis issued AXIS Pro LP Lawyers Professional Liability Insurance Policy No. EBN 782641/01/2016 (the "Primary Policy") insuring fifty percent of the primary $10,000,000 limit of liability that applies per claim and in the aggregate.  Ex. 1 at 004 (Item 3).  Endurance insures the other fifty percent of the $10,000,000 primary limit of liability pursuant to its Memorandum of Insurance No. LPL 10005398002 (the "MOI," and together with the Primary Policy, the "Primary Policies).  *See* Ex. 1 at 030 (defining the Axis Primary Policy as the "Co-Insuring Policy" with the MOI, pursuant to which Endurance insures a 50% share).  Finally, Defendant ProSight insures $10,000,000 in excess limits of liability per claim and in the aggregate under the Firm's program of professional liability insurance, pursuant to excess Certificate of Insurance No. PL201600002300 (the "Excess Certificate" and, together with the Primary Policies, the Policies).  Ex. 1 at 032 (Sum Insured or Limit of Indemnity).

Notably, the Endurance MOI and ProSight Excess Certificate each "follow form" to the Axis Primary Policy, meaning that, except for their respective percentage share of limits and/or attachment points, the MOI and Excess Certificate adopt the terms, conditions, definitions and

exclusions of the Axis Primary Policy.  *See* Ex. 1 at 031 § b (Endurance MOI) and 033 § A (ProSight Excess Certificate).

The Policies provide that Insurers "will pay on behalf of the **Insureds**[2] all **Loss**, in excess of the applicable **Retention**, resulting from **Claims** for **Wrongful Acts** committed before the expiration of the **Policy Period** that are first made against any **Insured** during the **Policy Period** . . . ."  Ex. 1 at 006 § I.A.  The Policies define "Insureds" to include not just the Firm, but also "Insured Individuals," defined, in relevant part, as "any one or more natural persons who are past, present or future . . . directors, officers, principals, shareholders, partners, or members of the **Firm**."  Ex. 1 at 008 §§ II.H and II.I.1.  It is undisputed, accordingly, that Mr. Schulman is an Insured under the Policies.

As is critical to this Motion, the Policies cover "Claims for Wrongful Acts."  In relevant part, "Claim" is expressly defined to include "*any* of the following" subparts of the definition, including the first, which is "a written demand against any **Insured** for monetary or non-monetary relief."  Ex. 1 at 007 § II.B.1.a (emphasis in italics added).  Such a "**Claim** will be deemed to have been first made . . . in the case of a written demand or request, when such demand or request is first received by an **Insured**."  Ex. 1 at 007 § II.B.

The Policies provide coverage for "Wrongful Acts," which notably are not limited to civil wrongdoing, but include, in relevant part, "any actual or alleged: 1. act, error or omission; 2. breach of contract for **Professional Services**; [or] 3. breach of fiduciary duty . . . committed or attempted, or allegedly committed or attempted, solely in the performance of or failure to perform **Professional Services** by any **Insured** or by any other person or entity for whose actions the **Insured** is legally responsible."  Ex. 1 at 009-010 § II.P.  "Professional Services," in

---

[2] Terms in bold are defined in the Policies.

relevant part, include Mr. Schulman's conduct as an attorney on behalf of the Firm, and

specifically:

> services provided to others by an **Insured** . . . in the conduct of any business by or
> on behalf of the **Firm** in its professional capacity as an attorney . . . but only if such
> services are performed in the name or on behalf of the **Firm** and some or all of the
> fee, if any, accruing from such services (regardless of whether such fee is actually
> collected) inures to the benefit of the **Firm**.

Ex. 1 at 009 § II.N.

Covered "Loss" under the Policies on account of any such Claims for Wrongful Acts

includes not just "damages, judgments, any award of pre-judgment or post-judgment interest,

settlement amounts, [and] costs and fees awarded pursuant to judgments," but also "Claim

Expense" (Ex. 1 at 008 § II.K), which encompasses all:

> reasonable and necessary legal fees and expenses (other than regular or overtime
> wages, salaries, fees, benefits,  or  other compensation of the **Insured Individuals**
> or the **Firm's** overhead expenses) incurred by or on behalf of the **Insured** in
> defending, settling, appealing or investigating **Claims**, and the premiums for
> appeal, attachment or similar bonds.

Ex. 1 at 007 § II.C.  The applicable retention is $100,000 per Claim.  Ex. 1 at 021 § 1 (amending

Item 4) and 032 (Sum Insured or Limit of Liability).

The Policies contemplate the potential for multiple Claims to relate to one another though

arise at different times, and expressly provide that "[a]ll **Claims** arising from the same **Wrongful**

**Act** and/or all **Interrelated Wrongful Acts** shall be deemed one **Claim** for the purpose of

applying the Limit of Liability and Retention."  Ex. 1 at 010 § III.C.  The Policies also state that:

> All **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful**
> **Acts** will be deemed to have been made on the earlier of the date the first of those
> **Claims** is made against any **Insured** or the first date the **Company** receives the
> **Insured's** written notice of the fact, circumstance, situation, event, transaction,
> cause or **Wrongful Act** which underlies such **Claim**.   The provisions of the policy
> in effect on that date will apply.

Ex. 1 at 013 § V.D.   "Interrelated Wrongful Acts" means "any or all **Wrongful Acts** that have

as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes." Ex. 1 at 008 § II.J.

With regard to the defense of Claims, the Policies state that it is "the **Insured's** duty to investigate, defend, and select counsel to defend a covered **Claim** made against the **Insured** alleging a **Wrongful Act**."  Ex. 1 at 006 § I.B.1.  Yet, Insurers have a duty to advance "Claim Expenses" as incurred; in fact, the Policies require Insurers "will, upon written request, pay **Claim Expense** owed under this policy on a current basis."  Ex. 1 at 006 § I.B.3.

Finally, the Policies state that Insurers "shall not be obligated to pay **Loss** arising from any **Claim**" where such Claim is "based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving: a. the gaining of any profit, remuneration, or advantage to which the **Insured** was not legally entitled; or b. any criminal, dishonest, malicious or deliberately fraudulent act, error or omission by an **Insured**," but this exclusion expressly applies only "if evidenced by any judgment, final adjudication, alternate dispute resolution proceeding or written admission by an **Insured**."  Ex. 1 at 010–011 § V.A.9.

## II.      The Underlying DOJ Claim

Since 2017, Mr. Schulman has incurred in excess of $2,000,000 in fees and costs to defend against alleged wrongful acts claimed against him in his rendering of legal services for the Firm on behalf of the Somali people and nation.  Mr. Schulman vigorously denies and is defending against all unproven allegations asserted against him in the underlying DOJ Claim.

### A.      The 2017 Criminal Investigation and Grand Jury Subpoena

On January 27, 2017, during the Policy Period, the DOJ gave written notice of, and issued a grand jury subpoena to the Firm.  The Subpoena is attached hereto as **Exhibit 2**.  The

Subpoena expressly notes its issuance as "[p]ursuant to an official *criminal* investigation being conducted by the United States Attorney's Office" for the District of Maryland.  Ex. 2 at 001 (emphasis added).

The Subpoena sought non-monetary relief from the Firm and Mr. Schulman in the form of production of documents, including those expressly implicating Mr. Schulman's work for certain Firm clients, including certain governmental, commercial, and individual clients, including the Transitional Federal Government of Somalia, the Federal Government of Somalia, and the Central Bank of Somalia, among others.  Ex. 2 at 002, 006–008.  Specifically, the Subpoena requested the Firm produce:  (1) "[a]ll engagement letters, contracts and billing records" related to the Firm's representation of twenty-three individuals and governmental and commercial entities (the "Alleged Clients"); (2) documents related to the Alleged Clients in the e-mails and files of current and former employees of the Firm, including Mr. Schulman; (3) all agreements between the Firm and any agents, consultants, or third parties acting on behalf of the Firm in connection with its representation of the Alleged Clients; (4) all federal and state tax documentation associated with entities and individuals identified in the Subpoena; and (5) all records of financial transactions between the Firm and the Alleged Clients.  Ex. 2 at 006–008, § B.  At all times, Mr. Schulman cooperated with the Firm and the U.S. Attorney's Office respecting this Subpoena and the criminal DOJ investigation.  *See* Compl. ¶ 45.

