# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JEREMY W. SCHULMAN,

                        Plaintiff,

vs.


AXIS SURPLUS INSURANCE
COMPANY, ENDURANCE
AMERICAN SPECIALTY
INSURANCE COMPANY, and
PROSIGHT SYNDICATE 1110 AT
LLOYD'S,


                        Defendants.

Civil Action No.: 8:21-cv-1252

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF UNDISPUTED FACTS ....................................................... 2

    A.    The Parties ................................................................................... 2

    B.    The Policies.................................................................................. 3

    C.    The DOJ Subpoena and related coverage correspondence ..................... 5

    D.    The Indictment and related coverage correspondence........................... 7

ARGUMENT ...................................................................................................... 8

I.    Summary Judgment Standard ...................................................................... 8

II.    The Insurers are entitled to summary judgment because the Indictment does not constitute a Claim as defined in the Primary Policy, and therefore no coverage exists. ........................................................................................................... 9

    A.    Counts I, III and IV should be dismissed because the criminal Indictment does not constitute a Claim as defined in the Policies. ........................................ 11

        1.    The Primary Policy's definition of "Claim" is limited to civil matters, not criminal proceedings. ............................................. 12

        2.    Plaintiff's reliance on the Primary Policy's exclusion for claims arising out of criminal acts, but only upon a final adjudication, fails because an exclusion cannot create coverage and Plaintiff's argument is inconsistent with the exclusion's plain language. ................. 15

        3.    The cases upon which Plaintiff relies support the Insurers' argument that the "written demand for… relief" prong cannot bring criminal proceedings within the definition of "Claim" that is otherwise limited to civil matters............................................ 17

    B.    Counts II and V should be dismissed because Maryland Law precludes a Court from expanding coverage based on an offer lacking the requisites of a contract, or on waiver, estoppel, or "detrimental reliance."............................. 19

        1.    Plaintiff cannot establish a contractual obligation, detrimental reliance, or estoppel because the Primary Carriers clearly stated that no coverage existed and offered to fund part of Plaintiff's defense of the Subpoena as a compromise and subject to a reservation of rights. .............................................................. 21

2.      Plaintiff likewise cannot establish that the Insurers waived any rights. ................................................................................................... 26

3.      Plaintiff cannot establish that waiver, estoppel, or detrimental reliance expand the coverage available under the Primary Policy. .......... 27

III.    Count VI should be dismissed because Maryland law does not recognize an independent tort of bad faith failure to pay defense expenses. ........................................ 28

CONCLUSION ....................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Casualty & Surety Co. v. Urner*,
    287 A.2d 764 (Md. 1972) ........................................................................................28

*Allstate Insurance Co. v. Reliance Insurance Co.*,
    786 A.2d 27 (Md. 2001) ...................................................................................26, 27

*Astellas US Holding, Inc. v. Starr Indemnity & Liability Co.*,
    No. 17 CV 8220, 2018 WL 2431969 (N.D. Ill. May 30, 2018)............................17

*Baltimore Scrap Corp. v. RLI Insurance Co.*,
    493 F.Supp.3d 433 (D. Md. 2020) ...................................................................11, 12

*Blissful Enterprises, Inc. v. Cincinnati Insurance Co.*,
    421 F.Supp.3d 193 (D. Md. 2019) ............................................................11, 12, 21

*Daniel v. National Casualty Insurance Co.*,
    135 F. Supp. 3d 355, 359 (D. Md. 2015) ...............................................................8

*Celotex v. Catrett*,
    477 U.S. 317 (1986)................................................................................................8

*Chartis Property Casualty Co. v. Huguely*,
    243 F. Supp. 3d 615 (D. Md. 2017) .....................................................................11

*Creveling v. Government Employees Insurance Co.*,
    828 A.2d 229 (Md. 2003) .....................................................................................26

*Dickson v. Selected Risks Insurance Co.*,
    666 F. Supp. 80 (D. Md. 1987) ............................................................................29

*Expo Properties, LLC v. Experient, Inc.*,
    956 F.3d 217 (4th Cir. 2020) ................................................................................15

*Fiberglass Insulators, Inc. v. Dupuy*,
    856 F.2d 652 (4th Cir. 1988) ................................................................................20

*Financial Industry Regulatory Authority, Inc. v. Axis Insurance Co.*,
    951 F.Supp.2d 826 (D. Md. 2013) .......................................................................13

*Francis v. Allstate Insurance Co.*,
    709 F.3d 362 (4th Cir. 2013) ................................................................................11

*Gallup, Inc. v. Greenwich Insurance Co.*,
    No. N14C–02–136FWW, 2015 WL 1201518 (Del. Super. Ct., Feb. 25, 2015)....................16

*Graham v. National Union Fire Insurance Co. of Pittsburgh, PA,*
    474 F. App'x 956 (4th Cir. 2012) .........................................................16

*Haines v. St. Paul Fire & Marine Insurance Co.,*
    428 F. Supp. 435 (D. Md. 1977) ...............................................23, 24, 26, 28

*Harleysville Preferred Insurance Co. v. Rams Head Savage Mill, LLC,*
    187 A.3d 797 (Md. Ct. Spec. App. 2018) ...............................................12

*Hartford Casualty Insurance Co. v. Chase Title, Inc.,*
    247 F. Supp. 2d 779 (D. Md. 2003) ..........................................................9

*Hartford Fire Insurance Co. v. Annapolis Bay Charters, Inc,*
    117 F. Supp. 2d 496 ..................................................................................25

*Home Exterminating Co., Inc. v. Zurich-American Insurance Group,*
    921 F. Supp. 318, 325 (D. Md. 1996) .......................................................9

*Insurance Co. of North America v. Coffman,*
    451 A.2d 952 (Md. Ct. Spec. App. 1982) ...............................................27

*Jackson v. Standard Fire Insurance Co.,*
    406 F.Supp.3d 480 (D. Md. 2019) .............................................................8

*Johnson v. Federal Kemper Insurance Co.,*
    536 A.2d 1211 (Md. Ct. Spec. App. 1988) .............................................28

*Joseph P. Bornstein, Ltd. v. National Union Fire Insurance Co. of Pittsburgh, Pa.,*
    828 F.2d 242 (4th Cir. 1987) ...................................................................18

*Mackey v. Shalala,*
    43 F. Supp. 2d 559 (D. Md. 1999) .............................................................8

*Maryland Automobile Insurance Fund v. Baxter,*
    973 A.2d 243 (Md. Ct. Spec. App. 2009) ...............................................16

*Mesmer v. Maryland Automobile Insurance Fund,*
    725 A.2d 1053 (Md. 1999) .......................................................................29

*Minuteman International, Inc. v. Great American Insurance Co.,*
    No. 03 C 6067, 2004 WL 603482 (N.D. Ill. Mar. 22, 2004) ..................17

*Morden v. XL Specialty Insurance,*
    177 F. Supp. 3d 1320 (D. Utah 2016) .....................................................17

*Nationwide Mutual Insurance Co. v. Regency Furniture, Inc.,*
    963 A.2d 710 (Md. Ct. Spec. App. 2009) ....................................22, 23, 25

*Nationwide Mutual Insurance Co. v. Regional Elec. Contractors*,
  680 A.2d 547 (Md. Ct. Spec. App. 1996) ...............................................................26

*Neuman v. Travelers Indemnity Co.*,
  319 A.2d 522 (Md. 1974) .......................................................................25, 26, 27

*OneBeacon Insurance Co. v. Metro Ready-Mix, Inc.*,
  242 F. App'x 936, 2007 WL 2031613 (4th Cir. July 13, 2007) ..............................28

*Patriarch Partners, LLC v. AXIS Insurance Co.*,
  No. 16-CV-2277 (VEC), 2017 WL 4233078 (S.D.N.Y. Sept. 22, 2017)..............................17

*Pavel Enterprises, Inc. v. A.S. Johnson Co., Inc.*,
  674 A.2d 521 (Md. 1996) ......................................................................22, 23

*Sallie v. Tax Sale Invs., Inc.*,
  814 A.2d 572 (Md. 2002) ...................................................................................27

*Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*,
  376 Md. 157, 829 A.2d 540 (2003) ..........................................................................11

