## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JEREMY W. SCHULMAN,                §
                                   §
        Plaintiff,                 §
                                   §
v.                                 §        CIVIL ACTION NO. 8:21-cv-1252-PWG
                                   §
AXIS SURPLUS INSURANCE             §
COMPANY, ENDURANCE AMERICAN        §
SPECIALTY INSURANCE COMPANY,       §
and PROSIGHT SYNDICATE 1110 AT     §
LLOYD'S,                           §
                                   §
        Defendants.                §

**PLAINTIFF JEREMY W. SCHULMAN'S REPLY IN FURTHER SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND COMBINED
OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND DEFENDANT PROSIGHT'S MOTION FOR SUMMARY JUDGMENT ON
<u>ISSUES SPECIFIC TO PROSIGHT</u>**

Jeffrey M. Schwaber (Bar # 06095)
STEIN SPERLING BENNETT DE JONG
DRISCOLL PC
1101 Wootton Parkway
Suite 700
Rockville, MD 20852
(301) 340-2020
(301) 354-8110
jschwaber@steinsperling.com

Robin L. Cohen *(Admitted pro hac vice)*
Jillian M. Raines *(Admitted pro hac vice)*
COHEN ZIFFER FRENCHMAN &
MCKENNA LLP
1350 Avenue of the Americas, 25th Floor
New York, NY 10019
(212) 584-1890
(212) 584-1891
rcohen@cohenziffer.com
jraines@cohenziffer.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT .................................................................................................... 1

ARGUMENT ............................................................................................................................. 3

I.  THE ENTIRE DOJ CLAIM—INCLUDING THE INDICTMENT—CONSTITUTES A "CLAIM" AND INSURERS CANNOT AVOID SUMMARY JUDGMENT BY IGNORING OR REWRITING UNDISPUTED FACTS .................................................... 3

    A.  The Policies' Definition of "Claim" Is Not Limited to Civil Matters Only, Nor Does "Wrongful Act" Mean Civil Misconduct Only ................................................................ 4

    B.  The Indictment Is a Covered Claim ....................................................................... 9

    C.  Plaintiff Has Established—and Insurers Effectively Concede—Coverage for the Entire Criminal DOJ Claim, Including the Indictment ................................................... 10

    D.  The Primary Carriers' Compromised, Inapplicable Reservations Reaffirm Plaintiff's Entitlement to Defense Coverage ......................................................................... 11

II.  THE PRIMARY CARRIERS MUST BE ESTOPPED FROM CONTINUING TO BREACH THE ADVANCEMENT AGREEMENT AND, AT A MINIMUM, QUESTIONS OF FACT PRECLUDE DISMISSAL OF COUNTS II AND V ............... 15

III.  THE PRIMARY CARRIERS' CONDUCT CONTINUES TO LACK GOOD FAITH, AND COUNT VI STATES A VALID CLAIM UNDER MARYLAND LAW .............. 19

IV.  PROSIGHT'S UNIQUE MOTION SHOULD ALSO BE DENIED AS PROSIGHT IS NOT ENTITLED TO SUMMARY DISMISSAL OF PLAINTIFF'S VALID ANTICIPATORY BREACH CLAIM AT THIS EARLY STAGE .................................. 20

    A.  Counter Statement of Undisputed Facts Unique to ProSight's Motion ............................ 20

    B.  Plaintiff's Declaratory Relief Claim Is Ripe as Against All Insurers ................................ 21

    C.  ProSight's Deliberate, Years-Long Inaction Supports Plaintiff's Valid Anticipatory Breach Claim .................................................................................................. 23

CONCLUSION ....................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*8621 Ltd. P'ship v. LDG, Inc.*,
    900 A.2d 259 (Md. Ct. Spec. App. 2006) ................................................................. 24

*Aetna Cas. & Sur. Co. v. Hartford Acc. & Indem. Co.*,
    539 A.2d 239 (Md. Ct. Spec. App. 1988) ................................................................... 5

*Agilis Benefit Servs., LLC v. Travelers Cas. & Sur. Co. of Am.*,
    2010 WL 11595321 (E.D. Tex. Feb. 24, 2010) .................................................... 4, 6, 7

*Allstate Ins. Co. v. Reliance Ins. Co.*,
    786 A.2d 27 (Md. Ct. Spec. App. 2001) .............................................................. 17, 19

*Astellas US Holding, Inc. v. Starr Indem. & Liab. Co.*,
    2018 WL 2431969 (N.D. Ill. May 30, 2018) .................................................... 4, 6, 11

*BRC Uluslararasi Taahut ve Ticaret A.S. v. Lexon Ins. Co.*,
    2020 WL 6801933 (D. Md. Nov. 19, 2020) ............................................................... 7

*Century Indem. Co. v. Marine Grp., LLC*,
    848 F. Supp. 2d 1229 (D. Or. 2012) ........................................................................ 22

*Chang v. Brethren Mut. Ins. Co.*,
    897 A.2d 854 (Md. Ct. Spec. App. 2006) ................................................................... 5

*Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*,
    656 A.2d 779 (Md. 1995) .......................................................................................... 5

*Charter Oak Fire Ins. Co. v. Am. Cap., Ltd.*,
    760 F. App'x 224 (4th Cir. 2019) ............................................................................ 14

*Collier v. MD-Individual Prac. Ass'n, Inc.*,
    607 A.2d 537 (Md. Ct. Spec. App. 1992) ................................................................... 5

*Dutta v. State Farm Ins. Co.*,
    769 A.2d 948 (Md. 2001) .......................................................................................... 5

*Expo Properties, LLC v. Experient, Inc.*,
    956 F.3d 217 (4th Cir. 2020) ..................................................................................... 6

*Fin. Indus. Regulatory Auth., Inc. v. Axis Ins. Co.*,
    951 F. Supp. 2d 826 (D. Md. 2013) ........................................................................... 9

*Gold Tip, LLC v. Carolina Cas. Ins. Co.*,
  2012 WL 3638538 (D. Utah Aug. 23, 2012) ........................................................................... 7

*Haines v. St. Paul Fire & Marine Ins. Co.*,
  428 F. Supp. 435 (D. Md. 1977) ............................................................................................ 18

*Harrell v. Sea Colony, Inc.*,
  370 A.2d 119 (Md. Ct. Spec. App. 1977) .............................................................................. 24

*Hartford Fire Ins. Co. v. Annapolis Bay Charters, Inc.*,
  117 F. Supp. 2d 496 (D. Md. 2000) ....................................................................................... 18

*Hiitt Contracting, Inc. v. Hartford Fire Ins. Co.*,
  2021 WL 2352281 (D. Md. June 9, 2021) .............................................................................. 22

*Holt v. Utica Mut. Ins. Co.*,
  759 P.2d 623 (Ariz. 1988) ............................................................................................... 23, 25

*Joseph P. Bornstein, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
  828 F.2d 242 (4th Cir. 1987) ......................................................................................... 8, 9, 10

*LCS Corr. Servs., Inc. v. Lexington Ins. Co.*,
  800 F.3d 664 (5th Cir. 2015) ................................................................................................... 5

*Maryland Cas. Co. v. Blackstone Int'l Ltd.*,
  114 A.3d 676 (Md. 2015) .................................................................................................. 5, 10

*Megonnell v. United Servs. Auto. Ass'n*,
  796 A.2d 758 (Md. 2002) ........................................................................................................ 4

*Nat'l Cas. Co. v. Lockheed Martin Corp.*,
  415 F. Supp. 2d 596 (D. Md. 2006) ......................................................................................... 8

*Nationwide Mut. Ins. Co. v. Regency Furniture, Inc.*,
  963 A.2d 253 (Md. Ct. Spec. App. Jan. 6, 2009) .................................................................. 18

*Nationwide Mut. Ins. Co. v. Reg'l Elec. Contractors, Inc.*,
  680 A.2d 547, 558 (Md. Ct. Spec. App. 1996) ..................................................................... 18

*Nautilus Ins. Co. v. 200 W. Cherry St., LLC*,
  383 F. Supp. 3d 494 (D. Md. 2019) ......................................................................................... 4

*Neuman v. Travelers Indem. Co.*,
  319 A.2d 522 (Md. 1974) ...................................................................................................... 18