## B.    The Resulting 2020 Indictment

The DOJ's criminal investigation into Mr. Schulman and his Somali representations on behalf of the Firm continued for years, and on December 2, 2020, the United States Attorney for the District of Maryland and the DOJ returned an indictment against Mr. Schulman.  The Indictment is attached hereto as **Exhibit 3**.  At bottom, the Indictment asserts various alleged

wrongful acts undertaken by Mr. Schulman in his capacity as a shareholder and attorney at the

Firm and demands both monetary and non-monetary relief.  *See, e.g.*, Ex. 3 at 001 ¶ 2, 004–005

¶¶ 21–23, 013 ¶ 42, 014 ¶ 46, 016–018 ¶¶ 53, 57–58, and 020 ¶ 66.

        Specifically, the Indictment alleges that at all material times Mr. Schulman "was licensed

to practice law in the State of Maryland" and was a shareholder at the Firm.  Ex. 3 at 001 ¶¶ 1–2.

The Indictment claims that, in connection with some of the Alleged Clients (*e.g.*, Abdiaziz

Amalo, the Transitional Federal Government of Somalia, the Federal Government of Somalia,

the Central Bank of Somalia, and Haden Global Services) and others, Mr. Schulman on behalf of

the Firm worked to recover frozen Somali assets based on allegedly forged and false

documentation and representations.  Ex. 3 at 002 ¶¶ 3, 4–5, 004-005 ¶¶ 21–23, 006–007 ¶ 24b–c,

008 ¶ 28–29, 014 ¶ 46, 018 ¶ 57; *see also* Ex. 2 at 006 §§ B.1.a–c, B.1.e, and B.1.r.  The

Indictment asserts that Mr. Schulman was compensated pursuant to retention agreements and

fixed-fee arrangements, and from revenue generated from recovered assets worth hundreds of

millions of dollars obtained by Mr. Schulman and co-conspirators through allegedly improper

means.  Ex. 3 at 014 ¶ 46, 016–017 ¶ 53, 018 ¶ 58, 020 ¶ 66.  As alleged in the Indictment,

between July 2010 and 2014, Mr. Schulman is purported to have improperly obtained $12.5

million on behalf of his Somalia-related clients, from which Mr. Schulman caused the Firm to

retain $3.3 million in revenue (and from which Mr. Schulman is alleged to have personally

received hundreds of thousands of dollars of additional compensation) and caused the Firm to

transfer hundreds of thousands of dollars more to an individual client and an alleged co-

conspirator.  *Id.*  Generally, the Indictment charges Mr. Schulman with the following wrongful

acts:  (1) conspiracy to commit mail, wire, and bank fraud (Ex. 3 at 01–021 ¶¶ 1–67); (2) wire

fraud (Ex. 3 at 022–023 ¶¶ 1–2); (3) bank fraud (Ex. 3 at 024 ¶¶ 1–2); (4) mail fraud (Ex. 3 at

025 ¶¶ 1–2); (5) conspiracy to commit money laundering (Ex. 3 at 026 ¶¶ 1–2); and (6) money

laundering (Ex. 3 at 027 ¶¶ 1–2).

The Indictment specifically demands Mr. Schulman forfeit "any property, constituting, or

derived from, proceeds obtained directly or indirectly" as a result of the alleged offenses,

including a "money judgment in an amount equal to the proceeds" obtained therefrom.  Ex. 3 at

029 ¶ 1-2.  Additionally, the United States seeks "forfeiture of substitute property up to the value

of the forfeitable property" as a result of "any act or omission of any defendant," including Mr.

Schulman.  Ex. 4 at 030 ¶ 4.

### III.     The Primary Carriers Acknowledge Coverage and Agree to Pay Mr. Schulman's Claim Expenses Pursuant to the Advancement Agreement

On or about January 31, 2017, the Firm timely reported its receipt of the Subpoena

implicating Mr. Schulman to the Insurers.  *See* Compl. ¶ 54.  Mr. Schulman retained Akin to

represent him in connection with the Subpoena, DOJ investigation and related matters, and

informed the Firm that Paul Butler, Esq. of Akin would serve as lead counsel on the matter.  *See*

Compl. ¶ 55; Declaration of Paul Butler, Esq., dated June 30, 2020, and submitted in support of

this Motion (the "Butler Decl.") ¶¶ 1–3.  Mr. Schulman communicated Akin's rates to the Firm

and was thereafter informed that the Primary Carriers had consented to this retention and, after

negotiating rates with the Firm, would agree to pay 70% of Akin's billable rates and 100% of

costs.  Compl. ¶ 56; ECF Dkt. No. 19 (Answer of Defs. Axis and Endurance) ¶ 56; *see also*

Butler Decl. ¶¶ 2, 5.  Mr. Schulman was told this agreement would extend unless or until a guilty

plea or conviction (*see* Compl. ¶ 56), neither of which has occurred.

After memorializing Akin's retention and seeking assurance to begin preparing his

defense, Mr. Schulman sought a direct line of communication with the Primary Carriers to

confirm their agreement to provide him coverage in connection with the "[DOJ] investigation, of

which the Firm was notified by its receipt of a grand jury subpoena." *See* May 20, 2017 Email

from J. Schulman (the "Advancement Email") (attached hereto as **Exhibit 4**) at 001.  Indeed, Mr.

Schulman wrote to the Primary Carriers on May 20, 2017, seeking written confirmation that the

Primary Carriers:

> under the Policies, have agreed to reimburse me for '70% of defense fees incurred
> with respect to Akin Gump,' which is the law firm I have engaged to represent me
> in connection with the ***investigation and any related proceedings*** . . . [and to] 'pay
> reasonable expert fees, subject to prior approval of the retention . . . .'"

Ex. 4 at 001 (emphasis added).  Mr. Schulman used this writing to further confirm his

understanding of the scope of the Primary Carriers' reservation of rights as well, which he

understood were based only on the definition of "Loss" and specified exclusions, including the

Policies' exclusions for ill-gotten gains and for criminal or dishonest conduct, both of which he

noted would not apply unless "evidenced by any judgment, final adjudication, alternative dispute

resolution proceeding or written admission by an insured."  Ex. 4 at 001.  In this Advancement

Email, Mr. Schulman was prudent to ask the Primary Carriers to provide copies of all

correspondence concerning the claim and the payment agreement referenced above, and also

requested contact information to secure prompt payment of Akin's bills.  Ex. 4 at 001-002.

On June 22, 2017, the Primary Carriers through their appointed claim representative

Mendes & Mount, responded to Mr. Schulman's Advancement Email in the form of a letter

agreement (the Advancement Agreement, attached hereto as **Exhibit 5**).  The Advancement

Agreement confirmed Mr. Schulman's understanding respecting the "captioned matter," defined

not solely as the Subpoena, but that involving the U.S. Department of Justice more broadly as

"Claimant."  Ex. 5 at 001.  Specifically, the Advancement Agreement stated and confirmed that

the Primary Carriers agreed "to ***cover*** 70% of defense fees and 100% of costs incurred with

respect to this matter [which] arrangement would apply to separate counsel to be retained for

individual attorneys involved . . . including Akin Gump on your [(*i.e.*, Mr. Schulman's)] behalf." Ex. 5 at 001 (emphasis added).