*Syracuse University v. National Union Fire Insurance Co. of Pittsburgh, PA*,
  40 Misc. 3d 1205(A), 975 N.Y.S.2d 370 (Sup. Ct.), aff'd, 112 A.D.3d 1379,
  976 N.Y.S.2d 921 (2013) ......................................................................................17

*Ticaret v. Lexon Insurance Co.*,
  No. 19-cv-00771, 2020 WL 6801933 (D. Md. Nov. 19, 2020)..............................15

*Transamerica Premier Life Insurance Company v. Selman & Company*,
  LLC, 401 F. Supp. 3d 576 (D. Md. 2019) ..............................................................19

*Travelers Insurance Co. v. Miller*,
  187 F.Supp. 895 (D. Md. 1960)..............................................................................21

*U.S. Bank National Ass'n v. Indian Harbor Insurance Co.*,
  68 F.Supp.3d 1044 (D. Minn. 2014).......................................................................16

*U.S. Home Corp. v. Settlers Crossing, LLC*,
  No. 08-cv-1863, 2015 WL 302816 (D. Md. Jan. 22, 2015)....................................15

*UBS Fin. Services, Inc. of Puerto Rico v. XL Specialty Insurance Co.*,
  929 F.3d 11 (1st Cir. 2019).....................................................................................14

*United Capitol Insurance Co. v. Kapiloff*,
  155 F.3d 488 (4th Cir. 1998) .................................................................................27

*Utica Mutual Insurance Co. v. Miller*,
  746 A.2d 935 (Md. Ct. Spec. App. 2000) ..................................................................9

*Weaver v. Axis Surplus Insurance Co.*,
  639 F. App'x 764 (2d Cir. 2016) ........................................................................17

*Whiteman v. Chesapeake Appalachia, L.L.C.*,
  729 F.3d 381 (4th Cir. 2013) ...............................................................................8

**Other Authorities**

Black's Law Dictionary "Demand for Relief" (11th ed. 2019) ...............................18, 19

Fed. R. Civ. P. 8(a)(2)-(3) ......................................................................................18

Fed. R. Crim. P.7(c)(1) ...........................................................................................18

Fed. R. Evid. 408 ...................................................................................................20

*Indictment*, Miriam Webster Dictionary,
  https://www.merriamwebster.com/dictionary/indictment (last visited July 28,
  2021) ..................................................................................................................19

*Relief*, Miriam Webster Dictionary,
  https://www.merriamwebster.com/dictionary/relief (last visited July 28, 2021) ...................19

Defendants AXIS Surplus Insurance Company ("AXIS"), Endurance American Specialty Insurance Company ("Endurance," and together with AXIS, the "Primary Carriers"), and ProSight Syndicate 1110 at Lloyd's ("ProSight Syndicate," and together with the Primary Carriers, the "Insurers") respectfully submit this joint brief in opposition to the Motion for Partial Summary Judgment filed by Plaintiff Jeremy W. Schulman ("Plaintiff") and in support of the Insurers' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, no dispute of material fact exists, and this Court should deny Plaintiff's motion and grant summary judgment in favor of the Insurers.

**Introduction**

This coverage litigation arises out of Plaintiff's request for insurance coverage for a criminal indictment (the "Indictment") charging Plaintiff with multiple counts of conspiracy to commit mail, wire, and bank fraud; conspiracy to commit money laundering; and money laundering. The insurance policies at issue provide specified coverage only for a "Claim" as that term is defined in the Primary Policy described below, and the Primary Policy unambiguously defines "Claim" to include only civil disputes, not a criminal proceeding like the one for which Plaintiff seeks coverage here. Thus, the Primary Policy's insuring agreement is not triggered, and Plaintiff's claim for coverage fails as a matter of law.

Implicitly conceding that no coverage is available based on the Primary Policy's plain language, Plaintiff seeks to create coverage based on the Primary Carriers' offer to Plaintiff's then law firm, expressly stated as a compromise of a disputed claim and subject to a reservation of all rights, to pay a portion of Plaintiff's defense expenses incurred in responding to a records and testimonial subpoena that was served on the Firm in January 2017. Plaintiff – who did not negotiate and was not a party to that compromise – nevertheless benefited greatly from it in that

he was able to maintain the defense counsel of his choosing for several years at the Primary Carriers' expense.  Now, based on his own unilateral and unreasonable articulation of the parties' intent, which he supports by cutting and pasting words and snippets of sentences from multiple documents, Plaintiff seeks to convert a compromise with the Firm over a subpoena into a binding commitment by the Primary Carriers to pay Plaintiff's defense costs for any indictment that might be issued in the future.  Maryland law does not support such a windfall for Plaintiff, particularly in light of the Insurers' repeated reservations of rights.

Regardless what theory Plaintiff relies upon, his claim fails because (i) he offers no evidence whatsoever that any party to the prior compromise over coverage for a subpoena intended it to apply to an indictment that might be handed down years later, (ii) Maryland law provides that waiver, estoppel, and the like cannot create or expand insurance coverage under these circumstances, and (iii) the Primary Carriers expressly conveyed the prior offer as an effort to compromise a disputed claim while clearly stating that they continued to dispute coverage and reserved all of their rights.  Thus, even if the Primary Carriers could be bound to their offer to pay certain amounts related to the subpoena, they cannot plausibly be deemed to have bound themselves to provide coverage for an indictment that did not yet exist at the time of their offer regarding the Subpoena.

Accordingly, for the reasons set forth more fully below, Plaintiff's motion should be denied, and this Court should grant summary judgment in favor of the Insurers.

**Statement of Undisputed Facts**

**A.      The Parties**

Plaintiff is a former equity partner with the law firm Shulman, Rogers, Gandal, Pordy & Ecker, P.A. (the "Firm"), where he worked until 2017.  Doc. No. 2 ¶ 9.  The Insurers are insurance carriers or insuring syndicates that issued lawyers professional liability insurance

policies (the "Policies") to the Firm for the Policy Period of August 22, 2016 to August 22, 2017. *Id.* ¶¶ 11-13, 19; *see also* Doc. No. 35-1.

### B.    The Policies

The Primary Carriers co-insured the primary layer of coverage on a fifty-percent quota share basis pursuant to AXIS Pro LP Lawyers Professional Liability Insurance Policy No. EBN 782641/01/2016, which provides a $10 million aggregate and per-claim limit of liability (the "Primary Policy").[1]  *Id.* ¶¶ 21-22.  Under the Primary Policy, the Primary Carriers agree to pay "all Loss, in excess of the retention, resulting from Claims for Wrongful Acts committed before the expiration of the Policy Period that are first made against any Insured during the Policy Period."  Doc. No. 35-1 at 006 § 1.A.

ProSight Syndicate issued a Certificate of Insurance Number PL20160002300, which is subject to a $10 million limit, excess of the Primary Policy.  Coverage under the ProSight Certificate of Insurance (the "ProSight Syndicate Policy") follows the lead terms and conditions of the Primary Policy and incorporates and is subordinate to any changes and endorsements of the Primary Policy provided ProSight Syndicate consents to any such changes and endorsements. *See* Doc No. 35-1 at 033; *see also* Doc. No. 2 ¶¶ 24-25.[2]

Under the Policies, the Insureds – not the Insurers – have the duty to defend Claims. Doc. No. 35-1 at 006 § I.B.I. "Loss" is the amount the Insureds become legally obligated to pay on account of a "Claim," including  "Claim Expenses," which are defined in relevant part as

---

[1] ProSight Syndicate issued an excess policy that follows form to the Primary Policy for all purposes relevant here. Doc. No. 2 ¶¶ 24-25. Accordingly, unless otherwise stated, all coverage arguments regarding the Primary Policy also apply to the excess policy issued by ProSight Syndicate.

[2] All coverage arguments based on the language of the Policies apply to all Insurers unless otherwise indicated.

"reasonable and necessary legal fees and expenses . . . incurred by or on behalf of the Insured in defending, settling, appealing or investigating Claims."  *Id*. at 007 § II.C.  "Loss" does *not* include, among other things, "fines, penalties or sanctions imposed by law against any Insured (other than punitive or exemplary damages or the multiplied portion of any multiplied damage award as described above)," the return, withdrawal, or reduction of any fees or receivables paid to an insured, or the cost of compliance with an injunction or any other non-monetary relief.  *Id*. at 008-009 § II.K.3.