*Onvoy, Inc. v. Carolina Cas. Ins. Co.*,
  2006 WL 1966757 (D. Minn. July 11, 2006) .......................................................................... 6

*Prison Health Servs., Inc. v. Baltimore Cty.*,
    912 A.2d 56 (Md. Ct. Spec. App. 2006) ............................................................... 5

*String v. Steven Dev. Corp.*,
    307 A.2d 713 (Md. 1973) .................................................................................. 23

*Studio Frames Ltd. v. Standard Fire Ins. Co.*,
    369 F.3d 376 (4th Cir. 2004) ............................................................................ 23

*Syracuse Univ. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    2013 WL 3357812 (N.Y. Sup. Mar. 7, 2013), *aff'd*, 112 A.D.3d 1379 (N.Y.
    App. Div. 2013) .............................................................................. 7, 10, 13

*Ticaret A.S. v. Lexon Ins. Co.*,
    2020 WL 6801933 (D. Md. Nov. 19, 2020) ........................................................ 6

*U.S. v. Reiner*,
    397 F. Supp. 2d 101 (D. Me. 2005) .................................................................. 10

*U.S. Home Corp. v. Settlers Crossing, LLC*,
    2015 WL 302816 (D. Md. Jan. 22, 2015) ........................................................... 7

*UBS Financial Services, Inc. of Puerto Rico v. XL Specialty Insurance Co.*,
    929 F.3d 11 (1st Cir. 2019) ............................................................................ 5, 6

*Unitrin Auto & Home Ins. Co. v. Karp*,
    481 F. Supp. 3d. 514 (D. Md. 2020) ................................................................. 19

*W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*,
    2014 WL 5812316 (D. Md. Nov. 7, 2014) ........................................................ 11

**Statutes**

Fed. R. Crim. P. 6(f) ............................................................................................ 10

Fed. R. Crim. P. 9(a) ........................................................................................... 10

Md. Code Ann., Cts. & Jud. Proc. § 3-1701(c)(1) and (c)(2)(iii) ............................ 20

Plaintiff[1] respectfully submits this combined reply and opposition in further support of Plaintiff's Motion and in opposition to Defendants' Cross-Motion for Summary Judgment[2] and Defendant ProSight's Motion for Summary Judgment on Issues Specific to ProSight.[3]

## PRELIMINARY STATEMENT

Despite Insurers' best efforts to rewrite the factual and legal bases underpinning Mr. Schulman's claim for defense coverage for the entire DOJ Claim and evade the consequences of their misconduct, their Cross-Motion lays bare three key points warranting denial of the Cross-Motion and granting Plaintiff's Motion in its entirety.

First, the Primary Carriers already and unequivocally acknowledged coverage, promised to pay, and in fact paid for nearly four years, Claim Expenses for the *criminal* Subpoena and related DOJ investigation pursuant to the Policies and the Advancement Agreement. Although the Primary Carriers suggest they reserved rights respecting coverage for the Subpoena, they simultaneously now state they "do not contest" their obligation for all costs incurred in connection therewith, a curious position to take after forcing Mr. Schulman to bring this lawsuit on account of unpaid bills impacting his pending criminal trial. Try as Insurers might to infer a meaningful (or any) distinction between the criminal Subpoena and DOJ investigation, and the related criminal Indictment—logic dictates that none exists when the basis of their coverage denial is that the Policies do not cover loss in connection with ***criminal*** proceedings.

Moreover, Insurers fail to respond to (let alone refute) the fact that Mr. Schulman met his burden to establish the Subpoena constitutes a "Claim" under the Policies, and they concede the

---

[1] Capitalized terms not separately defined herein have the same meaning as set forth in Plaintiff's Motion for Partial Summary Judgment, filed June 30, 2021 (ECF Dkt. No. 35) (hereinafter, "Plaintiff's Motion" or "Plf. Mot.").

[2] *See* ECF Dkt. No. 40 (hereinafter, the "Cross-Motion" or "Ins. Br.").

[3] *See* ECF Dkt. No. 39 (hereinafter, "ProSight's Motion" or "PS Mot.").

Indictment alleges and arises from Interrelated Wrongful Acts therewith.  In other words, to the extent Insurers concede the criminal Subpoena is covered (and they do), they cannot somehow avoid coverage for the interrelated Indictment.  Regardless, the Indictment, too, constitutes a written demand for monetary or non-monetary relief, qualifying as a "Claim," and  Insurers' failure to address the Indictment's allegations establishing as much, as well as their liberties taken in caselaw citations, are telling.  Even if the Policies' plain language was not clear that Mr. Schulman is entitled to coverage for the entire DOJ Claim (it is), Maryland law directs policy ambiguities to be resolved in favor of the policyholder and against the insurers as drafters.

Second, although Insurers assert they reserved rights to deny coverage for the DOJ Claim, their Cross-Motion bases this claim on letters that, in fact, they never provided to Mr. Schulman as an independent insured (despite his request for all communications bearing on his claim), and that do not reserve rights on the basis upon which the Primary Carriers belatedly denied coverage, *i.e.*, that the Policies do not cover criminal proceedings.  If anything, these letters highlight only that: i) the Primary Carriers initially reserved rights—and then relinquished such reservation—as to whether the Subpoena *yet* constituted a Claim (as opposed to a *potential* Claim to be formalized by the DOJ in the future); and ii) their agreement to cover and pay seventy percent (70%) of defense costs was not some compromise over disputed coverage, but rather a compromise of defense counsel's billable *rates* for a covered Claim.

Third, the Primary Carriers' payment of Claim Expenses for nearly four years in connection with both the Subpoena *and* related DOJ investigation confirms that Mr. Schulman interpreted, and relied to his detriment on, the Advancement Agreement's binding promise to pay exactly as the parties intended.  Thus, the Primary Carriers should be estopped from continuing their breach, or the parties, at a minimum, should be permitted to resolve any fact

questions surrounding the Advancement Agreement and detrimental reliance through discovery.

As to Insurers' attempt at dismissal of Count VI (Lack of Good Faith Against the Primary Carriers)—a request made without prior notice to Mr. Schulman or the Court in contravention of the Court's Letter Order Regarding the Filing of Motions (ECF Dkt. No. 8)—this only highlights the Primary Carriers' continued bad faith conduct regarding this claim.  Not to mention, Mr. Schulman states a valid claim under Maryland law and dismissal is unwarranted.

Finally, ProSight's Motion fares no better. Not only does ProSight rehash certain arguments contained in Insurers' Cross-Motion (which the Court directed ProSight not to do), but its Motion also inappropriately asks for summary disposition on Mr. Schulman's anticipatory breach claim, which is a fact issue under Maryland law.  Besides, ProSight's deliberate failure to act, as alleged, can and does constitute repudiation of its future obligation to insure Mr. Schulman's defense for the DOJ Claim, and ProSight cannot continue to hide behind the Primary Carriers after never so much as issuing a reservation of rights letter for more than four years.

In sum, it is beyond dispute that the entirety of the DOJ Claim is a covered Claim under the Policies and that the Primary Carriers are in breach of their defense obligation and the Advancement Agreement.  As all Insurers must pay Claim Expenses for the entire DOJ Claim as incurred, subject only to their attachment points, Plaintiff's Motion should be granted in full, and Insurers' Cross-Motion and ProSight's Motion should be denied in their entirety.

## **ARGUMENT**

I.      **THE ENTIRE DOJ CLAIM—INCLUDING THE INDICTMENT—CONSTITUTES A "CLAIM" AND INSURERS CANNOT AVOID SUMMARY JUDGMENT BY IGNORING OR REWRITING UNDISPUTED FACTS**

The plain and ordinary meaning of the Policies requires Insurers to pay for the defense of the entire DOJ Claim (which includes the Subpoena and related Indictment), which the Primary Carriers unequivocally acknowledged through the Advancement Agreement and their conduct.