This Advancement Agreement was unequivocal; it did not merely agree to advance subject to some future determination of coverage for alleged criminal misconduct.  Rather, it expressly guaranteed Mr. Schulman that the Primary Carriers would cover and pay his defense costs in connection with the ***criminal*** Subpoena and DOJ investigation and related matters.  The Advancement Agreement further reassured Mr. Schulman that, although Primary Carriers had initially taken the position to the Firm that "no Claim for a Wrongful Act had been made" respecting the matter, and that certain defense counsel had been retained by the Firm prior to consultation with underwriters, that a "compromise was reached with the insured firm on these issues."  Ex. 5 at 001.

In fact, the Advancement Agreement nowhere asserts or reserves rights on the basis that the Policies do not provide coverage for *alleged* criminal acts.  Nor is any such reservation included within the "supplemental reservation of rights letter" of the same June 22, 2017 date and addressed to Glenn Etelson at the Firm (the "Etelson Letter," attached hereto as **Exhibit 6**), which is the *only* enclosure the Primary Carriers included with the Advancement Agreement to Mr. Schulman, and which, together therewith, constitute the only two items of coverage correspondence provided to Mr. Schulman from the Insurers in response to his request for all such claims correspondence relevant to the Primary Carriers' agreement.[3]

---

[3] While Insurers June 4, 2021 letter to the Court references prior coverage correspondence dated in February and April 2017 (*see* ECF Dkt. No. 18 (hereinafter, "Defs.' Pre-Mot. Ltr.") at 2–3)— no such letters were ever provided to Mr. Schulman.  In any event, the purported position contained therein ("that the [S]ubpoena did not constitute a Claim as defined in the Policy" (*id.* at 2)) thereafter expressly was represented to Mr. Schulman as compromised in the Advancement Agreement.  *See* Ex. 6 at 001.

The Primary Carriers did not specifically reserve their rights in either the Advancement Agreement or the Etelson Letter with regard to whether the Subpoena or DOJ criminal investigation independently or together qualified as a "Claim" under the Policies' definition.  *See generally* Exs. 5 and 6.  Rather, they told Mr. Schulman that issue had been raised but resolved in favor of coverage.  *See* Ex. 6 at 001.  Indeed, the Primary Carriers reserved their rights in the Etelson Letter only with regard to the Policies' definition of "Loss" and certain Policy exclusions if "later determined to be applicable."  Ex. 6 at 002.  The Primary Carriers' references to the "ill-gotten gains" and "criminal or fraudulent acts" exclusions implicitly acknowledged, moreover, that such exclusions did not presently apply to the criminal Subpoena and DOJ investigation, and more critically, would ***never*** apply to mere allegations alone.  Ex. 6 at 002 (citing exclusions' express language noting applicability only "if evidenced by any judgment, final adjudication . . . or written admission by an Insured").  In other words, Mr. Schulman was covered unless and until a conviction or guilty plea.

## IV.     The Primary Carriers Stop Paying Claim Expenses and Issue Belated, Erroneous Coverage Disclaimer

Initially honoring their obligations under the Policies and the Advancement Agreement, the Primary Carriers paid Mr. Schulman's incurred Akin fees and costs for defense of the DOJ Claim from 2017 through part of 2020, paying in excess of $700,000.  Butler Decl. ¶ 6.  In December 2020, however, with payment on prior months' invoices outstanding and without explanation, the Primary Carriers abruptly stopped responding to Akin's written requests for reimbursement, and altogether ceased making payments for Mr. Schulman's Claim Expenses in connection with the DOJ Claim.  *Id.* ¶ 7.  Despite Mr. Schulman incurring (and Akin submitting for payment) in excess of $1,000,000 in covered Claim Expenses in connection with the DOJ Claim through year end 2020, the Primary Carriers paid nothing, and communicated nothing, to

14

Mr. Schulman or Akin in explanation.  *Id.* ¶¶ 6–8; Compl. ¶ 73.

It was not until months of silence passed, that the Primary Carriers on March 12, 2021, each belatedly and wrongfully disclaimed coverage to Mr. Schulman (the "Axis Denial Letter," attached hereto as **Exhibit 7**, and the "Endurance Denial Letter," attached hereto as **Exhibit 8**, collectively the "Denial Letters").[4]  The Denial Letters state—albeit falsely—that "the Polic[ies] afford[] no coverage for the Indictment because the Indictment does not constitute a Claim as defined by the Polic[ies], which is limited in pertinent part to civil rather than criminal proceedings."  Ex. 7 at 001; Ex. 8 at 001.  Despite having previously acknowledged coverage for the *criminal* DOJ investigation and Subpoena and related matters, and having paid Mr. Schulman's Claim Expenses for nearly four years in connection therewith, the Primary Carriers took the position in this March 2021 Denial Letter that "none of the [Policies' Claim] definition's subparts address criminal proceedings," and asserted in contravention to its clear allegations, that the Indictment charges criminal offenses, not "monetary or non-monetary relief."  Ex. 7 at 004; Ex. 8 at 004.

Left with mounting Claim Expenses and none of the insurance protection the Policies and Advancement Agreement had guaranteed him, Mr. Schulman has been forced to bring this action to seek recovery.  As of May 31, 2021, Mr. Schulman has incurred more than $2,000,000 in total Claim Expenses billed by current and prior Akin attorneys to vigorously defend himself against the DOJ Claim (Butler Decl. ¶ 9; Compl. ¶ 70), and Mr. Schulman continues to incur substantial costs to defend against the unproven DOJ Claim for which his innocence is presumed.  Butler Decl. ¶ 11.

---

[4] Although the Primary Carriers dispute the Indictment's status as a "Claim," they agree the Indictment and Subpoena arise from the same or "Interrelated Wrongful Acts," so as to constitute one claim "made" under the 2016–2017 Policy Period.  Ex. 7 at 002–003; Ex. 8 at 003.

## STANDARDS APPLICABLE TO THIS MOTION

### I.        Maryland Law Applies

Jurisdiction for this case is based on diversity of citizenship.  A federal court exercising

diversity jurisdiction applies the choice of law rules of the forum state in which it sits.  *Klaxon*

*Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  In insurance coverage cases, Maryland

follows the rule of *lex locus contractus*, "which requires that the construction and validity of a

contract be determined by the law of the state where the contract is made."  *All-Star Settlements,*

*LLC v. Zurich Am. Ins. Co.*, 2011 WL 4543363, at *4 (D. Md. Sept. 28, 2011).  For choice of law

purposes, a contract is considered to be made "where the last act necessary to make the contract

binding occurs."  *Id.*

Here, the Parties do not dispute that Maryland law applies to this case.  The Policies in

this matter were issued by Insurers to the Firm in Maryland.  (Compl. ¶ 2.)  The Firm is a

Maryland law firm with its head office in Maryland, where Mr. Schulman served as a

shareholder for the Firm at all times pertinent hereto, the Policies were delivered to the head

office in Maryland, and the premiums were paid out of that head office.  *See* Ex. 1 at 004, 030,

and 032. Accordingly, Maryland law applies to this case.  *Cap. City Real Est., LLC v. Certain*

*Underwriters at Lloyd's London*, 788 F.3d 375, 378 (4th Cir. 2015).

### II.        Standards Applicable to Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper where "there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing the Court that

there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once that showing has been made, the non-moving party must present a genuine issue of

material fact as to every one of the essential elements of each of the claims on which the non-

moving party bears the burden of proof at trial.  *Id*. at 322; *see also Scottsdale Ins. Co. v.*

*Lynnhaven Inlet Fishing Pier Corp.*, 113 F. App'x 526, 530 (4th Cir. 2004).