The Primary Policy defines "Claim" as follows:

1.    any of the following:

    a.    a written demand against any Insured for monetary or nonmonetary relief;

    b.    a civil proceeding against any Insured commenced by the service of a complaint or similar pleading;

    c.    a written demand for arbitration or mediation;

    d.    a formal civil administrative or civil regulatory proceeding against any Insured, including, but not limited to, a Disciplinary Proceeding, commenced by the filing of a notice o[f] charges or similar document or by the entry of a formal order of investigation or similar document;

2.    a written request received by an Insured to toll or waive a statute of limitations related to a matter described in subparagraph 1. above.

*Id*. at 009 § II.B.

The Primary Policy defines "Wrongful Act" to mean, in relevant part, "any actual or alleged . . . act, error or omission"; "breach of contract for Professional Services"; or "breach of fiduciary duty" committed or allegedly committed "solely in the performance of or failure to perform Professional Services. …"  *Id*. at 009-010 § II.P.

"Professional Services" in turn are defined in relevant part as "services provided to others by an Insured . . . in the conduct of any business by or on behalf of the Firm in its professional capacity as an attorney or notary public" or "as a government affairs advisor or lobbyist," "but only if such services are performed in the name or on behalf of the Firm and some or all of the fee, if any, accruing from such services . . . inures to the benefit of the Firm." *Id*. at 010 § II.N.

The Policy also contains an exclusion barring coverage for any Claim:

> based upon arising out of, directly or indirectly resulting from, in consequence of or in any way involving:
>
> a.      the gaining of any profit, remuneration, or advantage to which the Insured was not legally entitled; or
>
> b.      any criminal, dishonest, malicious or deliberately fraudulent act, error or omissions by an Insured;
>
> if evidenced by any judgment, final adjudication, alternate dispute resolution proceeding or written admission by an Insured. No fact pertaining to, knowledge possessed by or conduct by any Insured Individual shall be imputed to any other Insured Individual or the Firm.

*Id*. at 011 § IV.A.9.  The Primary Policy provides that "All notices under any provision of this policy must be made in writing and delivered by prepaid express courier, certified mail, fax or electronic mail.  Notice to the Insured Individuals shall be given to the Firm."  *Id.* at 016 § VI.P.

## C.      The DOJ Subpoena and related coverage correspondence

In or around January 2017, in connection with a criminal investigation into the procurement of certain assets of the nation of Somalia, the United States Department of Justice ("DOJ") served upon the Firm a grand jury subpoena (the "Subpoena") dated January 27, 2017. Doc. No. 35-2; *see also* Doc No. 2 ¶ 42, Ex. B.  The Subpoena sought documents and testimony on behalf of the Firm regarding activities of various individuals and entities, including a number of Somali officials, the Federal Government of Somalia, the Transitional Federal Government of

Somalia, and the Central Bank of Somalia, and their efforts to retrieve assets of the Somali government that had been frozen for decades.  Doc. No. 35-2 at 004-008.

On or about January 31, 2017, the Firm sought coverage for the Subpoena under the Policies.  Doc. No. 2 ¶ 54.  The Primary Carriers responded by letter dated February 3, 2017, in which they took the position that coverage under the Policies did not exist because the Subpoena did not constitute a Claim under the Policies.  The February 3, 2017 letter is attached hereto as **Exhibit 9**.  After further discussion between the Firm and counsel for the Primary Carriers, the Primary Carriers sent a letter to the Firm dated April 5, 2017, in which they (i) reiterated their position that no coverage existed for the Subpoena as stated in the February 3, 2017 letter; (ii) agreed to resolve the dispute over coverage "for defense costs incurred with respect to the DOJ's subpoena" by reimbursing the Firm and Plaintiff for 70% of defense fees incurred in connection with the Subpoena; (iii) additionally reserved their rights to deny coverage pursuant to Exclusion 9 and the definition of Loss in the Primary Policy; and (iv) reserved all of the insurers' rights and defenses whether specifically asserted or otherwise available.  The April 5, 2017 letter is attached hereto as **Exhibit 10**.  As mandated by the Primary Policy's Notice provision, the Primary Carriers communicated directly with the Firm throughout this process, and Plaintiff was not a party to any of these communications.

By email dated May 20, 2017, Plaintiff communicated directly with the Insurers and stated that the Firm had advised him that the Primary Carriers had agreed to "reimburse me for 70% of defense fees incurred with respect to Akin Gump," apparently quoting a communication to him from the Firm, and then added "which is the law firm that I have engaged to represent me in connection with the investigation and any related proceedings."  He went on to state his

understanding of the carriers' reservations of rights and asked for copies of the correspondence discussed in his email.  Doc No. 35-4 at 001; Doc. No. 2 ¶ 58.

The Primary Carriers responded by letter dated June 22, 2017, reiterating the coverage positions set forth above regarding the dispute over "defense costs incurred with respect to the subpoena," stating that the Primary Carriers initially determined that the Subpoena did not constitute a Claim for a Wrongful Act as those terms are defined in the Primary Policy, confirming that a compromise had been reached to cover 70% of defense fees and 100% of costs incurred in connection with the Subpoena, and reserving all rights.  Doc. No. 35-5 at 001. Neither Plaintiff's communication to the Primary Carriers nor their response said anything at all about coverage for any indictment that might be returned in the future.

### D.      The Indictment and related coverage correspondence

On December 2, 2020, the Grand Jury returned an indictment against Plaintiff (the "Indictment").  Doc. No. 35-3.  The Indictment alleged that Plaintiff was a member of the Maryland bar who represented individuals or entities in recovering frozen Somali assets based on allegedly forged and false documentation and representations.  *Id.* at 004-005.  According to the Indictment, between July 2010 and 2014, Plaintiff conspired to obtain $12.5 million in Somali assets, of which he caused the Firm to retain $3.3 million in revenue and to transfer hundreds of thousands of dollars to an alleged co-conspirator.  *Id.*; Doc. No. 2 ¶ 50.  The Indictment charges Plaintiff with multiple counts of conspiracy to commit mail, wire, and bank fraud; wire fraud; bank fraud; mail fraud; conspiracy to commit money laundering; and money laundering.  Doc. No. 35-3; Doc. No. 2 ¶ 51.  Per the Indictment, if Plaintiff is convicted, the DOJ will seek forfeiture of any property or money that Plaintiff wrongfully obtained as a result of the alleged wrongdoing.  Doc. No. 35-3 at 029-030; Doc. No. 2 ¶ 52.

By letters dated March 12, 2021, the Primary Carriers denied coverage for the Indictment on the grounds that it does not constitute a "Claim" as defined in the Primary Policy.  Doc. Nos 35-7 and 35-8; Doc. No. 2 ¶ 73.

## Argument

### I.    Summary Judgment Standard

As directed by Federal Civil Procedure Rule 56(a), a motion for summary judgment should be granted where "from the totality of the evidence, including pleadings, depositions, answers to interrogatories, and affidavits, the court believes no genuine issue of material fact exists for trial and the moving party is entitled to judgment as a matter of law."  *Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381, 385 (4th Cir. 2013).  "To defeat a motion for summary judgment, the party opposing the motion must present evidence of specific facts from which the finder of fact could reasonably find for him or her."  *Mackey v. Shalala*, 43 F. Supp. 2d 559, 564 (D. Md. 1999) (quoting *Daniel v. Nat'l Cas. Ins. Co.*, 135 F. Supp. 3d 355, 359 (D. Md. 2015).  In the absence of contradictory evidence showing a genuine dispute as to a material fact, the moving party is entitled to judgment as a matter of law.  *See Celotex v. Catrett*, 477 U.S. 317, 317 (1986).  When confronted with cross-motions, a court must consider each party's motion individually to determine whether that party has satisfied the summary judgment standard.  *Id*. (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2720 (1983)).  The insured bears the burden to prove that coverage exists, and only if coverage is established, does the insurer then bear the burden to prove that a claimed loss falls within a policy exclusion.  *Jackson v. Standard Fire Ins. Co.*, 406 F.Supp.3d 480, 488 (D. Md. 2019) (citing *Prop. & Cas. Ins. Guar. Corp. v. Beebe-Lee*, 66 A.3d 615, 624 (Md. 2013)).

The Parties have agreed that there are no disputed material facts and that the undisputed facts are sufficient to permit this Court to determine whether the Policies provide coverage for the Indictment.  For the reasons stated below, the Indictment is not covered under the Policies, and the Insurers are entitled to summary judgment as a matter of law.