**A.      The Policies' Definition of "Claim" is Not Limited to Civil Matters Only, Nor Does "Wrongful Act" Mean Civil Misconduct Only**

Insurers argue that because certain subparts of the "Claim" definition include the term "civil," all the distinct subparts of the definition must refer only to civil demands or proceedings. Ins. Br. at 9, 11-12. This contention fails for several reasons. First, in Maryland, clear and unambiguous policy language will be construed as written, without alteration or interpretation. *Nautilus Ins. Co. v. 200 W. Cherry St., LLC*, 383 F. Supp. 3d 494, 510 (D. Md. 2019) (rejecting interpretation that would nullify one phrase and "substitute it with a contradictory formulation") (quoting *Calomiris v. Woods*, 727 A.2d 358, 368 (Md. 1999)). Thus, Insurers may not simply ignore the definition's introductory phrase that a "Claim" means "any of the following" subparts. *See* Ex. 1 at 007 § II.B.1. In fact, many courts have rejected Insurers' exact argument on this point, holding each subpart of the definition of "Claim" independently stands on its own. *See, e.g.*, *Astellas US Holding, Inc. v. Starr Indem. & Liab. Co.*, 2018 WL 2431969, at *5 (N.D. Ill. May 30, 2018) ("[E]ach of the policy's subparts [of the definition of 'Claim'] offer alternative forms of coverage; they do not limit one another."); *Agilis Benefit Servs., LLC v. Travelers Cas. & Sur. Co. of Am.*, 2010 WL 11595321, at *11 (E.D. Tex. Feb. 24, 2010) (finding satisfaction of one subpart of the definition of "Claim" sufficient to trigger coverage).

Second, Insurers were obligated to "use clear and unambiguous language to distinctly communicate the nature of any limitation of coverage to the insured." *Megonnell v. United Servs. Auto. Ass'n*, 796 A.2d 758, 772 (Md. 2002). As drafters of the Policies, Insurers knew how to use the word "civil" and could easily have added that term to the first subpart of the definition of "Claim" if that had been their intent. Instead, in selling the Policies to the Firm in exchange for substantial premiums to which Mr. Schulman as an equity shareholder contributed, Insurers chose not to do so. Nor did Insurers use the word "civil" in defining what "Wrongful

Acts" would be entitled to coverage under the Policies, which acts include not only civil

misconduct, but "any act, error or omission . . . ." Ex. 1 at 009-010 § II.P.

Third, the Primary Carriers covered the criminal Subpoena and DOJ investigation for

nearly four years. *See* Plf. Mot. at 2-3, 25; Butler Decl. ¶¶ 5-6. Thus, to the extent any extrinsic

evidence is needed beyond the four corners of the Policies, the Primary Carriers have

demonstrated they intended the Policies to cover criminal proceedings. And since a reasonably

prudent layperson could understand the first subpart of "Claim" to refer to criminal subpoenas

and related proceedings (as Mr. Schulman does and as the Primary Carriers ostensibly did for

several years), any remaining doubt as to coverage must be resolved in favor of Mr. Schulman as

the insured. *Dutta v. State Farm Ins. Co.*, 769 A.2d 948, 957 (Md. 2001); *Maryland Cas. Co. v.*

*Blackstone Int'l Ltd.*, 114 A.3d 676, 682 (Md. 2015).[4]

Insurers' misguided reliance on the out-of-circuit case of *UBS Financial Services, Inc. of*

*Puerto Rico v. XL Specialty Insurance Co.*, 929 F.3d 11, 24 (1st Cir. 2019) (applying Puerto

Rican law) ignores the context of, and misconstrues, the quoted language from that case. Ins. Br.

at 14. In fact, contrary to *supporting* Insurers' argument—which many insurers have made

before and just as many courts have rejected[5]—*UBS* supports the conclusion that each subpart of

the definition of "Claim" independently defines a "Claim" under the Policies.

---

[4] Whether an insurance policy is ambiguous is a question of law for the Court, but where ambiguity is found, the question becomes one of fact and extrinsic evidence may be considered to help discern the parties' intent. *See Chang v. Brethren Mut. Ins. Co.*, 897 A.2d 854, 861-62 (Md. Ct. Spec. App. 2006); *Aetna Cas. & Sur. Co. v. Hartford Acc. & Indem. Co.*, 539 A.2d 239 (Md. Ct. Spec. App. 1988); *Prison Health Servs., Inc. v. Baltimore Cty.*, 912 A.2d 56, 60-61 (Md. Ct. Spec. App. 2006); *Collier v. MD-Individual Prac. Ass'n, Inc.*, 607 A.2d 537, 539 (Md. Ct. Spec. App. 1992). Thus, even if the Court finds Insurers' construction reasonable (it is not), then ambiguity warrants denying Insurers' Cross-Motion and permitting discovery to see if such ambiguity can be clarified, with any remaining doubt to be interpreted in Mr. Schulman's favor as the insured. *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*, 656 A.2d 779, 786 (Md. 1995); *Chang*, 897 A.2d at 861-62; *Collier*, 607 A.2d at 539.

[5] *See, e.g., Astellas*, 2018 WL 2431969, at *5 (noting "[s]ubpart (1) is broader than subpart (4)," but holding "each of the policy's subparts offer alternative forms of coverage"); *Agilis*, 2010 WL 11595321, at *11; *LCS Corr. Servs., Inc. v. Lexington Ins. Co.*, 800 F.3d 664, 670 (5th Cir. 2015) (analyzing an exclusion with multiple subparts, some broader than others, separated by disjunctive "or," and finding "each subpart must be considered separately").

*UBS* centered on interpreting a policy exclusion barring coverage for "any Claim" related to or arising from specific prior matters. 929 F.3d at 21. The at-issue policy defined "Claim" to include, in addition to civil and criminal proceedings, "any written notice received by an Insured that any person or entity intends to hold any Insured responsible for a Wrongful Act." *Id.* at 23. Pointing to this written notice prong of the definition, UBS argued the exclusion did not bar coverage for the entirety of new proceedings—only that portion of the claim's allegations sharing the requisite nexus to those alleged in the specific prior matters. *Id.*

The First Circuit cried foul, stating: "If the definition of a 'claim' only included the first prong, UBS's interpretation might have better traction." *Id.* at 23. However, the exclusion barred "any" Claim, and UBS's argument "fail[ed] to take into account the entire [Claim] definition and the disjunctive use of the word 'or,'" which, "indicates an item is separate from others in a list." *Id.* Because of the breadth of the exclusion, the First Circuit noted that "we do not see why the first prong should govern," adding "[i]f we were to adopt UBS's construction, the other prongs would be rendered superfluous, and we refuse to construe the definition of 'claim' in a way that would make two-thirds of it meaningless." *Id.* at 24 (citing *In re Advanced Cellular Sys., Inc.*, 483 F.3d 7, 12 (1st Cir. 2007)).

In effect, Insurers make the same argument the First Circuit rejected—that the Court should ignore and render as surplusage one subpart of the definition of "Claim." Insurers cannot choose the subparts of the definition of "Claim" that do not provide coverage and plausibly argue that these subparts govern and make meaningless the pertinent subpart of the definition that does provide coverage. *See, e.g., Astellas*, 2018 WL 2431969, at *5; *Agilis*, 2010 WL 11595321, at *8; *Onvoy, Inc. v. Carolina Cas. Ins. Co.*, 2006 WL 1966757, at *3 (D. Minn. July 11, 2006).

Also, Insurers' continued reliance on *Expo Properties, LLC v. Experient, Inc.*, 956 F.3d

6

217 (4th Cir. 2020), as well as *BRC Uluslararasi Taahut ve Ticaret A.S. v. Lexon Ins. Co.*, 2020 WL 6801933, at *7 (D. Md. Nov. 19, 2020) and *U.S. Home Corp. v. Settlers Crossing, LLC*, 2015 WL 302816, at *6 (D. Md. Jan. 22, 2015) for the inapplicable and incomplete proposition that "under Maryland law, specific contract terms take precedence over general terms" (Ins. Br. at 15) remains misplaced. *See* Plf. Mot. at 26 n.9. First, these cases are not insurance coverage cases. Second, the interpretive canon that "when two contract provisions *conflict*, the specific contract provision controls the more general provision" does not apply (1) where (as here) there is no conflict; and (2) to a carefully drafted defined term in an insurance policy that expressly provides that "*any* of the following" four distinct subparts trigger coverage.[6]

Additionally, contrary to Insurers' suggestion (Ins. Br. at 17), several cases have, in fact, found that policy language similar to the first subpart of the Policies' "Claim" definition applies to criminal subpoenas, investigations, or proceedings *without* reference to, or reliance on, any subpart that otherwise references the term "criminal." *See, e.g., Gold Tip, LLC v. Carolina Cas. Ins. Co.*, 2012 WL 3638538, at *4 (D. Utah Aug. 23, 2012) (letters and requests from Utah County Attorney's Office in connection with a criminal investigation "were plausibly 'written demands for . . . non-monetary relief'"); *Agilis*, 2010 WL 11595321, at *8 ("[T]he definition of 'Claim' in subpart (1) ['a written demand for monetary or non-monetary relief'] can include coverage for a criminal investigation."); *Syracuse Univ. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2013 WL 3357812, at *2 (N.Y. Sup. Mar. 7, 2013) ("The grand jury's [criminal] investigations and the subpoenas constitute a 'written demand . . . for non-monetary relief.'"), *aff'd*, 112 A.D.3d 1379 (N.Y. App. Div. 2013).