Evidence from the non-moving party that is "merely colorable" or "not significantly

probative" is insufficient to defeat summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 249–50 (1986).  "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment.  Factual disputes

that are irrelevant or unnecessary will not be counted."  *Id*. at 248.  Notably here, the non-

moving parties have agreed that "the coverage determination at issue in this litigation should be

decided as a matter of law and that there are no issues of material fact that preclude an immediate

determination of these issues."  Defs.' Pre-Mot. Ltr. (ECF Dkt. No. 18) at 1.

### III.        Standards Applicable to Insurance Policy Interpretation and Application

In Maryland, when "deciding the issue of coverage under an insurance policy, the

primary principle of construction is to apply the terms of the insurance contract itself."  *Warfield-*

*Dorsey Co. v. Travelers Cas. & Sur. Co. of Illinois*, 66 F. Supp. 2d 681, 685 (D. Md. 1999).

Words in an insurance policy are accorded their "usual, ordinary and accepted meaning,"

*Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 889 A.2d 387, 393 (Md. 2006), and "[t]he test is what

meaning a reasonably prudent layperson would attach to the term."  *Pac. Indem. Co. v. Interstate*

*Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985); *see also MFS, Inc. v. Tidewater Ins. Assocs.,*

*Inc.*, 1992 WL 297444, at *3 (D. Md. Sept. 24, 1992).

Moreover, Maryland law requires that insurance policies be interpreted "as a whole,

according words their usual, everyday sense, giving force to the intent of the parties, preventing

absurd results, and effectuating clear language."  *Drutz v. Scottsdale Ins. Co.*, 2012 WL 665984,

at *2 (D. Md. Feb. 28, 2012).  Indeed, clear and unambiguous policy language will be construed

as written, without alteration, and any interpretation that would "nullify" one phrase "to

substitute it with a contradictory formulation" will be rejected.  *Nautilus Ins. Co. v. 200 W. Cherry St., LLC*, 383 F. Supp. 3d 494, 510 (D. Md. 2019) (quoting *Calomiris v. Woods*, 727 A.2d 358, 368 (Md. 1999)).

Provided such terms of an insurance policy are clear and unambiguous (as they are here), construction may be "determined by the court as a matter of law."  *Nautilus*, 383 F. Supp. 3d at 510.  In the event any term within the Policies were ambiguous (they are not), however, Maryland law requires that such ambiguities be construed "liberally in favor of the insured." *Dutta v. State Farm Ins. Co.*, 769 A.2d 948, 957 (Md. 2001); *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*, 656 A.2d 779, 786 (Md. 1995) ("[A]ny doubt as to whether there is a potentiality of coverage under an insurance policy is to be resolved in favor of the insured."); *Nautilus*, 383 F. Supp. 3d at 511 (ambiguities to be construed against the insurer as drafter of the policy).  Finally, as it relates specifically to an insurer's duty to defend or advance defense costs, Maryland law recognizes that such obligation is broader than the duty to indemnify and is triggered wherever the allegations present even the *potential* for coverage.  *Nautilus*, 383 F. Supp. 3d at 511.

## ARGUMENT

I.  **The DOJ Claim Constitutes a "Claim" for "Wrongful Acts" Under the Policies, Triggering the Primary Carriers' Obligation to Pay 100% of Mr. Schulman's Claim Expenses on a Current Basis**

Although the Primary Carriers previously acknowledged that the criminal DOJ Claim against Mr. Schulman constituted a "Claim for a Wrongful Act" with respect to the Subpoena and DOJ investigation pending as of June 2017 (*see* Ex. 5 at 001), the Insurers later unilaterally reversed course entirely, claiming (wrongly) that the Indictment is not covered because "none of the [Claim] definition's subparts address criminal proceedings."  Ex. 7 at 004; Ex. 8 at 004.

The Primary Carriers' reading of the "Claim" definition in their effort to contrive a rationale for their precipitous and late-hour repudiation of coverage contravenes the plain

18

language of the Policies and well-established law.  The definition does not limit a Claim to a civil demand only; qualifying under "any" of the subparts is sufficient to trigger coverage. Ex. 1 at 007 § II.B.1.  Moreover, adding the term "civil" to all of the Policies' "Claim" definition subparts would, in effect, rewrite the terms of the Policies Insurers drafted and issued, which Maryland law does not allow.  *Drutz*, 2012 WL 665984, at *2 ("If the language in a contract is clear and unambiguous, then the contract must be enforced as written and the language may not yield to what the parties later say they meant.").

The Policies unambiguously cover "Claims for Wrongful Acts," including those in the form of any "written demand against any Insured for monetary or non-monetary relief."  Ex. 1 at 007 § II.B.1.a.  Here, the Subpoena and Indictment each constitute a "Claim" under the Policies, and together constitute one related "Claim" deemed made during the relevant 2016–2017 Policy Period.  Ex. 1 at 010 § III.C.  By their express terms, the Policies do not limit coverage to allegations of civil wrongdoing only, and the return of the Indictment against Mr. Schulman does not somehow convert the DOJ Claim from a covered one (as the Primary Carriers previously acknowledged) into an uncovered one.

### A.       The DOJ Claim Constitutes a "Claim" Under the Policies

The Policies broadly define "Claim" to include "any of the following" of the definition's four subparts that include more than civil proceedings, and expressly include "written demand[s] against any **Insured** for monetary or non-monetary relief."  Ex. 1 at 007 § B.1.a.  Applying the fundamental principle of insurance policy interpretation that requires policy terms to be accorded "their ordinary and accepted meanings," the DOJ Claim clearly constitutes a Claim under the Policies.  *Pacific Indem.*, 488 A.2d at 488.

First, there can be no dispute that the Subpoena and Indictment are both "written" documents.  *See, e.g.*, *Fin. Indus. Regulatory Auth., Inc. v. Axis Ins. Co.*, 951 F. Supp. 2d 826,

832 (D. Md. 2013) (finding email communication satisfied claim definition's requirement of a writing). Second, the Subpoena and Indictment are both demands. The common and ordinary meaning of "demand" includes "something claimed as due or owed."[5] In short, "the gravamen of a legal demand is its notice providing function." *Gil Enter., Inc.*, 79 F.3d at 246 (citing cases).

Here, the Subpoena "COMMANDED" a representative of the Firm "to appear in [a] United States district court at [a specific] time, date, and place . . . to testify before the court's grand jury"; and ordered ("YOU MUST . . . bring with you") the Firm, Mr. Schulman, and others to produce numerous documents, including as an option to comply with the Subpoena in lieu of providing testimony. Ex. 2 at 001–002. In sum, the DOJ exercised its legal rights, which in turn triggered the Firm's and Mr. Schulman's legal obligations. *See also Weaver v. Axis Surplus Ins. Co.*, 639 Fed. Appx. 764, 766–67 (2d Cir. 2016) (concluding a Maryland Attorney General's letter was a "demand" because it "set forth the Division's request under a claim of right, including its entitlement to the documents," and put recipient "on notice of the legal consequences"); *Astellas US Holding, Inc. v. Starr Indem. & Liab. Co.*, 2018 WL 2431969, at *4 (N.D. Ill. May 30, 2018) ("The subpoena satisfies subpart (1) [of the definition of 'Claim'] because it is a written demand for plaintiffs to appear before government officials and to produce specific documents. This is a demand for non-monetary relief."); *Minuteman Int'l, Inc. v. Great Am. Ins. Co.*, 2004 WL 603482, at *7 (N.D. Ill. Mar. 22, 2004) (a "subpoena is not a mere request for information, but a substantial demand for compliance by a federal agency with the ability to enforce its demand"); *Syracuse Univ. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,

---

[5] *Demand*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/demand (last visited June 30, 2021). *See also Gil Enter., Inc. v. Delvy*, 79 F.3d 241, 246 (2d Cir. 1996) (a demand is an "imperative solicitation for that which is legally owed," and it "is intended to trigger certain rights and obligations").