## II.  The Insurers are entitled to summary judgment because the Indictment does not constitute a Claim as defined in the Primary Policy, and therefore no coverage exists.

In order to prevail on his contention that the Insurers are obligated to defend him against the Indictment, Plaintiff must demonstrate that (1) the Indictment is a Claim as defined in the Primary Policy and otherwise triggers coverage under the Primary Policy's Insuring Agreement, and (2) that none of the exclusions bar coverage.  *See Utica Mut. Ins. Co. v. Miller*, 746 A.2d 935, 939 (Md. Ct. Spec. App. 2000); *Hartford Cas. Ins. Co. v. Chase Title, Inc.*, 247 F. Supp. 2d 779, 780 (D. Md. 2003).  The Insurers are entitled to summary judgment here because the Primary Policy plainly provides coverage only for civil matters, and the Indictment indisputably is a criminal proceeding.  Accordingly, Plaintiff cannot possibly establish that the Indictment is a Claim that triggers the Primary Policy's Insuring Agreement, and this Court need not even consider whether one or more exclusions might bar coverage.

As an initial matter, Plaintiff seeks a declaratory judgment of coverage not only for defense expenses incurred in defending against the Indictment, but also as to indemnity coverage for "any Loss incurred by Mr. Schulman in resolution of the DOJ Claim absent a final adjudication or admission of criminal culpability."  Doc. No. 2 at 27, Count IV, Prayer for Relief 1(e).  Even if this Court were to rule in Plaintiff's favor with respect to the Primary Carriers' obligation to pay the costs of defending against the Indictment, however, this Court cannot grant summary judgment on any duty to indemnify because that issue is not yet ripe.  *See Home Exterminating Co., Inc. v. Zurich-Am. Ins. Grp.*, 921 F. Supp. 318, 325 (D. Md. 1996) (finding

9

that "a determination of the question of indemnification would be premature" because the underlying action had not been resolved and noting that "[t]he issue of duty to indemnify, therefore, shall not be decided at this time, as it is not ripe for decision").  Accordingly, if this Court determines that no coverage exists for any reason, then it should grant summary judgment in favor of the Insurers on all counts, but if the Court were to find that the Insurers are obligated to defend Plaintiff in the criminal proceeding, it may grant Plaintiff's motion on that issue and leave the duty to indemnify to be decided if and when the issue ripens.[3]

In addition, Plaintiff seeks a summary judgment ruling "ordering Insurers to advance 100% of Mr. Schulman's incurred, outstanding and continuing Claim Expenses," Doc. No. 35 at 40, but he could not be entitled to such a ruling under any circumstances.  Whatever obligations the Insurers may have are subject to all of the terms and conditions of the Primary Policy and, where applicable, the ProSight Syndicate Policy.  Accordingly, if this Court determines, as it should, that no coverage exists under the Policies for any reason, then it should grant summary judgment in favor of the Insurers on all counts.  If, however, the Court were to find that Plaintiff's cost of defending the criminal Indictment somehow constitutes a "Loss" arising from a "Claim," it may grant Plaintiff's motion only to that extent since there remain genuine issues of material fact concerning, among other things, the reasonableness of and need for Plaintiff's millions of dollars in defense expenses, and the applicability of other terms and limitations of the applicable Policies.

---

[3] In addition, the Primary Policy's definition of "Loss" expressly carves out "fines, penalties or sanctions imposed by law against any Insured (other than punitive or exemplary damages or the multiplied portion of any multiplied damage award as described above)" and therefore precludes the possibility of coverage for any amount that might be awarded in any event.  Doc. No. 35-1 § II.K.  This is further evidence that the Primary Policy was never intended to provide coverage for criminal proceedings.

**A.    Counts I, III and IV should be dismissed because the criminal Indictment does not constitute a Claim as defined in the Policies.**

This Court should dismiss Counts I (Breach of Contract – Duty to Pay Claims Expenses Against the Primary Carriers), Count III (Anticipatory Breach of Contract Against All Carriers), and Count IV (Declaratory Judgment), because all three causes of action require that Plaintiff establish that the Indictment is covered under the Primary Policy.  The Plaintiff cannot carry his burden because the Indictment is not a Claim as defined in the Primary Policy.  As explained in greater detail below, the Primary Policy provides specified coverage only for a "Claim" against an Insured, which the Primary Policy defines to include only civil matters, not criminal indictments.  Because Plaintiff seeks coverage for a criminal matter – the Indictment – he cannot establish the existence of coverage.

"In Maryland, the insured party bears the burden of proving that coverage exists."  *Balt. Scrap Corp. v. RLI Ins. Co.*, 493 F.Supp.3d 433, 445 (D. Md. 2020).[4]  "Unlike some states, Maryland does not require courts to construe insurance policies against the insurer.  Courts should instead ascertain and give effect to the intentions of the parties at the time of contracting." *Blissful Enters., Inc. v. Cincinnati Ins. Co.,* 421 F.Supp.3d 193, 199 (D. Md. 2019) (citations omitted). "[T]he court will give effect to the plain, ordinary and usual meaning of contract language, taking into account the context in which it is used."  *Sy-Lene of Wash., Inc. v.*

---

[4] The parties agree that Maryland law applies to this dispute.  "Maryland courts follow the doctrine of *lex loci contractus* when interpreting insurance contracts and determining which state's law governs. The doctrine requires courts to apply the law of the jurisdiction where the contract was made to determine questions of its validity and construction." *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013) (citation omitted). "The *locus contractus* is the place where the last act is performed which makes an agreement a binding contract. In an insurance contract, the delivery of the policy and the payment of the premiums constitute these last acts." *Chartis Prop. Cas. Co. v. Huguely*, 243 F. Supp. 3d 615, 622 (D. Md. 2017) (internal quotation marks and citation omitted). Here, the Policy was issued to the Firm at its address in Maryland, and that Maryland office is presumably the place from which the premiums were paid.

*Starwood Urban Retail II, LLC*, 376 Md. 157, 829 A.2d 540, 546 (2003).  "To that end, the court must construe the instrument as a whole, and as much as possible, give effect to each clause of an insurance policy, and avoid treating [any] term as surplusage."  *Blissful Enters.,* 421 F. Supp. 3d at 199.

"Generally, Maryland courts analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent layperson would understand them to mean" at the time of contracting. *Baltimore Scrap*, 493 F.Supp.3d at 446.  To determine whether an insurer must defend, or in this case, whether an insurer must advance defense costs, Maryland employs a two-part test: first, the court determines the scope of coverage available under the policy; second, the court "review[s] the allegations of the underlying suit to determine whether they potentially bring the tort claim within the policy's coverage."  *Harleysville Preferred Ins. Co. v. Rams Head Savage Mill, LLC*, 187 A.3d 797, 806 (Md. Ct. Spec. App. 2018).

### 1. The Primary Policy's definition of "Claim" is limited to civil matters, not criminal proceedings.

Plaintiff cannot possibly carry the burden of establishing coverage here because the Primary Policy's definition of "Claim" does not include criminal proceedings.  As a threshold requirement for coverage, the Primary Policy's Insuring Clause requires that there be a Claim for Wrongful Acts made against an Insured.  Doc. No. 35-1 at 006 § 1.A.  The Policy defines "Claim" as follows:

1. any of the following:

   a. a written demand against any Insured for monetary or nonmonetary relief;

   b. a civil proceeding against any Insured commenced by the service of a complaint or similar pleading;

   c. a written demand for arbitration or mediation;

> d.   a formal civil administrative or civil regulatory proceeding
> against any Insured, including, but not limited to, a
> Disciplinary Proceeding, commenced by the filing of a
> notice o[f] charges or similar document or by the entry of a
> formal order of investigation or similar document;
>
> 2.   a written request received by an Insured to toll or waive a
> statute of limitations related to a matter described in
> subparagraph 1. above.

*Id*. at 007 § II.B.  The Indictment does not fall within the definition of "Claim" because none of

the definition's subparts contemplate a criminal proceeding.  Rather, the requests, demands or

proceedings that constitute a "Claim" are all civil in nature: a written demand for monetary or

non-monetary relief, "a *civil* proceeding" commenced by a complaint that often follows such a

demand, "a formal *civil* administrative . . . proceeding," and a "*civil* regulatory proceeding."  *Id*.