---

[6] The Policies' plain language also contradicts Insurers' claim that the first subpart encompasses only "a precursor to a civil proceeding" (Ins. Br. at 15), as does the Primary Carriers' provision of coverage for the criminal Subpoena and DOJ investigation under this same subpart for nearly four years. *See* Butler Decl. ¶¶ 5-6.

Insurers make much of the irrelevant fact that certain of Mr. Schulman's cases separately contemplate criminal proceedings in another subpart of a policy's "claim" definition.  Ins. Br. at 17-18.  Here, the Policies' actual Insuring Agreement extends coverage for any form of "Claim" so long at is for a "Wrongful Act," which is not limited to "civil" wrongdoing but means "any actual or alleged . . . act, error or omission" of any type.  Ex. 1 at 006 § I.A. and 009 § II.P.1.  To that end, and contrary to Insurers' claim (Ins. Br. at 15), the exclusion for "criminal . . . act[s], error[s] or omission[s] by an Insured," which expressly applies only "if evidenced by any judgment, final adjudication . . . or written admission by an Insured," would necessarily be superfluous if criminal actions were not covered in the first instance, as criminality must never be presumed and cannot be adjudicated in a civil proceeding.[7]  Ex. 1 at 011 § IV.A.9.b.  *See Nat'l Cas. Co. v. Lockheed Martin Corp.*, 415 F. Supp. 2d 596, 602 (D. Md. 2006) ("[A]ny construction of a contract that makes another provision superfluous is generally disfavored.").

Finally, Insurers make up out of whole cloth their contention regarding the Fourth Circuit's holding in *Joseph P. Bornstein, Ltd. v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 828 F.2d 242 (4th Cir. 1987).  Insurers assert that the Fourth Circuit "made clear that in the absence of language that could at least be interpreted to provide express coverage for criminal matters, it would not find such coverage in an innocuous and common phrase like 'written demand for . . . relief.'"  Ins. Br. at 18.  The Fourth Circuit's holding, in fact, does not state or support this proposition, nor can it be contorted to infer anything remotely close.  Contrary to Insurers' claim, the policy in *Bornstein* did not include the word "criminal" anywhere in its definition of "Claim" and yet the Fourth Circuit found a criminal investigation

---

[7] Mr. Schulman does not rely on this exclusion to claim the defense coverage he is due.  *See* Ins. Br. at 14.  Rather, the exclusion's existence (and Insurers' acknowledgement of its final adjudication or admission language) confirms it cannot apply to unproven *allegations* of criminal acts.  Ex. 6 at 002.

and post-indictment proceedings seeking "criminal liability and criminal sanctions" nonetheless

qualified as a "Claim" "seeking nonpecuniary relief." *Bornstein*, 828 F.2d at 245.

### B.      The Indictment Is a Covered Claim

Insurers' do not dispute that the Indictment alleges Interrelated Wrongful Acts to those in

the Subpoena and DOJ investigation (a concession their Cross-Motion fails to address). *See* Plf.

Mot. at 15 n.4; Ex. 7 at 002–003; Ex. 8 at 002–003.  Rather, Insurers mistakenly assert the

Indictment does not constitute (1) a *demand* (2) for monetary or non-monetary *relief* because

these terms purportedly connote the "civil" context only. *See* Ins. Br. at 13, 17-19.

First, the Indictment claims Mr. Schulman owes money and property, which is "a demand

for something due." *Fin. Indus. Regulatory Auth., Inc. v. Axis Ins. Co.*, 951 F. Supp. 2d 826, 832

(D. Md. 2013); Plf. Mot. at 20.  That some relief sought is conditioned on a conviction is

irrelevant, as are the Federal Criminal Rules of Procedure's pleading requirements for

indictments. *See* Ins. Br. at 13-14, 18-19.  The Indictment expressly demands that Mr. Schulman

"shall forfeit to the United States" all property "constituting or derived from proceeds obtained

directly or indirectly" because of alleged offenses, as well as property "traceable to such

property," and demands a "money judgment" against Mr. Schulman in the event of conviction.

Ex. 3 at 029–030 ¶¶ 1–3.  The Indictment also demands "forfeiture of substitute property" should

certain money and property be unobtainable from Mr. Schulman "as a result of any act or

omission."[8]  Ex. 3 at 030–031 ¶ 4.  Thus, the Indictment is a demand.

Second, the Indictment is a demand "for monetary or non-monetary relief."  As Insurers

concede, the common and ordinary meaning of "relief" includes "legal remedy or redress."  Ins.

---

[8] Insurers' reference to the Policies' exclusion for the "gaining of any profit . . . to which the Insured was not legally entitled" (Ins. Br. at 14) ignores that this exclusion, too, applies only in the event of final adjudication or admission and not to allegations alone. *See* Ex. 1 at 011 § IV.A.9.  Insurers' defense obligation may not be avoided.

Br. at 19 (citing ordinary dictionary definition).   Nothing about this favors a civil over criminal context, and Insurers' contrasting of a "prayer for relief" in a civil complaint with the definition of "indictment" does not change this.  *See* Ins. Br. at 19.[9]  Tellingly, ***courts analyzing criminal forfeiture claims under the exact section cited in the Indictment (28 U.S.C. § 2461(c)) expressly recognize such criminal forfeiture claim as "relief."***  *U.S. v. Reiner*, 397 F. Supp. 2d 101, 103-04 (D. Me. 2005) ("requested forfeiture relief" of "a personal money judgment," pursuant to 28 U.S.C. § 2461(c) and as alleged in indictment, constitutes "the relief the government requests here").  *See* Ex. 3 at 029-031.  Put simply, the Indictment demands *both* types of relief (although either one would be sufficient).  The fact that the Indictment *also* seeks punitive relief (a conviction) does not somehow disqualify it from coverage.

Besides, an indictment is returned to a judge in court.  *See* Fed. R. Crim. P. 6(f).  Then, the "court must issue a warrant—or at the government's request, a summons—for each defendant named in an indictment . . . ."  Fed. R. Crim. P. 9(a).  Thus, an indictment seeks relief *from a court* regardless of Insurers' claim otherwise.  *See Syracuse*, 2013 WL 3357812, at *3 ("[A] grand jury's investigations are criminal proceedings for monetary or non-monetary relief."); *Bornstein*, 828 F.2d at 245; Plf. Mot. at 21-22.  Thus, the Indictment seeks both non-monetary relief from the court and monetary and non-monetary relief from Mr. Schulman via judicial process.[10]  Consequently, the Indictment is a "Claim."

**C.      Plaintiff Has Established—and Insurers Effectively Concede—Coverage for the Entire Criminal DOJ Claim, Including the Indictment**

Even if the plain language of the Policies was not unambiguously clear that matters

---

[9] Insurers' unsupported supposition that use of agnostic terms like "judgment," "adjudication," and "admission" in the criminal acts exclusion refers only to civil or regulatory contexts may likewise be disregarded.  Ins. Br. at 16.