2013 WL 3357812, at *2 (N.Y. Sup. Ct. Mar. 7, 2013) ("The grand jury's investigations and the subpoenas constitute a 'written demand . . . for non-monetary relief.'"), *aff'd*, 112 A.D.3d 1379 (N.Y. App. Div. 2013).[6]

The Indictment, too, constitutes a demand; it seeks to require that Mr. Schulman "shall forfeit to the United States" all property "constituting or derived from proceeds obtained directly or indirectly" as a result of alleged offenses, as well as property "traceable to such property," and expressly demands a "money judgment" against Mr. Schulman in the event of conviction, in an amount equal to the purported proceeds obtained as a result of the alleged offenses.  Ex. 3 at 029–030 ¶¶ 1–3.  The Indictment further makes an express and distinct demand that, should property demanded from Mr. Schulman be unobtainable "as a result of any act or omission of" Mr. Schulman (whether now or in the future), "it is the intent of the United States . . . to seek forfeiture of substitute property."  Ex. 4 at 030 ¶ 4.

Third, both the Subpoena and Indictment are "against an[] Insured."  The Subpoena was addressed and issued to the Firm, an Insured under the Policies.  Ex. 2 at 001–002; Ex. 1 at 008 § II.H.  The Subpoena was also against Mr. Schulman, who is an Insured under the Policies.  Ex. 1 at 008 § II.I.1.  The Subpoena defines "'You' or 'your'" as the Firm and defines the Firm as "the entity to which this subpoena is addressed and includ[ing] all of its present and former directors, officers, partners, counsel, associated attorneys, employees, agents and all other persons purporting to act on behalf of the foregoing."  Ex. 2 at 004–005 §§ A.3–4.  The Subpoena also

---

[6] Notably, failure to comply with a grand jury subpoena like the Subpoena here, may be "punishable by fine or imprisonment as contempt of court."  *Syracuse Univ.*, 2013 WL 3357812, at *2 (citing Judiciary Law § 751; Fed. R. Crim. Proc. § 17(g); 18 USC § 401; 28 USC § 1826); *see also MBIA Inc. v. Federal Ins. Co.*, 652 F.3d 152, 159 (2d Cir. 2011) ("The outward-facing form [an] investigation takes is the service of a subpoena, which, on its face, commands the production of documents and threatens criminal penalties for noncompliance.").

specifically demands all relevant "documents and correspondence . . . located in the e-mails or files of [Mr.] Schulman." Ex. 2 at 007 § B.2.a. Since the Policies define Insured Individuals, in relevant part, as "any one or more natural persons who are past, present or future . . . directors, officers, principals, shareholders, partners, or members of the **Firm**," the Subpoena is against Mr. Schulman and, thus, "against any Insured." Ex. 1 at 008 § II.I.1 and 006 § I.A. Similarly, the Indictment is "against any Insured" because it is against Mr. Schulman. Ex. 3 at 001 ¶ 1.

Finally, the Subpoena and Indictment are demands "for monetary or non-monetary relief." The common and ordinary meaning of "relief" includes "legal remedy or redress,"[7] and a subpoena is a legal instrument that demands a party give redress or a remedy to another party. *See, e.g.*, *Syracuse Univ.*, 2013 WL 3357812, at *2 ("A subpoena is a grand jury's means of preventing or redressing a wrong by enforcing the public's right to 'every man's evidence.'") (quoting *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972)). Furnishing information, appearing in court, and producing documents are all forms of relief the DOJ demanded from the Firm and Mr. Schulman in the Subpoena. Indeed, numerous courts have "concluded that the plain meaning of 'non-monetary relief' includes the production of documents." *Patriarch Partners, LLC v. AXIS Ins. Co.*, 2017 WL 4233078, at *4 (S.D.N.Y. Sept. 22, 2017) (subpoena "sought 'non-monetary relief' in the form of the documents that were to be produced"); *see also Morden v. XL Specialty Ins.,* 177 F. Supp. 3d 1320, 1330 (D. Utah 2016) (finding that subpoenas compelling testimony and the production of documents sought specific relief), *rev'd in part on other grounds*, 903 F.3d 1145 (10th Cir. 2018); *Minuteman Int'l Inc.*, 2004 WL 603482, at *7 ("Just as being required to produce documents or provide testimony would be relief in a court proceeding . . . the relief

---

[7] *Relief*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/relief (last visited June 30, 2021).

sought by the subpoena itself is the production of documents or testimony.").

Similarly, the Indictment seeks both monetary and non-monetary relief. Specifically, the Indictment seeks forfeiture from Mr. Schulman of both money and property, and expressly, "a money judgment," on various counts in an amount equal to property directly or indirectly obtained as a result of the alleged offenses. Ex. 3 at 029–030 ¶¶ 1–4. *See also Syracuse Univ.*, 2013 WL 3357812, at *3 (finding "that a grand jury's investigations are criminal proceedings for monetary or non-monetary relief").

Consequently, the DOJ Claim is "for monetary or non-monetary relief" and thus constitutes a "Claim" under the Policies. *See Joseph P. Bornstein, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 828 F.2d 242, 245 (4th Cir. 1987) (holding grand jury investigation and post-indictment proceedings constituted "claims" under policy definition that did not mention criminal wrongdoing, only "proceedings brought by government regulatory agencies seeking nonpecuniary relief") (applying Virginia law).

### B. The DOJ Claim Alleges "Wrongful Acts" Under the Policies, Which Do Not Limit Coverage to Civil Wrongdoing

Any contention that the DOJ Claim is not one for "Wrongful Acts" against Mr. Schulman sufficient to trigger coverage under the Policies also fails as a matter of law. The Policies define "Wrongful Act," in relevant part, as "*any actual or alleged . . . act, error or omission* [or] breach of contract for **Professional Services** . . . committed or attempted, or allegedly committed or attempted, solely in the performance of or failure to perform **Professional Services** by any **Insured**." Ex. 1 at 009–010 § II.P (emphasis in italics added). "Professional Services" means legal services Mr. Schulman performed in the course of his professional capacity as an attorney of the Firm, so long as fees accruing from such services, in part, inured to the Firm's benefit. Ex. 1 at 009 § II.N.

Tellingly, nothing in the Policies suggests—let alone requires—that a Wrongful Act must be purely civil in nature.  Rather, any act, error or omission will suffice.  Significantly, the Primary Carriers *already conceded* as much when they confirmed the criminal DOJ Claim constitutes a "Claim for Wrongful Acts" to Mr. Schulman in the written Advancement Agreement, with respect to the Subpoena and DOJ investigation pending at that time.  *See* Ex. 5 at 001 (confirming Primary Carriers had compromised prior position "that no Claim for a Wrongful Act had been made within the meaning of the policy" and confirming agreement "to cover" Mr. Schulman's defense fees and costs in the DOJ matter).[8]

Moreover, the return of the subsequent and related Indictment only serves to reiterate the alleged Wrongful Acts against Mr. Schulman investigated by the DOJ; it in no way vitiates his available coverage for same.  The Indictment alleges Mr. Schulman (i) undertook various acts, errors and omissions, including the purported creation of a series of false documents used to falsely claim and obtain control over $12.5 million in Somali sovereign assets (Ex. 3 at 005 ¶ 22); (ii) caused the Firm "to retain approximately $3.3 million of the Somali funds for fees and expenses," purportedly receiving hundreds of thousands of dollars in compensation from that revenue (Ex. 3 at 005 ¶ 23, 018 ¶ 58); and (iii) from 2009 to 2014, obtained money and property in the course and scope of his Somali representations, as a consequence of making a series of "materially false and fraudulent pretenses, representations and promises" in violation of Federal