(emphasis added).  Likewise, a Disciplinary Proceeding means "a formal investigation

proceeding regarding the Insured's adherence to professional standards of conduct before a

court, state licensing board, peer review committee, bar association, or other regulatory body,"

*Id*. at 008 § II.F, and comprises a subset of the *civil* administrative or regulatory proceedings set

forth in the Claim definition.  Arbitrations and mediations, also included as a subpart of the

Claim definition, are means of resolving *civil* disputes.  The Indictment, as a document charging

criminal offenses, simply does not fall within any of subparts comprising the "Claim" definition.

Plaintiff argues that the Indictment is a "written demand for monetary or non-monetary

relief," a baseless assertion that fails on its face since the Indictment is undoubtedly a *criminal

charging* document and clearly does *not make any demand* for anything *due*.  *See* Doc. 35-3; *see

also Fin. Indus. Regul. Auth., Inc. v. Axis Ins. Co.*, 951 F.Supp.2d 826, 832 (D. Md. 2013)

(concluding that the phrase "demand for monetary or non-monetary relief" includes a "demand

for something due").  At most, the Indictment advises that the DOJ will seek forfeiture as part of

any sentence in the event Plaintiff is convicted of any of the crimes with which he is charged.

13

Doc. No. 35-3 at 029-030. Plaintiff acknowledges as much in his Complaint, alleging that "[p]er the Indictment, *if* Mr. Schulman were convicted . . ., the United States seeks forfeiture. ..." Doc. No. 2 ¶ 52 (emphasis added). Again, this is not a demand for something due. Even if it were, the Insurers could not be obligated to indemnify Plaintiff because, among other things, the Primary Policy expressly excludes coverage for the return, withdrawal, or reduction of any fees or receivables paid to an Insured, which is precisely what the forfeiture, which again would be conditioned on Plaintiff being convicted, would accomplish. (Doc. No. 35-1 at 008 § II.K; *see also id.* at 010-011 §IV.9 (excluding "Loss arising from any Claim . . . based upon . . . the gaining of any profit, remuneration or advance to which the Insured was not legally entitled . . .")).

Plaintiff cannot plausibly assert that the "written demand" prong of the definition of Claim silently creates coverage for criminal proceedings despite the glaring absence of the word "criminal" from the definition. It is simply nonsensical to conclude that the parties carefully limited each of the more specific prongs of the Claim definition to means of resolving civil disputes and yet intended that the "written demand" prong would encompass all civil disputes *and* all criminal proceedings, thereby both rendering the other prongs superfluous and silently expanding the scope of coverage beyond anything contemplated by the other prongs of the Claim definition. As the First Circuit recently observed, "We see no reason why we should read a single subpart defining a 'claim' as a 'written notice' to .… govern instead of the more pertinent ones regarding civil proceedings, arbitrations, or investigations. If we were to adopt [the policyholder]'s construction, the other prongs would be rendered superfluous, and we refuse to construe the definition of 'claim' in a way that would make two-thirds of it meaningless." *UBS Fin. Servs., Inc. of Puerto Rico v. XL Specialty Ins. Co.*, 929 F.3d 11, 24 (1st Cir. 2019).

Instead, the only plausible reading of the "Claim" definition as a whole is that the "written demand," is intended to encompass a precursor to a civil proceeding commenced by complaint or similar pleading.  It is thus a general provision that must be read consistently with and yield to the more specific terms once a proceeding has been initiated, and the Claim definition plainly limits coverage to civil disputes and proceedings.  *See*, *e.g.*, *Expo Props., LLC v. Experient, Inc.*, 956 F.3d 217, 229 (4th Cir. 2020) (holding that under Maryland law, specific contract terms take precedence over general terms); *BRC Uluslararasi Taahut ve Ticaret v. Lexon Ins. Co.*, No. 19-cv-00771, 2020 WL 6801933, at *7 (D. Md. Nov. 19, 2020) (same); *U.S. Home Corp. v. Settlers Crossing, LLC*, No. 08-cv-1863, 2015 WL 302816, at *6 (D. Md. Jan. 22, 2015) (same).

> **2.      Plaintiff's reliance on the Primary Policy's exclusion for claims arising out of criminal acts, but only upon a final adjudication, fails because an exclusion cannot create coverage and Plaintiff's argument is inconsistent with the exclusion's plain language.**

Contrary to Plaintiff's contention, the Primary Policy's exclusion for claims arising out of illegal profit and fraud or criminal acts undermines Plaintiff's argument and in fact supports summary judgment in favor of the Insurers.  That exclusion bars coverage for any Claim:

> based upon arising out of, directly or indirectly resulting from, in consequence of or in any way involving:
>
> a.      the gaining of any profit, remuneration, or advantage to which the Insured was not legally entitled; or
>
> b.      any criminal, dishonest, malicious or deliberately fraudulent act, error or omissions by an Insured;
>
> if evidenced by any judgment, final adjudication, alternate dispute resolution proceeding or written admission by an Insured. No fact pertaining to, knowledge possessed by or conduct by any Insured Individual shall be imputed to any other Insured Individual or the Firm.

Doc. No. 35-1 at 011 § IV.A.9.

Plaintiff's reliance on this provision in his quest for coverage fails for at least two reasons: first, exclusions cannot create coverage that does not otherwise exist. *E.g., Maryland Auto. Ins. Fund v. Baxter*, 973 A.2d 243, 252-53 (Md. Ct. Spec. App. 2009) ("a basic legal precept concerning insurance coverage is that exclusions do not create coverage.") (collecting cases). If there is no Claim in the first instance, Plaintiff cannot bootstrap coverage based on the final adjudication requirement in an exclusion.

Second, the specific wording of the exclusion's final adjudication requirement undermines Plaintiff's position, which is inconsistent with the Primary Policy's plain language. Plaintiff suggests that the exclusion is intended to bar coverage for a criminal proceeding that is otherwise covered, but only if the final adjudication requirement is met. However, the plain language of the exclusion belies Plaintiff's suggestion because the events triggering application of the exclusion – "any judgment, final adjudication, alternate dispute resolution proceeding or written admission by an Insured" – are limited to ones occurring in civil and regulatory contexts. If the exclusion were intended to bar coverage for criminal charges that are otherwise covered, it no doubt would include a "plea," "conviction," "admission of guilt" or other terms common to criminal proceedings among the forms of final adjudication that would trigger the exclusion.[5] Thus, the only plausible reading of this provision is that it is intended to exclude coverage for a civil proceeding, such as a malpractice claim, that is either found or admitted to arise out of fraudulent or criminal acts. Plaintiff is not being sued by a client or his firm in connection with

---

[5] The cases upon which Plaintiff relies support the Insurers' point. For example, *Graham v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 474 F. App'x 956, 958 (4th Cir. 2012) addressed coverage for a civil proceeding by the state, not a criminal matter, and the opinion noted that the applicable policy included "admission of guilt" among events that trigger the final adjudication requirement. *See also U.S. Bank Nat'l Ass'n v. Indian Harbor Ins. Co.*, 68 F.Supp.3d 1044 (D. Minn. 2014) (addressing coverage for a civil proceeding, not a criminal one); *Gallup, Inc. v. Greenwich Ins. Co.*, No. N14C–02–136FWW, 2015 WL 1201518 (Del. Super. Ct., Feb. 25, 2015) (same).

professional negligence or misappropriating funds; rather, the Department of Justice has charged Plaintiff with crimes as set forth in the Indictment – something that could not possibly have been intended to be covered under the professional liability Policies.