[10] Contrary to Insurers' further attempt to distinguish *Bornstein* (Ins. Br. at 18), Maryland's law is indistinguishable from Virginia's regarding interpreting ambiguous policy language in favor of the insured.  *Compare Blackstone*, 114 A.3d at 682, *with Bornstein*, 828 F.2d at 245.

alleging criminal acts are covered and that the Indictment is a Claim—the Indictment is indisputably a single Claim with the criminal Subpoena and DOJ investigation,[11] for which the Primary Carriers not only provided coverage to Mr. Schulman for nearly four years (*see* Butler Decl. ¶¶ 5-6) but, more importantly, ***now concede they are obligated to pay in their Cross-Motion*** (*see* Ins. Br. at 20 n.6)—albeit after forcing Mr. Schulman to first file this lawsuit on account of the Primary Carriers' late-hour refusal to pay.  *See Astellas*, 2018 WL 2431969, at *4 (concluding "that the subpoena demanded a form of non-monetary relief and that the subpoena was not distinct from the potential enforcement proceedings"); *W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, 2014 WL 5812316, at *7 (D. Md. Nov. 7, 2014) (claims related under D&O policy where the earlier claim was a but-for cause of the later claim).

Thus, while Insurers are correct that the Primary Carriers did not "undertake an open-ended commitment to fund Mr. Schulman's defense of any criminal matters following the Subpoena" (Ins. Br. at 24), they did promise in the Advancement Agreement to cover fees incurred in his defense of "the investigation ***and any related proceedings***" (Ex. 4 at 001 (emphasis added); *see also* Ex. 5 at 001), a promise required of them pursuant to their Policies' ordinary and common meaning.  That the Primary Carriers breached their defense duty under the Policies, and also breached the Advancement Agreement, including by refusing to pay all Claim Expenses related to the Subpoena, is not a "distraction," but the crux of this dispute.  Insurers must cover 100% of Mr. Schulman's Claim Expenses for the *entire* DOJ Claim.

### D.  The Primary Carriers' Compromised, Inapplicable Reservations Reaffirm Plaintiff's Entitlement to Defense Coverage

Nor may Insurers avoid providing defense coverage for the entire DOJ Claim based on

---

[11] *See* Ex. 1 at 010 § III.C and 013 § V.D.  Insurers nowhere dispute their concession that the Indictment arises from or alleges the same or Interrelated Wrongful Acts as the Subpoena and DOJ investigation.  Plf. Mot. at 15 n.4.

reservation of rights letters that Insurers never sent to Mr. Schulman, and that, in fact, reaffirm his coverage for the Indictment.

Even after being informed by the Firm that the Primary Carriers had agreed to pay 70% of Akin's billable rates and 100% of costs in defense of the DOJ Claim (Plf. Mot. at 11), as a prudent insured under the Policies, Mr. Schulman sent the Advancement Email to Insurers to confirm both the Primary Carriers' consent to Akin and his coverage in connection with the DOJ investigation, criminal Subpoena, "***and any related proceedings***." Ex. 4 at 001 (emphasis added). Mr. Schulman stated he understood the Primary Carriers had reserved their rights with respect to two issues only: (1) the definition of "Loss" and (2) specified exclusions "including criminal or dishonest conduct 'if evidenced by any judgment, final adjudication . . . or written admission by an Insured.'" Ex. 4 at 001. He also noted he had not been provided any "written documentation evidencing" this agreement, and requested "copies of all correspondence concerning the claim and confirmation of the payment agreement." Ex. 4 at 001-002.

Through Insurers' appointed claim representative, the Primary Carriers responded to Mr. Schulman with the Advancement Agreement (Ex. 5), which is not a settlement communication or settlement agreement as Insurers contend.[12] Ins. Br. at 20. Rather, the Advancement Agreement reflects the Primary Carriers' acknowledgment of Mr. Schulman's coverage pursuant to the Policies that Mr. Schulman paid premiums for as an equity shareholder of the Firm. It further confirms Mr. Schulman's understanding that coverage applies to the entire "matter" where the DOJ is claimant, and more specifically confirms that the Primary Carriers agreed to cover Mr. Schulman's defense pursuant to rates negotiated with the Firm. Ex. 5 at 001.

---

[12] The Advancement Agreement was issued to Mr. Schulman, not the Firm, *following* resolution of Insurers' initial dispute with the Firm, not with Mr. Schulman. Moreover, the Advancement Agreement lacks the hallmarks of a settlement agreement, *e.g.*, a preamble, recitals, a mutual release, provisions regarding confidentiality, choice of law, dispute resolution methods, and notice, among others, not to mention a signature page.

Accordingly, the Advancement Agreement unequivocally guarantees Mr. Schulman that the Primary Carriers would provide the coverage owed to him under the Policies for the entire DOJ Claim, including the Indictment. *See Syracuse*, 2013 WL 3357812, at *3 ("[C]ommon sense dictates that a criminal investigation is an integral part of a criminal proceeding.").

The Advancement Agreement also expressly assures Mr. Schulman that the two issues previously raised to the Firm regarding (i) whether a Claim for a Wrongful Act had been made in the Subpoena and (ii) retention of defense counsel—had been resolved.  Ex. 5 at 001 ("A compromise was reached with the insured firm *on these issues, whereby [the Primary Carriers] have agreed to **cover** 70% of defense fees and 100% of costs incurred with respect to this matter* under a reservation of rights.") (emphasis added).  The Advancement Agreement does not identify specifically the Primary Carriers' remaining reservations and encloses only the Etelson Letter, wherein Insurers continued to reserve rights regarding the two issues Mr. Schulman referenced in his Advancement Email (*i.e.*, the definition of "Loss" and presently inapplicable exclusions), along with only one other specific reservation that the Primary Carriers no longer contend is relevant.  Ex. 6.

Accordingly and importantly, these two and only communications the Primary Carriers provided to Mr. Schulman in confirming his coverage and agreeing to pay:  (1) do not mention Insurers' contention that the Policies do not cover criminal matters, nor reserve any rights in that regard; (2) do not dispute Mr. Schulman's understanding that the Primary carriers will provide him with coverage for the DOJ investigation, the criminal Subpoena, "and any related proceedings"; (3) do not reserve any rights beyond the definition of "Loss" and exclusions that are either irrelevant or apply only "if evidenced by any judgment, final adjudication . . . or written admission by an Insured"; (4) affirm a Claim had been made respecting the criminal

13

Subpoena and investigation; (5) affirm the Primary Carriers' consent to Akin's retention and agreement to pay 70% of counsel's rates;[13] and (6) do not provide Mr. Schulman with copies of any other coverage correspondence bearing on his claim.

Insurers' contention, therefore, that they repeatedly reserved (any relevant) rights to Mr. Schulman regarding coverage is belied by the undisputed facts (*see* Ins. Br. at 2, 20-21, 27-28), and Insurers cannot rely on letters they never provided to Mr. Schulman in supposed support for their claim. *See* Ins. Br. at 27 (citing Exs. 9-10).[14] Moreover, neither letter reserves the right to deny coverage on the basis that criminal proceedings are not Claims—despite Insurers' knowledge of the criminal nature of the Subpoena and DOJ investigation at the time these letters were issued to the Firm. *Infra* n.18.

Exhibit 9 is Insurers' initial February 3, 2017 reservation of rights letter to the Firm, wherein Insurers acknowledged notice "of the captioned potential claim" from the DOJ. Ex. 9 at 001. This letter nowhere reserves rights on the basis that the Policies do not insure criminal matters or that the alleged criminal acts asserted by the DOJ do not qualify for coverage; it simply informed the Firm that "at this time" it did not yet appear to the Primary Carriers that the DOJ's Subpoena articulated any Wrongful Acts (Ex. 9 at 002)—a position they expressly repudiate to Mr. Schulman in the Advancement Agreement (*see* Ex. 5 at 001) and concede in their Cross-Motion. *See* Ins. Br. at 20 n.6.

---

[13] Insurers cannot plausibly now challenge, or claim a need for discovery on, the "reasonableness" of Mr. Schulman's fees. *See* Ins. Br. at 10. No Insurer has challenged a single cost on any outstanding invoice, all of which they received, seemingly did not review, and have refused to pay. *See Charter Oak Fire Ins. Co. v. Am. Cap., Ltd.*, 760 F. App'x 224, 229 (4th Cir. 2019) (affirming fees award as reasonable where insurers knew defense costs were accruing and, "but for their breach of coverage obligations, would have known the specifics of those costs").

[14] Insurers attempt to explain away their failure to provide these letters to Mr. Schulman by citing the Policies' provision requiring the form of notice to the Firm. *See* Ins. Br. at 24. Yet Insurers concede the Firm authorized direct dialogue with Mr. Schulman. Even after doing so, Insurers never provided him with either letter. Not to mention, the Policies are clear that each Insured must be considered separately. *See* Ex. 1 at 015 § VI.M ("Notice to or knowledge possessed by the Company, the Insureds or any agent . . . shall not effect a waiver of or estop the Company or the Insureds from asserting any rights under this policy.").