---

[8] Nonetheless, the Subpoena makes clear it was issued "[p]ursuant to an official criminal investigation being conducted by the United States Attorney's Office."  Ex. 2 at 001.  To aid in that criminal investigation, the Subpoena demanded various of the Firm's contracts, billing records and financial transaction details expressly targeting various of Mr. Schulman's Somali engagements.  Ex. 2 at 006–008 § B.  *See also Conduent State Healthcare, LLC v. AIG Specialty Ins. Co.*, 2019 WL 2612829, at *5 (Del. Super. Ct. June 24, 2019) (interpreting a professional liability policy and holding that an investigation by the Texas Attorney General into the possibility of Medicaid fraud by the insured was no "different from actually alleging an unlawful act").

law.  Ex. 3 at 006–007 ¶ 24b, 008–010 ¶¶ 29–32, 012 ¶¶ 39–40, 013 ¶ 42, 014 ¶ 46, 016–017 ¶

53.  The Indictment charges Mr. Schulman with conspiracy to commit mail, wire, and bank

fraud, as well as wire fraud, bank fraud, mail fraud, conspiracy to commit money laundering, and

money laundering.  Ex. 3 at 001–021 (detailing conspiracy count one), 022–027 (detailing counts

two through eleven). Further, the Indictment includes forfeiture allegations expressly seeking

Mr. Schulman forfeit any property "constituting, or derived from, proceeds obtained directly or

indirectly as a result of such offenses, including, but not limited to, a money judgment" (Ex. 3 at

029 ¶ 2 and 030 ¶ 3), and further seeks to substitute assets "[i]f, as a result of any act or omission

of any defendant, any property described" is unobtainable.  Ex. 3 at 030 ¶ 4.

Insurers knew the Subpoena was expressly pursuant to an official *criminal* investigation

when they acknowledged coverage for Mr. Schulman in June 2017 and thereafter proceeded to

pay Mr. Schulman's Claim Expenses in connection with that Subpoena and the associated DOJ

investigation for nearly four years.  *See* Bulter Decl. ¶¶ 5-6.  *See also Syracuse Univ.*, 2013 WL

3357812, at *3 ("[C]ommon sense dictates that a criminal investigation is an integral part of a

criminal proceeding.").

Nothing in the Indictment transforms the covered DOJ Claim against Mr. Schulman into

an uncovered claim, and the Primary Carriers are wrong that coverage under the Policies is

"limited in pertinent part to civil rather than criminal proceedings."  Ex. 7 at 001; Ex. 8 at 001.

Indeed, a lack of express mention of "criminal" proceedings in two of four subparts of the Claim

definition does not somehow negate the subpart of the Claim definition that broadly *does* apply

to any type of "written demand against any **Insured** for monetary or non-monetary relief."  Ex. 1

at 007 § II.B.1.a.  To the contrary, the fact that subpart a. of the Claim definition *excludes* any

reference limiting coverage to "civil" demands necessarily demonstrates Insurers' intent to

*include* written demands that might allege criminal acts, errors or omissions.[9] *See Chantel Assocs.*, 656 A.2d at 786 ("[A]ny doubts as to whether there is a potentiality of coverage under an insurance policy is to be resolved in favor of the insured").

This conclusion is further compelled by a review of the Policies as a whole, and in particular, the terms of the Policies' illegal profit and fraud or criminal acts exclusions, which in fact support Mr. Schulman's entitlement to defense coverage for the DOJ Claim because by their express terms, these exclusions apply only when and "*if* evidenced by any judgment, final adjudication . . . or written admission by an Insured." Ex. 1 at 011 § IV.A.9 (emphasis added); *Graham v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 474 F. App'x 956, 960 (4th Cir. 2012) (insurer obligated to defend policyholder absent adjudication or admission) (applying West Virginia law); *Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 921 A.2d 245, 247 (Md. 2007) (applying exclusion for fraudulent or criminal acts to limit coverage, but noting expressly that relevant exclusion (unlike here) applied to claims for fraudulent and criminal conduct "whether finally adjudicated or not").[10]

---

[9] Insurers' assertion that "the Claim definition plainly limits coverage for proceedings to civil proceedings" is, accordingly, misleading. Defs.' Pre-Mot. Ltr. (ECF Dkt. No. 18) at 2. As is Insurers' reliance on *Expo Properties, LLC v. Experient, Inc.*, 956 F.3d 217 (4th Cir. 2020) for the inapplicable proposition that "under Maryland law, specific contract terms take precedence over general terms." In *Expo Properties*, the Fourth Circuit examined two separate lease provisions (Article 6 (C) and Article 24) that the lower court found "both related to surrender." *Id.* at 229. Because one provision was general in character and the other specific, both courts correctly applied the nearly self-evident rule that a specific provision takes precedence over a general provision and controls it. *Id.* That scenario is a far cry from a carefully drafted defined term in an insurance policy relied upon by an insured, which expressly provides that satisfaction of any of the four distinct subparts will trigger coverage.

[10] *See also U.S. Bank Nat. Ass'n v. Indian Harbor Ins. Co.*, 68 F. Supp. 3d 1044, 1050 (D. Minn. 2014), *amended sub nom. U.S. Bank Nat'l Ass'n v. Indian Harbor Ins. Co.*, 2015 WL 12778848 (D. Minn. Mar. 19, 2015) (ill-gotten gains exclusion containing final adjudication requirement did not apply to claim including allegations of disgorgement when claim settled before trial); *Gallup, Inc. v. Greenwich Ins. Co.*, 2015 WL 1201518, at *10 (Del. Super. Ct. Feb. 25, 2015) (exclusion requiring "final adjudication in the underlying action or in a separate action or

Notably, the Primary Carriers acknowledged as early as June 22, 2017 (in the Etelson Letter sent to Mr. Schulman with the Advancement Agreement), that these exclusions would only apply if "later determined to be applicable" (Ex. 6 at 002), and the Denial Letters, too, merely reserve the Primary Carriers' rights on these exclusions, implicitly conceding they do not—and cannot—presently apply while the Indictment's allegations remain unproven.  Ex. 7 at 005; Ex. 8 at 005.

Mr. Schulman vigorously disputes the pending Indictment's charges and, absent a final adverse adjudication or admission in the criminal proceeding, the Primary Carriers cannot avoid their defense obligations under the Policies, nor the Advancement Agreement's guarantee, to cover Mr. Schulman's Claim Expenses as incurred.

### C.      The Policies Require Advancement of 100% of Claim Expenses on a Current Basis

The plain terms of the Policies require Insurers to, "upon written request, pay Claim Expense owed . . . on a current basis."  Ex. 1 at 006 § I.B.3.  Mr. Schulman, through Akin, made numerous such requests, yet the Primary Carriers abruptly stopped paying in late 2020 despite having honored their Policy and Advancement Agreement obligations for nearly four years. Butler Decl. ¶¶ 5, 7; *see generally* Exs. 5–6.  Accordingly, the Primary Carriers are in present breach of the Policies, and currently owe 100% of Mr. Schulman's Claim Expenses, which exceed $2,000,000 for amounts incurred through May 2021 and are continuing.  Butler Decl. ¶¶ 9–11; *see also Aspen Ins. UK, Ltd. v. Fiserv, Inc.*, 2010 WL 5129529, at *7 (D. Colo. Dec. 9, 2010) (insurer required to advance defense costs as they are incurred); *Westchester Fire Ins. Co. v. Schorsch*, 186 A.D.3d 132, 147–48 (N.Y. Sup. Ct. Aug. 20, 2020) (insurer must advance

---

proceeding" demonstrated insurer "specifically decided" reimbursement would "only be precluded upon a final adjudication").

defense costs for any claim "prior to its final disposition" since "there is a possibility of coverage under the policies"); *Syracuse Univ.*, 2013 WL 3357812, at *5 (granting insured partial summary judgment where "the definition of 'claim' and 'wrongful act' have been met for purposes of coverage," and the policy "provides that the defendant is required to 'advance defense costs of such claim prior to disposition").