>**3.**     **The cases upon which Plaintiff relies support the Insurers' argument that the "written demand for… relief" prong cannot bring criminal proceedings within the definition of "Claim" that is otherwise limited to civil matters.**

Plaintiff has not cited – and the Insurers are not aware of – a single opinion finding coverage for a criminal indictment under remotely analogous policy language.  Indeed, the cases upon which Plaintiff relies also undermine his argument for at least two reasons.  First, each of the cases cited by Plaintiff addressed whether a subpoena or similar document can constitute a demand for non-monetary relief – none addressed a criminal indictment.  Second, each of those opinions involved an insurance policy that defined the term "claim" very differently than the Primary Policy.  In all but one of the opinions, the applicable policies expressly defined "claim" to include criminal proceedings or investigations.  *See Astellas US Holding, Inc. v. Starr Indem. & Liab. Co.,* No. 17 CV 8220, 2018 WL 2431969 (N.D. Ill. May 30, 2018) (policy defined "claim" to include criminal proceedings); *Weaver v. Axis Surplus Ins. Co.*, 639 F. App'x 764 (2d Cir. 2016) (same); *Minuteman Int'l, Inc. v. Great Am. Ins. Co.*, No. 03 C 6067, 2004 WL 603482 (N.D. Ill. Mar. 22, 2004) (same); *Syracuse Univ. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 40 Misc. 3d 1205(A), 975 N.Y.S.2d 370 (Sup. Ct.), aff'd, 112 A.D.3d 1379, 976 N.Y.S.2d 921 (2013) (same); *Morden v. XL Specialty Ins.*, 177 F. Supp. 3d 1320 (D. Utah 2016), *aff'd in part, rev'd in part and remanded*, 903 F.3d 1145 (10th Cir. 2018) (same); *Patriarch Partners, LLC v. AXIS Ins. Co.*, No. 16-CV-2277 (VEC), 2017 WL 4233078 (S.D.N.Y. Sept. 22, 2017), *aff'd*, 758 F. App'x 14 (2d Cir. 2018) (policy defined "claim" to include criminal investigations by the SEC).

The only case on which Plaintiff relies in which "claim" was not *expressly* defined to include criminal proceedings or investigations was *Joseph P. Bornstein, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 828 F.2d 242 (4th Cir. 1987).  The court in *Bornstein*, interpreting an insurance policy under Virginia law (which, unlike Maryland law, required the court to construe the policy in favor of coverage), determined that the policy's insuring agreement, which required the insurer to "defend any proceeding or suit brought by any government regulatory agency seeking nonpecuniary relief," could reasonably be read to include a grand jury investigation and post-indictment proceedings.  *Joseph P. Bornstein, Ltd.* 828 F.2d at 243.  The "Claim" definition in *Bornstein* differed notably from the definition in the Primary Policy, and the court made clear that in the absence of language that could at least be interpreted to provide express coverage for criminal matters, it would not find such coverage in an innocuous and common phrase like "written demand for … relief" as used in the Primary Policy.

The complete dearth of case law to support Plaintiff's argument is not surprising given that a federal criminal indictment would not appear to demand "monetary or nonmonetary relief" in the ordinary sense of the words as dictated under Maryland law. An indictment charges crimes and seeks punishment, not "relief." The Federal Rules of Criminal Procedure require that "[t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P.7(c)(1).  By contrast, it is civil claims that seek "relief."  *E.g.*, Fed. R. Civ. P. 8(a)(2)-(3) (providing that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought").

In legal parlance, a "demand for relief" is synonymous with a "prayer for relief," which appears in civil pleadings, not criminal charging documents or filings.  Black's Law Dictionary,

"Demand for Relief" (11th ed. 2019).  And "relief" means "[t]he redress or benefit, esp.

equitable in nature (such as an injunction or specific performance) that a party asks of a court. –

Also termed remedy." *Id.* This is consistent with the ordinary usage of the word "relief," which

is "legal remedy or redress."  *Relief*, Miriam Webster Dictionary,

https://www.merriamwebster.com/dictionary/relief (last visited July 28, 2021).  By contrast, the

common understanding of an indictment is "a formal written statement framed by a prosecuting

authority and found by a jury (such as a grand jury) charging a person with an offense."

*Indictment*, Miriam Webster Dictionary, https://www.merriamwebster.com/dictionary/indictment

(last visited July 28, 2021).  Plaintiff's proffered definition flies in the face of the common usage

of the relevant terms, which helps to explain the utter lack of legal support he has found for his

position.

Accordingly, the Indictment does not constitute a Claim and therefore does not trigger

coverage under the Primary Policy's Insuring Clause as a matter of law.  And because Plaintiff

cannot establish that denying coverage was a breach of contract, he likewise cannot establish that

the Insurers anticipatorily breached the contract: there can be no anticipatory breach where a

party is not obligated to perform under the contract.  *Cf. Transamerica Premier Life Ins. Co. v.*

*Selman & Co.*, LLC, 401 F. Supp. 3d 576, 593 (D. Md. 2019) (where party was not required to

perform under the contract, clear expression of intent not to perform was neither breach of

contract nor anticipatory breach).

> **B.      Counts II and V should be dismissed because Maryland Law precludes a
> Court from expanding coverage based on an offer lacking the requisites of a
> contract, or on waiver, estoppel, or "detrimental reliance."**

Likewise, the Primary Carriers are entitled to summary judgment on Count II (Breach of

Contract – Advancement Agreement against the Primary Carriers) and Count V (Detrimental

Reliance Against the Primary Carriers) because Plaintiff cannot plausibly establish coverage based on the Primary Carriers' prior offer to fund a portion of Plaintiff's defense expenses in connection with the Subpoena. [6]   As an initial matter, the Primary Carriers repeatedly stated that their offer to fund a portion of Plaintiff's defense expenses was a compromise of a disputed claim for coverage, and therefore any evidence of that agreement is inadmissible to prove the validity of Plaintiff's claims against the Insurers.  Fed. R. Evid. 408; *Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652, 654 (4th Cir. 1988) ("the public policy of favoring and encouraging settlement makes necessary the inadmissibility of settlement negotiations in order to foster frank discussions") (internal citation and quotation omitted).  And even if Plaintiff could rely upon the Primary Carriers' prior compromise offer to establish their liability in this litigation, his claim would fail because (i) Plaintiff cannot establish the existence of a contract, detrimental reliance, or estoppel in light of the Primary Carriers' repeated statements that their offer was a compromise of a disputed claim and their reservation of all rights, (ii) the Primary Carriers' prior offer addressed coverage only for the Subpoena, and not for the Indictment, which would not exist until years later, and (iii) on these facts, Maryland law would not permit coverage to be created or expanded by waiver, estoppel, or detrimental reliance.

---

[6] Plaintiff's motion and the attached Butler declaration repeatedly state that the Insurers have not paid 70% of all amounts incurred in connection with the Subpoena.  The Primary Carriers understand that, in part because Plaintiff has not fulfilled his obligation to pay 30% of the amounts incurred, a modest amount of the Subpoena-related defense expenses may remain to be paid.  The Primary Carriers do not contest their agreement to pay 70% of amounts incurred in connection with the Subpoena, and any outstanding amounts will be paid as identified. Plaintiff's discussion of unpaid amounts related to the Subpoena appears to be a distraction.

      1.       **Plaintiff cannot establish a contractual obligation, detrimental reliance, or estoppel because the Primary Carriers clearly stated that no coverage existed and offered to fund part of Plaintiff's defense of the Subpoena as a compromise and subject to a reservation of rights.**

Plaintiff cannot possibly establish that the Primary Carriers contracted to provide coverage for the defense of the Indictment by offering to fund a portion of Plaintiff's defense expenses incurred with respect to the Subpoena subject to repeated reservations of rights and statements that they were compromising a dispute over coverage.  As an initial matter, the Primary Policy provides that "[n]o change in, modification of, or assignment of interest under this policy shall be effective except when made by a written endorsement to this policy which is signed by an authorized representative of the Company. The Insureds agree that this policy constitutes the entire agreement between the Insureds and the Company, or any of their agents or brokers."  Doc. No. 35-1 at 015 § VI.M.  Any argument that the Primary Carriers somehow expanded the scope of agreed coverage through their correspondence regarding coverage therefore fails because the Primary Policy cannot be modified or changed in that fashion.  *See*, *e.g.*, *Blissful Enters.*, 421 F.Supp.3d at 203 ("Here, [the insured]'s email did not create a new contract. The Policy provides that its 'terms can be amended or waived only by endorsement issued by us and made a part of the policy.' (Policy at 7). The Court sees no evidence that [the insured]'s email constituted an 'endorsement issued by [the insurer]' that was 'made a part of the policy.'").