Exhibit 10, too, only bolsters Mr. Schulman's entitlement to defense coverage. This April 5, 2017 letter to the Firm memorialized that the Primary Carriers originally disputed that the Subpoena constituted a Claim for the reasons in Exhibit 9, but after considering additional information "regarding the nature and scope of the DOJ's investigation," Insurers were willing to resolve that issue and provide coverage "subject to the *remaining* terms and conditions of the captioned policy."[15] Ex. 10 at 001-002 (emphasis added). Indeed, Exhibit 10 makes clear the Primary Carriers agreed to provide Mr. Schulman (and the Firm) defense coverage for the Subpoena and ongoing DOJ investigation that they knew involved criminal allegations. Ex. 10 at 002. The only *specific* reservations the Primary Carriers memorialize in this letter were the same three reservations later identified in the Etelson Letter. Ex. 10 at 002-003. Nowhere does Exhibit 10 reserve rights or assert that "Claim" does not include criminal matters.

Thus, Insurers' exclusive reliance on resolved, irrelevant reservations in Exhibits 9 and 10 does nothing to change the fact that the Policies' definition of "Claim" is not limited to civil matters only or that the Primary Carriers' breached their Policies' defense obligation, memorialized in the Advancement Agreement, to provide Mr. Schulman a defense for the entire DOJ Claim as the Policies' plain language requires. Plaintiff's Motion on Counts I, III and IV should be granted and Insurers' Cross-Motion seeking dismissal of Counts I, III and IV denied.

II.  **THE PRIMARY CARRIERS MUST BE ESTOPPED FROM CONTINUING TO BREACH THE ADVANCEMENT AGREEMENT AND, AT A MINIMUM, QUESTIONS OF FACT PRECLUDE DISMISSAL OF COUNTS II AND V**

Even if the Court were to find that ambiguity in the Policies precludes resolution of Mr.

---

[15] This letter also explains the retention dispute between Insurers and the Firm, namely that the Firm's lead counsel had purportedly been informed that Insurers would cover 70% of rates "in the event counsel would not agree to reduced rates," which Insurers asserted had compromised their ability to secure a discount. Ex. 10 at 001. Insurers nowhere claim prejudice with respect to Akin's rates or Mr. Schulman, and confirm they will "cover" 70% of defense fees incurred for both sets of counsel. Ex. 10 at 002.

Schulman's entitlement to defense coverage at this stage, the Primary Carriers should nonetheless be estopped from continuing to breach the Advancement Agreement, which in no way reflects, as Insurers contend, a) an expansion of coverage; or b) merely an "offer to fund" a portion of Mr. Schulman's defense costs notwithstanding that coverage "did not exist." Ins. Br. at 20-21, 23, 25. The Advancement Agreement memorialized the Primary Carriers' agreement to pay pursuant to their defense duty under the Policies and promised funding of specific defense counsel rates. The Primary Carriers simply ignore that Mr. Schulman—as an equity shareholder with the Firm—did, in fact, pay substantial premiums and not only accepted the Primary Carriers' offer, but relied on it to his detriment.

Nor can the Advancement Agreement be understood as the result of anything other than a meeting of the minds. *See* Ins. Br. at 21. Mr. Schulman's Advancement Email requested confirmation of coverage "under the Policies [for] the investigation and any related proceedings" (Ex. 4 at 001), and in the Advancement Agreement the Primary Carriers confirmed that there was coverage in place for the DOJ's claim, made no clarifications to Plaintiff's understanding, and reiterated their agreement "to cover and pay" 70% of Akin attorneys' fees and 100% of expenses for the matter, noting *prior* reservations on the criminal Subpoena as a "Claim for a Wrongful Act" and retention of defense counsel had been compromised. Ex. 5 at 001.

Insurers are also wrong in claiming Mr. Schulman has presented "no evidence that *any* party to the purported agreement understood it the way he asks the Court to interpret it." Ins. Br. at 22. The Court need not look further than Insurers' Cross-Motion for confirmation that the Primary Carriers understood the Advancement Agreement as a binding agreement, and to mean what it says. *See* Ins. Br. at 20 n.6 ("The Primary Carriers do not contest their agreement to pay 70% of amounts incurred in connection with the Subpoena, and any outstanding amounts will be

paid as identified.").[16]  Moreover, that the Indictment had not yet been returned at the time of the

Advancement Agreement is irrelevant, as the Primary Carriers' conduct for years confirms they

understood the Advancement Agreement exactly as Mr. Schulman does.  In fact, the Primary

Carriers covered and paid the majority of Mr. Schulman's Claim Expenses not just in connection

with the Subpoena, but for the related DOJ investigation, for almost four years.  *See* Butler Decl.

¶¶ 5-6; Raines Decl. at Ex. 1, SCHUL0000001 (reflecting matter name for all Akin invoices as

"Investigation by the USDA for the District of Maryland"); *see also* Ex. 10 at 001-002 (resolving

prior Claim reservation based on additional information regarding the DOJ's investigation).[17]

Although Insurers accurately cite the elements of detrimental reliance (Ins. Br. at 22-23

(citing *Pavel Enters., Inc. v. A.S. Johnson Co., Inc.*, 674 A.2d 521, 532 (Md. 1996)), their

application of these elements to Mr. Schulman's claim draws the wrong conclusion.  First, the

Primary Carriers made a clear and definite promise to "cover and pay" the entire DOJ Claim.

Ex. 4 at 001; Ex. 5 at 001; Butler Decl. ¶¶ 5-6.  Insurers' assertion that the Primary Carriers

meanwhile maintained that coverage did not exist (*see* Ins. Br. at 23) utterly lacks support when

they expressly informed Mr. Schulman that the only even arguable reservation had been

compromised.  Ex. 5 at 001.[18]  Insurers' position is thus nothing like the insurer in *Regency*

*Furniture* (who *denied* coverage) or the insurer in *Haines* (who expressly conditioned defense on

---

[16] Insurers have all invoices reflecting costs incurred through June 2021, and a summary reflecting fees outstanding (*see* Ex. A to the Declaration of Jillian M. Raines ("Raines Decl."), submitted herewith).  Still, the Primary Carriers have made no payment.  *See also* ECF Dkt. No. 37 (Plaintiff's initial damages disclosure identifying $1,976,539.37 in total outstanding amounts through June 2021).

[17] Even had Insurers reserved rights on the basis upon which they disclaimed (and they did not), they ceased payment prior to return of the Indictment and issuance of their coverage denial in March of 2021. Plf. Mot. at 4; Compl. ¶¶ 5, 71; Butler Decl. ¶ 7; Exs. 7-8.

[18] Though not raised in Plaintiff's Motion, Insurers argue they have not waived rights.  *See* Ins. Br. at 27.  Given the Primary Carriers' express affirmation to Plaintiff that the issue of whether the Subpoena and investigation constituted a Claim was compromised, and their corresponding payment over several years, the Primary Carriers arguably did waive rights to deny coverage on this basis.  *Allstate Ins. Co. v. Reliance Ins. Co.*, 786 A.2d 27, 32 (Md. Ct. Spec. App. 2001) (ordinarily a fact question, "[w]aiver is 'the intentional relinquishment of a known right, or such conduct as warrants an inference of [such] relinquishment").

"the absolute right to withdraw at any time upon written notice," which the insured accepted).