## II.      In the Alternative, the Primary Carriers Are Estopped From Continuing to Breach the Advancement Agreement, Which Guarantees Coverage and Payment for Mr. Schulman's Claim Expenses

Even if there were questions of fact surrounding interpretation of the Policies and Mr. Schulman's clear entitlement to Claim Expenses coverage thereunder—which there are not—the Primary Carriers should nonetheless be estopped from continuing to breach the Advancement Agreement upon which Mr. Schulman has detrimentally relied and pursuant to which the Primary Carriers expressly promised to cover and pay 70% of Mr. Schulman's Akin defense fees and 100% of his costs for the DOJ Claim.  *See* Exs. 4–5.

Indeed, there are no disputed issues of material fact:  the Policies, the Advancement Email, the Advancement Agreement, the Etelson Letter, the Denial Letter, and the Primary Carriers' past conduct of advancing Mr. Schulman's Claim Expenses all speak for themselves. Additionally, the Primary Carriers agreed immediately prior to, and after notice of, this Motion that "the coverage determination at issue in this litigation should be decided as a matter of law and that there are no issues of material fact that preclude an immediate determination of these issues."  Defs.' Pre-Mot. Ltr. (ECF Dkt. No. 18) at 1.

Thus, as Mr. Schulman's ability to continue to mount a defense to the pending and unproved DOJ Claim is substantially prejudiced—and will remain so—if his defense counsel remain unpaid and the Advancement Agreement is not enforced against the Primary Carriers, this Court may decide the issue of estoppel as a matter of law, and Mr. Schulman respectfully

requests the Court do so in his favor.  *See Allstate Ins. Co. v. Reliance Ins. Co.*, 786 A.2d 27, 33

(Md. Ct. Spec. App. 2001) (deciding question of estoppel as a matter of law).

**A.      Mr. Schulman Relied on the Primary Carriers' Definite Promise in
the Advancement Agreement to His Detriment**

Under Maryland law, the elements of detrimental reliance include: (i) a clear and definite

promise; (ii) a reasonable expectation on the part of the Primary Carriers that such promise will

induce action or forbearance on the part of Mr. Schulman; (iii) actual inducement of reasonable

action or forbearance by Mr. Schulman; and (iv) resulting detriment to Mr. Schulman, which can

only be avoided by the enforcement of the promise.  *See Pavel Enters., Inc. v. A.S. Johnson Co.,*

*Inc.*, 674 A.2d 521, 532 (Md. 1996).  All four elements are satisfied here, warranting the granting

of Mr. Schulman's Motion on this issue.

First, the Advancement Agreement is a "clear and definite promise."  The Advancement

Agreement promises Mr. Schulman that the Primary Carriers agreed "to ***cover*** 70% of defense

fees and 100% of costs incurred with respect to this matter . . . ."  Ex. 5 at 001 (emphasis added).

This Agreement is not, as the Primary Carriers would have this Court believe, an agreement to

advance fees pending some future declaration or resolution of coverage.  Rather, it expressly

promised defense coverage to Mr. Schulman, noting the agreement would "apply to separate

counsel to be retained for individual attorneys involved in this matter, including Akin Gump on

[Mr. Schulman's] behalf."  Ex. 5 at 001.  Moreover, the subject "matter" of the Advancement

Agreement, while "involving a subpoena," was not limited thereto (Ex. 5 at 001) and responded

directly to Mr. Schulman's request to confirm the payment agreement with respect to his

retention of Akin in "the investigation and any related proceedings."  Ex. 4 at 001.

That the Advancement Agreement was made "under a reservation of rights" (*see* Ex. 5 at

001) does not weigh against a finding of estoppel.  In fact, the ***only*** reservations communicated

29

to Mr. Schulman in connection with the Advancement Agreement related to the Policies'
definition of "Loss" and certain presently inapplicable exclusions that the Primary Carriers
acknowledged do not apply unless and until "evidenced by any judgment, final adjudication,
alternate dispute resolution proceeding or written admission by an Insured."  Ex. 6 at 001–003;
*see also* Ex. 1 at 010–011 § IV.A.9.  No judgment or admission has established that Mr.
Schulman committed any crime or received any ill-gotten gain to trigger these exclusions.

Moreover, neither the Advancement Agreement, nor the Etelson Letter reserved rights on
the definition of "Claim" or on the basis that the Policies do not insure *allegations* of criminal
acts, errors or omissions.  *See* Exs. 5–6.  This is true despite full awareness at the time of the
unequivocal Advancement Agreement that the Subpoena and DOJ investigation involved alleged
criminal misconduct and the DOJ as claimant.

Second, the Primary Carriers had a reasonable expectation that the offer would induce
action or forbearance by Mr. Schulman.  The Advancement Agreement expressly acknowledges
that Mr. Schulman retained Akin as his defense counsel in the matter as a whole and promises to
pay Claim Expenses for Mr. Schulman's incurred fees. Ex. 5 at 001.  Therefore, the Primary
Carriers had a reasonable expectation that Mr. Schulman would, at a minimum:  (i) continue to
retain Akin as his defense counsel as the matter progressed, including in any "related
proceedings"; (ii) rely on the Primary Carriers' promise to cover and pay 70% of Akin's fees and
100% of costs as the DOJ Claim progressed in order to prepare and mount his defense; and (iii)
expect that such defense coverage would continue unless and until a final adverse adjudication or
admission of criminal offense came about—neither of which have occurred.

Third, the Advancement Agreement did, in fact, induce Mr. Schulman's actions and
forbearances listed above.  Mr. Schulman has been able to maintain continuity in his defense

team of current and prior Akin attorneys since commencement of the DOJ investigation and notice of the Subpoena in 2017, throughout the resulting 2020 Indictment, and has submitted to the Primary Carriers invoices for covered Claim Expenses incurred over that nearly four-year period, which the Primary Carriers paid for years.  Butler Decl. ¶¶ 4–7; Exs. 7–8.

Fourth, the Advancement Agreement "causes a detriment which can only be avoided by the enforcement of the" Advancement Agreement.  *Pavel*, 674 A.2d at 532.  Without warning, the Primary Carriers abruptly stopped paying Mr. Schulman's Claim Expenses in late 2020 when Mr. Schulman was at his most vulnerable, facing the unproven charges in the Indictment returned against him in December.  Bulter Decl. ¶ 7.  In fact, the Primary Carriers actually stopped paying Mr. Schulman's Claim Expenses even *prior to* the return of the Indictment, as invoices billed for fees incurred before December 2020 remain outstanding.  *Id.* ¶¶ 7–8.  The Primary Carriers reneged on their promise knowing full well that Mr. Schulman had relied for years on the Primary Carriers' promise to pay—and actual payment—of his Claim Expenses.

Now, Mr. Schulman's interests are materially prejudiced because of the Primary Carriers' breach of the Advancement Agreement.  For example:  (i) in reliance on the Advancement Agreement, Mr. Schulman did not seek or arrange from 2017 until now any alternative means of paying his defense counsel the amounts the Primary Carriers agreed to pay pursuant to the Advancement Agreement acknowledging coverage; (ii) had Mr. Schulman been informed the Primary Carriers disputed defense coverage or would not honor the Advancement Agreement after years of doing so, Mr. Schulman may have brought a coverage claim against Insurers years ago to resolve the issue; instead, he focused on defending himself against the DOJ Claim based upon a reasonable belief that he could rely on the Advancement Agreement; (iii) the Primary Carriers have not paid Mr. Schulman's defense counsel since at least late 2020, which creates

substantial risk to, and burdens, Mr. Schulman, Mr. Schulman's defense counsel, and the defense itself; (iv) Mr. Schulman's Claim Expenses continue to increase as he continues to vigorously defend against the unproven DOJ Claim pending against him; (v) the DOJ Claim is in an advanced stage such that it would be difficult (not to mention expensive) for any substitute defense counsel to step in anew and continue to efficiently and effectively defend Mr. Schulman; (vi) current defense counsel may not be willing to continue to represent Mr. Schulman in light of the Primary Carriers' ongoing breach of the Advancement Agreement, which has left them uncompensated for legal services that, in total, exceed $2,000,000; and (vii) had Mr. Schulman known the Primary Carriers would breach the Advancement Agreement or dispute defense coverage after years, he would have had the opportunity to retain a lower cost defense firm from the outset, in which case his accrued defense spend would not be in excess of $2,000,000 (as it is today), and he would not be facing (as he is presently) the potential challenge of retaining new, lower cost defense counsel and getting such counsel up to speed in the midst of a complex and expansive high-stakes proceeding.  Accordingly, Mr. Schulman relied on the Primary Carriers' promise in the Advancement Agreement to his detriment.