Moreover, the coverage correspondence bears none of the characteristics of a binding contract – Plaintiff provided no consideration for any promise of coverage, and there is no evidence that the parties had a meeting of the minds regarding coverage for an Indictment that would not exist until some four years later.  *See id.*; *see also Travelers Ins. Co. v. Miller*, 187 F.Supp. 895, 898 (D. Md. 1960) (holding that expanding coverage beyond that provided in the

policy requires the "ordinary essentials of a contract, and among them, a meeting of the minds of the parties on the new undertaking, in this instance an undertaking to insure against disability occurring after the age of sixty as well as before it, if the insured should prove to be so old. And the evidence is not sufficient to show that the parties contemplated that undertaking."); *Pavel Enters., Inc. v. A.S. Johnson Co., Inc.*, 674 A.2d 521, 533-34 (Md. 1996) (holding that contract claim and claim for detrimental reliance both failed in the absence of a meeting of the minds or a clear, definite promise and justifiable reliance).

Indeed, Plaintiff has presented no evidence that *any* party to the purported agreement understood it the way he asks this Court to interpret it. Plaintiff seeks to rely on a purported agreement between the Primary Carriers and the Firm, to which he is at best a third-party beneficiary. Even assuming that an agreement existed, and that Plaintiff could enforce the agreement as a third-party beneficiary, he may only enforce the agreement actually reached between the parties to the agreement. The Primary Carriers have established that they viewed their offer as a compromise of a dispute over defense *of the Subpoena* –not the Indictment – and Plaintiff has not presented any evidence at all that the Firm understood the purported agreement differently.

Nor can Plaintiff establish coverage by means of detrimental reliance, estoppel, or the like. Under Maryland law, "[d]etriment and reliance are elements of estoppel." *Nationwide Mut. Ins. Co. v. Regency Furniture, Inc.*, 963 A.2d 710, 732 (Md. Ct. Spec. App. 2009). In order to state a plausible claim of detrimental reliance, Plaintiff must plausibly allege:

1. that the Primary Carriers made a clear and definite promise;
2. the Primary Carriers had a reasonable expectation that their offer would induce action or forbearance on Plaintiff's part;
3. the promise did induce actual and reasonable action or forbearance by Plaintiff; and

4.     caused a detriment which can only be avoided by the enforcement of the promise.

*Pavel Enters., Inc.*, 674 A.2d at 533.  Plaintiff cannot establish even one of these elements, and therefore the Primary Carriers are entitled to summary judgment.

First, Plaintiff cannot establish even the first element of detrimental reliance because his allegations show that the Primary Carriers made no clear and definite promise to provide the coverage he now seeks.  Where, as here, an insurer agrees to fund the insured's defense while maintaining its position that coverage does not exist and explicitly reserving all rights under the policy, coverage cannot be created by estoppel as a matter of law.  *Haines v. St. Paul Fire & Marine Ins. Co.*, 428 F. Supp. 435, 442 (D. Md. 1977).  Plaintiff cannot point to a clear and definite promise of coverage because, like the insurer in *Haines*, the Primary Carriers agreed to assume Plaintiff's defense in a series of letters that "clearly indicate[d] [the Primary Carriers'] position that coverage did not exist and [their] explicit reservation of all rights under the policy." *Id.*  And whatever the Primary Carriers agreed to do applied only to defense costs incurred in connection with the Subpoena.  No agreement could possibly have been reached with regard to the Indictment, which did not yet exist.

For these same reasons, Plaintiff cannot establish that the Primary Carriers reasonably expected him to rely on their compromise offer as an unlimited promise of future coverage or that he reasonably did rely in that fashion.  Setting aside that the Primary Carriers' offer was made to the Firm, and not to Plaintiff, Plaintiff's allegations "ignore the controlling fact that [the Primary Carriers] denied coverage," and he cannot plausibly claim that he reasonably relied to his detriment on the Primary Carriers' denial of coverage or their agreement to compromise the dispute over coverage subject to a complete reservation of all of their rights, or that the Primary Carriers reasonably would have expected him to do so.  *Regency Furniture*, 963 A.2d at 732. Plaintiff's claim of detrimental reliance is especially unreasonable here – unlike the insurer in

*Haines*, which withdrew the defense of the same matter in which it had previously agreed to provide a defense— where Plaintiff seeks coverage for an Indictment that did not even exist until some four years after the Primary Carriers' prior compromise. [7]  To resolve a specific coverage dispute, the Primary Carriers agreed only to provide partial coverage "for defense costs incurred *with respect to the DOJ's subpoena*," Ex. 10 at 002 (emphasis added); they did not, as Plaintiff argues, undertake an open-ended commitment to fund Plaintiff's defense of any criminal matters following the Subpoena, such as the Indictment that would be handed down years later.

Plaintiff's repeated complaint that the Primary Carriers did not communicate certain matters directly to him not only tacitly concedes that the Primary Carriers *did* clearly reserve their rights, but it also misconstrues the Primary Carriers' obligations under the Primary Policy's plain language.  As noted above, the Primary Policy expressly provides that the Primary Carriers must provide any notice intended for an Insured Individual directly to the Firm as the Named Insured.  Doc. No. 35-1 at 016 § VI.P. ("All notices under any provision of this policy must be made in writing and delivered by prepaid express courier, certified mail, fax or electronic mail. *Notice to the Insured Individuals shall be given to the Firm*.").  Thus, Plaintiff was not entitled to receive *any* communication directly from the Primary Carriers, and the Primary Carriers communicated directly with him once the Firm advised them to do so.

---

[7] Plaintiff's effort to pre-empt the Insurer's citation to *Haines* fails for two reasons.  First, the *Haines* opinion noted that the insurer there expressly reserved the right to withdraw the defense *because* the insurer withdrew from defending the same claim that it had initially agreed to defend subject to a reservation of rights.  Here, by contrast, the litigation involves a separate Indictment for which the Insurers never agreed to provide a defense, so there is no defense to withdraw. Plaintiff's argument that the insurer in *Haines* paid all expenses through the date it withdrew from the defense is a red herring.  The Insurers have never refused to pay any invoices related to the Subpoena, and Plaintiff's allegation that amounts remain unpaid in connection with the Subpoena has nothing to do with whether coverage exists for the Indictment.

Nor can Plaintiff identify any way in which he changed his position in reliance on anything the Primary Carriers said or did.  Maryland courts have consistently held that an insurer is not estopped from denying coverage, even after the initial assumption of a defense, under any factual scenario remotely analogous to this one.  *See*, *e.g.*, *Neuman v. Travelers Indem. Co.*, 319 A.2d 522 (Md. 1974) (insurer not estopped from raising defense of non-coverage after undertaking a defense of the insured); *Hartford Fire Ins. Co. v. Annapolis Bay Charters, Inc,* 117 F. Supp. 2d 496 (insurer that provided a defense for one year not estopped from withdrawing the defense where no coverage existed under the terms of the applicable policy).  Plaintiff's allegations make clear that he did not rely to his detriment on any promise by the Primary Carriers; he simply allowed the Primary Carriers to pay a portion of his defense costs in connection with the Subpoena, which were incurred by counsel the Plaintiff already had retained, and "[w]hen [the Primary Carriers] refused coverage" once the Indictment was tendered to them, Plaintiff "was free to challenge that decision in court" and "did exactly that."  *Nationwide Mut. Ins. Co.*, 963 A.2d at 265.

Plaintiff's only argument regarding detrimental reliance is that he "has been able to maintain continuity in his defense team of current and prior Akin attorneys," and he "did not seek or arrange from 2017 until now any alternative means of paying his defense counsel."  Doc. No. 35 at 30-31.  As noted above, it is undisputed that Plaintiff already had retained Akin before he first communicated with the Insurers, and he was free at any time to make other arrangements in light of the fact that he knew an Indictment could ultimately be handed down.  He cannot plausibly assert that, having retained Akin to represent him, he did anything to his detriment in reliance on any purported promise by the Primary Carriers.

In any event, such vague, conclusory allegations are insufficient to establish any element of detrimental reliance.  Indeed, Maryland courts have found coverage through estoppel only in one case where an insurer expressly told an insured that certain repairs were covered, and in reliance on that clear and definite statement, the insured proceeded with the repairs.  *See Nationwide Mut. Ins. Co. v. Reg'l Elec. Contractors,* 680 A.2d 547, 558 (Md. Ct. Spec. App. 1996).  Plaintiff's alleged reliance is indistinguishable from the alleged detrimental reliance in *Haines*, *Neuman*, and *Annapolis Bay Charters* – in all three cases, the insurers withdrew the defense of the same matter in which they had agreed to provide a defense subject to a reservation of rights, and in all three cases, the courts held that the insured could not establish detrimental reliance as a matter of law.  The same result is called for here, but even more clearly since the Primary Carriers indisputably had promised nothing about coverage for a future Indictment.