*Nationwide Mut. Ins. Co. v. Regency Furniture, Inc.*, 963 A.2d 253, 265 (Md. Ct. Spec. App. Jan. 6, 2009); *Haines v. St. Paul Fire & Marine Ins. Co.*, 428 F. Supp. 435, 443 (D. Md. 1977).[19]

Second, the Primary Carriers cannot dispute that they reasonably expected Mr. Schulman to rely on their clear and definite promise to cover the DOJ Claim and pay for the majority of Mr. Schulman's Claim Expenses because that is exactly what they did for almost four years. Butler Decl. ¶¶ 5-7. Third, the Advancement Agreement induced reasonable action or forbearance by Mr. Schulman, which, contrary to Insurers' claim regarding "vague, conclusory allegations" (*see* Ins. Br. at 25-26), is set out concretely in *at least* ten factually specific examples in Plaintiff's Motion. Plf. Mot. at 30-32 (citing factors).[20] Accordingly, Mr. Schulman's claim is akin to the insured in *Nationwide Mutual Insurance Co. v. Regional Electric Contractors, Inc.*, who similarly relied on an express promise of coverage to proceed with action that proved to his detriment in light of the insurer's subsequent denial. 680 A.2d 547, 558 (Md. Ct. Spec. App. 1996). Fourth, the Advancement Agreement caused a detriment that can only be remedied by finding defense coverage for the entire DOJ Claim (as this Court should) or enforcing the 70% fees and 100% costs payment terms of the Advancement Agreement.

Finally, even if the Court does not agree that this case presents exceptional circumstances

---

[19] Insurers' other cases are also inapposite. *See Neuman v. Travelers Indem. Co.*, 319 A.2d 522, 523-24 (Md. 1974) (declining estoppel where Insurer withdrew defense mere months after assuming it—not after nearly four years and in the middle of an unproven criminal matter); *Hartford Fire Ins. Co. v. Annapolis Bay Charters, Inc.*, 117 F. Supp. 2d 496, 498-99 (D. Md. 2000) (declining estoppel where financial tort exposure was eighteen times the available policy limit and underlying action had been stayed).

[20] Most critically, Mr. Schulman did not bring a claim to resolve coverage against Insurers at the infancy of the DOJ Claim and has instead been forced to do so after four years when costs exceed $2 million and current and former Akin attorneys cannot be timely or economically replaced. His continued criminal defense is also at risk given his counsel remain unpaid for several months. Had Insurers informed Mr. Schulman in response to his Advancement Email back in 2017 that they would withdraw coverage if the DOJ investigation resulted in indictment, Mr. Schulman could have and would have prepared and budgeted his defense differently. He lost that opportunity.

justifying a decision on estoppel as a matter of law (*see Allstate Ins. Co.*, 786 A.2d at 33),

dismissal of Counts II and V would nonetheless be an extreme remedy at this stage, as Mr.

Schulman should be permitted the opportunity to take discovery on his detrimental reliance and

breach claims, including to explore the intent and circumstances surrounding the creation of the

Advancement Agreement and the Primary Carriers' failure to comply therewith.

### III.   THE PRIMARY CARRIERS' CONDUCT CONTINUES TO LACK GOOD FAITH, AND COUNT VI STATES A VALID CLAIM UNDER MARYLAND LAW

In violation of this Court Order, the Primary Carriers move to dismiss Count VI of the

Complaint without having first alerted the Court or Mr. Schulman's counsel in their pre-motion

letters of any intent to do so.   *See* ECF Dkt. No. 8 (Letter Order); ECF Dkt. No. 18 (pre-motion

letter request).  For this reason alone, Insurers' Cross-Motion should be denied on this point.

Moreover, the Primary Carriers' actions constitute bad faith under Section 3-1701 of the

Courts and Judicial Proceedings Article of the Annotated Code of Maryland and Maryland

common law by, for example:  (1) acknowledging a coverage obligation for the DOJ Claim in

the Advancement Agreement pursuant to the Policies and then arbitrarily and capriciously

breaching such Advancement Agreement; (2) continuing to fail to make timely payment for

Claim Expenses incurred as far back as 2020 and in connection with the Subpoena; (3) waiting

for more than three months to issue a coverage denial letter for the Indictment; (4) refusing to

acknowledge material provisions in the Policies that establish the Indictment constitutes a Claim;

and (5) disclaiming coverage for the Indictment on the basis of its criminal nature when Insurers

acknowledged (and no longer contest) that the criminal Subpoena was a covered Claim and

never reserved their rights with regard to whether a criminal proceeding constitutes a "Claim"

under the Policies. *Cf. Unitrin Auto & Home Ins. Co. v. Karp*, 481 F. Supp. 3d. 514, 526 (D.

Md. 2020) (insurer's good faith is judged by totality of circumstances, including efforts taken to

resolve coverage dispute promptly or in such a way as to limit any potential prejudice to insured; substance of coverage dispute or weight of legal authority on coverage issues; and insurer's diligence and thoroughness in investigating facts pertinent to coverage); Md. Code Ann., Cts. & Jud. Proc. § 3-1701(c)(1) and (c)(2)(iii) (West) (allowing party to file action without exhausting administrative remedies where applicable commercial insurance policy limit of liability exceeds $1,000,000).

## IV.  PROSIGHT'S UNIQUE MOTION SHOULD ALSO BE DENIED AS PROSIGHT IS NOT ENTITLED TO SUMMARY DISMISSAL OF PLAINTIFF'S VALID ANTICIPATORY BREACH CLAIM AT THIS EARLY STAGE

### A.  Counter Statement of Undisputed Facts Unique to ProSight's Motion

ProSight's Excess Certificate insures $10,000,000 in excess limits of liability and "follows form" to the Axis Primary Policy, meaning that, except for its limit and attachment point, it adopts all Primary Policy terms, conditions, definitions and exclusions. *See* Ex. 1 at 033 § A. Tellingly, ProSight's Excess Certificate notes that, "[i]n matters regarding claims, [ProSight] will act exclusively through the representative or representatives designated by the Underwriters of the Primary [Policy], and will receive copies of initial and subsequent reports." *Id.* It notes further that ProSight may "elect to participate in the investigation, and defense of any claims which may result in payment under this Certificate *regardless of whether the underlying insurance has been exhausted*." *Id.* (emphasis added).

Between the Firm's timely notice of claim in January 2017 and present, ProSight never provided Mr. Schulman with any reservation of rights, coverage position letter, or objection to any position asserted by the Primary Carriers. Compl. ¶¶ 53, 57, 130. This is so despite Mr. Schulman writing directly to Insurers—including to Mr. Patrick Donohue as a claim representative acting for *all* Insurers—in the 2017 Advancement Email, requesting to memorialize the Primary Carriers' agreement on coverage and payment terms. Ex. 4 at 001-002.

For nearly four years, ProSight sat silently as the Primary Carriers confirmed coverage and payment to Mr. Schulman in the Advancement Agreement. Despite its independent right to investigate and defend absent exhaustion, ProSight remained silent in December 2020 when, without explanation, the Primary Carriers stopped responding to Akin's written requests for reimbursement, having failed to pay complete costs incurred through the end of 2020. Compl. ¶ 68; Butler Decl. ¶ 7. Further, after the Indictment was issued on December 2, 2020 and the Primary Carriers waited for more than three months to erroneously retract Mr. Schulman's defense coverage (Compl. ¶¶ 69, 72; Exs. 7-8), ProSight sat silently then, too.

Thus, Mr. Schulman reasonably inferred from ProSight's affirmative lack of communication otherwise that ProSight will do as it has for the last four years when Claim Expenses or other covered Loss inevitably reach ProSight's excess layer: hide behind the Primary Carriers and passively adhere to their baseless disclaimer, even in the face of Mr. Schulman's pending criminal proceeding expected to result in defense costs in excess of $18,000,000. Compl. ¶¶ 113-14, 130. Despite years of opportunity during which ProSight could have informed Mr. Schulman of a contrary view respecting his entitlement to coverage—or taken *any* position or reserved rights in *any* capacity—ProSight has done nothing.[21] Even now, facing a lawsuit Insurers forced, ProSight fails to affirmatively stray from the pack and confirm Mr. Schulman's coverage subject to ProSight's attachment point. To the contrary, ProSight proactively moves for judgment against Mr. Schulman right alongside the Primary Carriers.

**B.     Plaintiff's Declaratory Relief Claim Is Ripe As Against All Insurers**

As a preliminary matter, in direct contravention of the Court's Order to ProSight to limit its motion to issues specific to its unique position as an excess carrier, ProSight rehashes

---

[21] Moreover, the Primary Carriers' claim representative (and thus ProSight's claim representative) already told Mr. Schulman in March 2021 that the Policies do not cover the DOJ Claim. Exs. 7-8.

arguments that are not unique to it. *See* Dkt. No. 31. Specifically, ProSight argues that Mr. Schulman's claim for declaratory relief in Count IV is not yet ripe (*see* PS Mot. at 3), but so do all Insurers in their Cross-Motion. *See* Ins. Br. at 9-10.