### B.      Circumstances Justify Deciding Estoppel as a Matter of Law

Moreover, contrary to Insurers' contention otherwise, this matter does not present a situation of an insurer agreeing to fund an insured's defense "while maintaining its position that coverage does not exist" so as to preclude this Court from finding estoppel as a matter of law. *See* Defs.' Pre-Mot. Ltr. (ECF Dkt. No. 18) at 3.  Rather, the Primary Carriers represented exactly the opposite to Mr. Schulman; the Advancement Agreement agreed not just to pay negotiated rates for Claim Expenses on behalf of Mr. Schulman but also "***to cover***" such Claim Expenses.  Ex. 5 at 001 (emphasis added).  And this Advancement Agreement was directly in response to Mr. Schulman's request seeking to memorialize his defense coverage in connection

with the Subpoena, the DOJ investigation, "and any related proceedings."  *See* Ex. 4 at 001.  The Primary Carriers expressly confirmed their agreement to cover and pay the Akin rates negotiated with the Firm, making a definite promise of advancement to Mr. Schulman personally.  Ex. 5 at 001.  By the Advancement Agreement, moreover, the Primary Carriers *reassured* Mr. Schulman that prior issues raised to the Firm (never to Mr. Schulman directly) relating to whether the matter constituted a "Claim for a Wrongful Act" had, in fact, been compromised, and provided Mr. Schulman no record or documentation of any prior correspondence or continued reservations on this resolved issue.  Ex. 5 at 001; *see also* Ex. 6 at 001-003.

The Primary Carriers did not reserve their rights with regard to whether the DOJ Claim constituted a "Claim" because it alleged criminal wrongdoing or whether a future indictment could somehow vitiate Insurers' defense coverage obligation.  *See generally* Exs. 5–6. Accordingly, Insurers' reliance in their pre-motion letter to the Court on *Nationwide Mutual Insurance Co. v. Regency Furniture, Inc.* is misplaced (among other reasons) because there the insurer *denied* coverage, so the policyholder could not rely on the insurer's denial as a promise that it would, "in fact, pay the claim as covered."  963 A.2d 253, 265 (Md. Ct. Spec. App. Jan. 6, 2009); Defs.' Pre-Mot. Ltr. (ECF Dkt. No. 18) at 3.

The *Haines v. St. Paul Fire & Marine Insurance. Co.* case cited by Insurers is also distinguishable for at least two significant reasons.  428 F. Supp. 435 (D. Md. 1977); Defs.' Pre-Mot. Ltr. (ECF Dkt. No. 18) at 3.  First, the insurer there expressly conditioned its defense of the policyholder (which condition the policyholder accepted) on "the absolute right to withdraw at any time upon written notice."  *Haines*, 428 F. Supp. at 443.  That was not and is not the case here.  Second, the insurer "paid all expenses related to the plaintiffs' defense through April 23, 1975 [and on] April 23, 1975 . . . notified plaintiffs that it would no longer provide a defense."

*Id.* at 437.  Here, the Primary Carriers did not notice Mr. Schulman of their coverage denial until approximately four months *after* they stopped paying any of Mr. Schulman's Claim Expenses, including outstanding fees incurred *prior* to return of the Indictment.  Butler Decl. ¶¶ 7–8.  Thus, the Primary Carriers should be estopped from their continued breach.

Mr. Schulman does not seek to create coverage through estoppel as Insurers contend.  Defs.' Pre-Mot. Ltr. (ECF Dkt. No. 18) at 2.  Mr. Schulman seeks merely to enforce the Advancement Agreement's prior *acknowledgement* of defense coverage under the Policies, which the Primary Carriers, in fact, honored for nearly four years.  *See* Ex. 6; Butler Decl. ¶¶ 5–6.  The Primary Carriers' revisionist history aside, they cannot escape this conclusion by reference to prior reservations they failed to communicate to Mr. Schulman as an Insured and which do not underpin the bases upon which they disclaimed coverage in March 2021.  Exs. 7–8.  Nor may the Primary Carriers rely on the position taken in their Denial Letters issued ***almost four years after*** the Advancement Agreement and notice of the "official criminal investigation" by the DOJ.  As set forth above, the assertion that the Indictment "does not fall within the definition of Claim, as none of the definitions' subparts address criminal proceedings" (Ex. 7 at 004; Ex. 8 at 004) is contrary to:  (i) the Primary Carriers' own reasoning that the Indictment is one Claim with the Subpoena (Ex. 7 at 002–003); (ii) the plain language of the Policies, which do not include the term "civil" in subpart a. of the definition of "Claim" (Ex. 1 at 007 § II.B.1.a.) and cover "any actual or alleged . . . act, error or omission" (Ex. 1 at 009 § II.P.1.); and (iii) established case law requiring policy language to be afforded its plain and ordinary meaning, with any ambiguities construed in favor of coverage.  Accordingly, the Primary Carriers should be estopped from denying payment of Mr. Schulman's Claim Expenses pursuant to their promise in the Advancement Agreement.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Mr.

Schulman's motion for partial summary judgment on Counts I, II, IV and V of the Complaint

and find that:  (i) the DOJ Claim inclusive of the Indictment constitute a "Claim" under the

Policies triggering Mr. Schulman's entitlement to defense coverage, and specifically ordering

Insurers to advance 100% of Mr. Schulman's incurred, outstanding and continuing Claim

Expenses, subject only to each Insurer's respective limits of liability and attachment points; or

(ii) in the alternative, that the Primary Carriers are estopped from reneging on their promise in

the Advancement Agreement to pay 70% of Mr. Schulman's defense fees and 100% of his

defense costs, and ordering specific performance of the Primary Carriers' payment obligations

thereunder; and (iii) award Plaintiff all relief as in law and justice he is entitled to Counts I, II, IV

and V of the Complaint.

Dated: June 30, 2021                    Respectfully submitted,

                                        /s/ *Jeffrey M. Schwaber*
                                        Jeffrey M. Schwaber (Bar # 06095)
                                        STEIN SPERLING BENNETT DE JONG
                                        DRISCOLL PC
                                        1101 Wootton Parkway
                                        Suite 700
                                        Rockville, MD 20852
                                        (301) 340-2020
                                        jschwaber@steinsperling.com

                                        Robin L. Cohen *(pro hac vice pending)*
                                        Jillian M. Raines *(pro hac vice pending)*
                                        COHEN ZIFFER FRENCHMAN &
                                        MCKENNA LLP
                                        1350 Avenue of the Americas, 25th Floor
                                        New York, NY 10019
                                        (212) 584-1890
                                        rcohen@cohenziffer.com
                                        jraines@cohenziffer.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the above and foregoing document has been served electronically on all counsel of record via operation of the Court's electronic filing system and by electronic mail on June 30, 2021.

*/s/  Jeffrey M. Schwaber*
Jeffrey M. Schwaber (Bar # 06095)