## 2.    Plaintiff likewise cannot establish that the Insurers waived any rights.

Nor can Plaintiff possibly prove that any of the Insurers waived the right to deny coverage.  Under Maryland law, waiver is "the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right."  *Allstate Ins. Co. v. Reliance Ins. Co.*, 786 A.2d 27, 32 (Md. 2001) (internal citation omitted).  Waiver may be inferred where the insurance company's conduct is "inconsistent with an intention to insist upon strict performance of the condition."  *Id.*  In the context of an insurance contract, waiver requires "an actual intention to relinquish an existing right, benefit, or advantage, with knowledge, either actual or constructive, of its existence, or such conduct as to warrant an inference of such intention to relinquish."  *Creveling v. Gov't Emps. Ins. Co.*, 828 A.2d 229, 243 (Md. 2003) (internal citation and quotation omitted).

The undisputed facts make clear that the Insurers manifested no intent to waive the right to deny coverage based on the Policy's definition of "Claim" or any other Primary Policy

provision.  Far from indicating any intent to waive their coverage defenses, the Primary Carriers

repeatedly stated that their offer to fund a portion of the Insureds' defense costs in connection

with the Subpoena was an agreement to compromise a dispute over coverage (and coverage

solely "for defense costs incurred with respect to the DOJ's subpoena" at that).  Ex. 10 at 002.

The Primary Carriers expressly stated that they continued to dispute the existence of coverage for

the Subpoena and that they reserved all rights available to them under the Primary Policy or

applicable law.  *Id.* at 002-003.  In light of these express reservations of rights, which the

Primary Carriers repeated each time they communicated with Plaintiff or the Firm, Plaintiff

cannot plausibly assert that the Insurers expressed any intent to waive their coverage defenses.

### 3.      Plaintiff cannot establish that waiver, estoppel, or detrimental reliance expand the coverage available under the Primary Policy.

Further, Maryland law provides that waiver cannot create coverage – rather, an extension

of coverage may only be created by a new contract.  *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d

488, 497 (4th Cir. 1998); *Allstate Ins. Co.*, 786 A.2d at 32.  As the Maryland Court of Appeals

has explained, "defenses founded upon lack of basic coverage" as opposed to "those arising from

the failure of the claimant to satisfy some technical condition subsequent [. . .] may not be

waived merely by the company's failure to specify them in its initial response to the claim, for

the effect of that would be to expand the policy to create a risk not intended to be undertaken by

the company."  *Ins. Co. of N. Am. v. Coffman*, 451 A.2d 952, 957 (Md. Ct. Spec. App. 1982)

(citing *St. Paul Fire & Marine Ins. Co. v Molloy*, 433 A.2d 1135 and *Neuman v. Travelers

Indemn. Co.*, 319 A.2d 522 (Md. 1974); *see also Sallie v. Tax Sale Invs., Inc.*, 814 A.2d 572,

575-76 (Md. 2002).  The Primary Carriers *did* "specify" their defenses to coverage "in [their]

initial response to the claim," and repeatedly in subsequent communications, and therefore

cannot plausibly be stated to have waived any of their rights.  *See* Exs. 9, 10.

Likewise, "[a]s a general matter, Maryland law does not recognize estoppel as a means of creating a new contract." *OneBeacon Ins. Co. v. Metro Ready-Mix, Inc.*, 242 F. App'x 936, 942, 2007 WL 2031613 (4th Cir. July 13, 2007).  Moreover, "under Maryland law, waiver or estoppel may occur only when it does not create new coverage; an extension of coverage may only be created by a new contract." *Id.* (quoting *Sallie*, 814 A.2d at 575).  "[I]f the loss was not within the coverage of the policy contract, it cannot be brought within that coverage by invoking the principle of waiver or estoppel." *Id.* (quoting *Prudential Ins. Co. of Am. v. Brookman*, 175 A. 838, 840 (Md. 1934)). While the Maryland Court of Appeals has not definitively excluded the possibility of coverage by estoppel, it has held that an insurer's attempt to settle a claim where coverage is disputed "is not a basis for estoppel" and cannot preclude an insurer from subsequently denying coverage. *Aetna Cas. & Sur. Co. v. Urner*, 287 A.2d 764, 768 (Md. 1972). And as noted above, this Court has held that estoppel is precluded as a matter of law where the insurer agrees to fund a defense while taking the position that no coverage exists and reserving all rights. *Haines*, 428 F. Supp. at 442.

Plaintiff cannot plausibly establish the elements of waiver, estoppel or detrimental reliance in light of the Primary Carriers' repeated reservations of rights while compromising a dispute over coverage, and coverage would not be expanded even if he could.  Accordingly, coverage is precluded as a matter of law for the reasons set forth above.

### III.   Count VI should be dismissed because Maryland law does not recognize an independent tort of bad faith failure to pay defense expenses.

Count VI (Lack of Good Faith Against the Primary Carriers) also should be dismissed because Maryland law does not recognize an independent tort of bad faith in the insurance context outside the context of bad faith failure to settle a third-party claim.  *See Johnson v. Fed. Kemper Ins. Co.*, 536 A.2d 1211, 1213 (Md. Ct. Spec. App. 1988), *cert. denied*, 542 A.2d 844

(Md. 1988); *Dickson v. Selected Risks Ins. Co.*, 666 F. Supp. 80, 81 (D. Md. 1987).  Specifically, the Maryland Court of Appeals has held that a claim for bad faith will not stand where it is based solely on an insurer's refusal to defend the insured, even if that failure is in breach of the insurance contract.  *Mesmer v. Md. Auto. Ins. Fund*, 725 A.2d 1053, 1064 (Md. 1999) ("Consequently, when a liability insurer erroneously takes the position that it has no contractual obligation with respect to a particular claim, and refuses to undertake any defense against the claim, it is liable only for breach of contract. The tort action based upon a liability insurer's bad faith failure to settle a claim within policy limits can arise only if the insurer undertakes to provide a defense against the claim."); *Dickson*, 666 F. Supp. at 81.  Plaintiff alleges nothing in support of Count VI other than that the Primary Carriers denied coverage, which they were entitled to do for the reasons set forth above, and there can be no bad faith failure to settle a criminal proceeding.  Accordingly, Plaintiff cannot state a plausible claim of "Lack of Good Faith" or the like, and Count VI should be dismissed.

### Conclusion

Accordingly, the Court should deny Plaintiffs' motion, grant the Insurers' cross-motion, and enter a judgment declaring that the Policies do not afford coverage to Plaintiff in connection with the Indictment and that the Insurers – AXIS, Endurance, and ProSight Syndicate – are entitled to judgment in their favor as a matter of law.

Dated: July 28, 2021                    Respectfully submitted,


                                     /s/ Charles C. Lemley
                                      Charles C. Lemley
                                      clemley@wiley.law
                                      D. Md. Bar No. 15205
                                      WILEY REIN LLP
                                      1776 K Street, NW
                                      Washington, DC  20006
                                      Telephone: (202) 719-7000
                                      Facsimile: (202) 719-7049

                                      *Attorneys for Defendants AXIS Surplus
                                      Lines Insurance Company and Endurance
                                      American Specialty Insurance Company.*

                                     /s/ John J. Murphy
                                     John J. Murphy, Esq. Bar No. 14407
                                     WALKER, MURPHY & NELSON, LLP
                                     9210 Corporate Boulevard, Suite 320
                                     Rockville, MD 20850
                                     Phone: 301.519.9150
                                     Fax: 301.519.9152
                                     jmurphy@walkermurphy.com

                                     /s/ Marc R. Kamin
                                     Marc R. Kamin, Esq. PHV Bar No. 815831
                                     STEWART | SMITH
                                     300 Four Falls Corporate Center, Suite 670
                                     300 Conshohocken State Rd.
                                     West Conshohocken, PA 19428
                                     (T) 484.589.5506 (F) 484.534.9470
                                     MKamin@StewartSmithLaw.com

                                     *Counsel for Defendant
                                     ProSight Syndicate 1110 at Lloyd's*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served electronically on all counsel of record via operation of the Court's electronic filing system and by electronic mail on July 28, 2021.

/s/ Charles C. Lemley
Charles C. Lemley (Bar # 15205)