Regardless, ProSight's second attempt at this argument fundamentally misses the point. Mr. Schulman's request for declaratory judgment is not asking for a declaration of ProSight's present obligation to pay; rather, Mr. Schulman requests a declaration interpreting the Policies' coverage grant as against all Insurers, and requests a declaration as against ProSight specifically that it will pay *subject to* its Excess Certificate's respective attachment point for the criminal DOJ Claim where Claim Expenses are accruing rapidly and Mr. Schulman anticipates the costs of trial will likely exceed the underlying $10,000,000 threshold. Compl. ¶¶ 114, 130; *see also* Dkt. No. 37 at 5 (defense spend "expected to exceed $18 million").

Besides, courts routinely allow declaratory relief against excess insurers, and there *is* a greater immediacy here than other coverage cases because Mr. Schulman cannot afford any gap in coverage while he vigorously defends against the pending criminal action. *Hiitt Contracting, Inc. v. Hartford Fire Ins. Co.*, 2021 WL 2352281, at *7 (D. Md. June 9, 2021) (a "live case or controversy exist[ed]" when follow-form excess policy potentially implicated); *see also Century Indem. Co. v. Marine Grp., LLC*, 848 F. Supp. 2d 1229 (D. Or. 2012) (ripeness turned on probability that excess insurer's limits will be reached). In sum, the Court has all facts needed to rule on Mr. Schulman's request for declaratory judgment against all Insurers, including ProSight.

ProSight also misunderstands Mr. Schulman's declaratory relief claim against ProSight (PS Mot. at 9-11), as neither Plaintiff's Complaint nor his Motion seeks a declaration of breach of the Advancement Agreement against ProSight. *See* Plf. Mot. at 1-2, 35. ProSight is not bound by the Advancement Agreement, yet ProSight's claim that it is not bound by the Primary

Carriers' disclaimer of coverage cannot stand.  This claim ignores that ProSight *has* effectively adopted such disclaimer, and that delaying or refusing to provide a position respecting defense coverage may lead to an insurer waiving its right to disclaim coverage later.  *See, e.g.*, *Holt v. Utica Mut. Ins. Co.*, 759 P.2d 623, 628-29 (Ariz. 1988) ("Even absent an express refusal to defend, an unreasonable delay in taking action . . . may constitute a breach of the duty to defend.").  ProSight should not be permitted to evade providing Mr. Schulman with *any* response on coverage for nearly four years without consequence.

### C.     ProSight's Deliberate, Years-Long Inaction Supports Plaintiff's Valid Anticipatory Breach Claim

In hastily seeking summary dismissal of Count III (Anticipatory Breach of Contract), ProSight again raises an issue already argued in Insurers' Cross-Motion.  *See* PS Mot. at 6.[22] Further, although ProSight would have the Court believe there are no issues of material fact because Mr. Schulman's anticipatory breach claim is "hollow" and costs are unlikely to reach ProSight's attachment point (PS Mot. at 7-8), neither assertion is true.  In sum, ProSight's assertion that there can be no anticipatory breach of contract for not doing something it is not obligated to do misstates Maryland law, basic precepts of insurance law, and Mr. Schulman's allegations.  Further, fact issues remain as to the intent of ProSight's deliberate silence and inaction for more than four years, especially after the Indictment was returned in December 2020, which nearly guarantees Loss reaching ProSight's excess layer, as ProSight has been informed.  Compl. ¶¶ 113-14; Dkt. No. 37 at 4-5.[23]

Under Maryland law and Fourth Circuit precedent, conduct that evinces an intention to

---

[22] *See* Ins. Br. at 19 (wrongly asserting that "there can be no anticipatory breach where a party is not obligated to perform under the contract").

[23] Exhibits 9-10 to Insurers' Cross-Motion—never before sent to Mr. Schulman and addressed from the claims representative appointed to act for all Insurers—confirms additional discovery is warranted.

refuse performance in the future or when performance comes due is sufficient to show
anticipatory breach of contract. *String v. Steven Dev. Corp.*, 307 A.2d 713, 719 (Md. 1973)
("[W]hen in anticipation of the time of performance one definitely and specifically refuses to do
something which he is obliged to do . . . it may be treated as a breach by anticipation."); *Studio
Frames Ltd. v. Standard Fire Ins. Co.*, 369 F.3d 376, 383 (4th Cir. 2004) (repudiation "may rest
on a defendant's conduct evidencing a clear intention 'to refuse performance in the future'").
Further, the Fourth Circuit (applying Virginia law) stated repudiation need not be "express";
rather, it can rest on "conduct evidencing a clear intention 'to refuse performance in the future.'"
*Studio Frames Ltd.*, 369 F.3d at 383.  ProSight's cases do not refute this point.  Thus, ProSight's
claim that inaction cannot constitute anticipatory breach fails.[24]

　　　　ProSight's argument that as an excess carrier it "is not obligated to defend until the
primary limits are exhausted" does not alter Mr. Schulman's claim that ProSight's defense duty
is a material and definite obligation of its Excess Certificate and that ProSight's conscious
inaction confirms (as does its Motion) its clear repudiation of this future obligation.  *See* PS Mot.
at 1 ("[T]he Policies do not afford coverage to Mr. Schulman in connection with his claims for
coverage for the Subpoena or the Indictment"), 5; Ins. Br. (joined by ProSight).[25]  In hiding
silently behind the Primary Carriers for years—even in the face of the Primary Carriers'
withdrawal of their prior acknowledgment of coverage and breach of the Primary Policies and
Advancement Agreement—ProSight has shown that it likewise will not honor its contractual
defense obligation when its time for performance comes due.  Regardless, any question on

---

[24] *See Harrell v. Sea Colony, Inc.*, 370 A.2d 119, 123-24 (Md. Ct. Spec. App. 1977) (failure to answer requests
pertaining to settlement location did not amount to anticipatory repudiation because contract imposed no such duty);
*8621 Ltd. P'ship v. LDG, Inc.*, 900 A.2d 259, 272 (Md. Ct. Spec. App. 2006) (holding anticipatory breach is a fact
question and a jury could find LDG breached its future obligation by inaction).

[25] The litany of extra-jurisdictional cases cited by ProSight from the subrogation or contribution arena do not support
a contrary conclusion. *See* PS Mot. at 8.

ProSight's years-long silence evincing the positive and unconditional refusal to establish anticipatory breach of contract is a factual one not appropriately resolved on summary judgment. *See, e.g.*, *Holt*, 759 P.2d at 629 (finding inferences that may be drawn from insurers' silence for years in failing to defend insured, including anticipatory repudiation, should be resolved by trier of fact). Accordingly, ProSight's Motion should be denied.

### **CONCLUSION**

For the foregoing reasons, Mr. Schulman respectfully requests that the Court grant his Motion for Partial Summary Judgment on Counts I, II, IV and V of the Complaint and deny in their entirety Insurers' Cross-Motion for dismissal of all Counts of the Complaint and ProSight's Motion seeking dismissal of Count III of the Complaint as against ProSight.

Dated: August 11, 2021                        Respectfully submitted,

                                              /s/ Jeffrey M. Schwaber
                                              Jeffrey M. Schwaber (Bar # 06095)
                                              STEIN SPERLING BENNETT DE JONG
                                              DRISCOLL PC
                                              1101 Wootton Parkway
                                              Suite 700
                                              Rockville, MD 20852
                                              (301) 340-2020
                                              (301) 354-8110
                                              jschwaber@steinsperling.com

                                              Robin L. Cohen *(Admitted pro hac vice)*
                                              Jillian M. Raines *(Admitted pro hac vice)*
                                              COHEN ZIFFER FRENCHMAN &
                                              MCKENNA LLP
                                              1350 Avenue of the Americas, 25th Floor
                                              New York, NY 10019
                                              (212) 584-1890
                                              (212) 584-1891
                                              rcohen@cohenziffer.com
                                              jraines@cohenziffer.com

25

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has

been served electronically on all counsel of record via operation of the Court's electronic filing

system and by electronic mail on August 11, 2021.


*/s/ Jeffrey M. Schwaber*_____
Jeffrey M. Schwaber (Bar # 06095)

8317059_1