# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JEREMY W. SCHULMAN,

                         **Plaintiff,**

**vs.**

**AXIS SURPLUS INSURANCE COMPANY, ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY, and PROSIGHT SYNDICATE 1110 AT LLOYD'S,**

                         **Defendants.**

Civil Action No.: 8:21-cv-1252

## DEFENDANTS' JOINT REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

INTRODUCTION .......................................................................................................... 1

ARGUMENT ................................................................................................................. 2

I.   ARGUMENTS IN FURTHER SUPPORT OF THE INSURERS' JOINT MOTION ........ 2

   A.   The Indictment is Not a Claim Under the Primary Policy's "Written Demand" Prong. . 2

   B.   The Primary Carriers Have Never Agreed to Provide Coverage for Anything but the Subpoena, and that was an Offer to Compromise a Disputed Claim. .................................... 6

   C.   There Can be no Coverage Through Waiver, Estoppel, Or "Detrimental Reliance" Under Maryland Law .................................................................................................... 9

   D.   The Primary Carriers are Entitled to Summary Judgment on the "Bad Faith" Count for the Same Reasons as the Other Counts. .............................................................................. 12

II.  ARGUMENTS SPECIFIC TO SEPARATE MOTION OF PROSIGHT ......................... 14

   A.   Plaintiff Fails to Acknowledge that If the Court Denies the Insurers' Cross-Motions, ProSight Syndicate Will Remain Entitled to Render Its Own Coverage Determination If and When Its Excess Layer of Coverage is Triggered. ............................................................. 14

   B.   As Excess Carrier, ProSight Syndicate Is Not Bound by Coverage Determinations of the Primary Carriers, Nor Is ProSight Syndicate's Excess Layer Triggered Unless and Until the Primary Limit of Insurance is Exhausted. .................................................................... 16

   C.   Plaintiff's Claims as to ProSight Syndicate Are Not Yet Ripe, and Plaintiff's Supposed Authority in Opposition to this Argument on Summary Judgment Is Unavailing. ............... 18

   D.   Plaintiff's Purported Opposition Fails to Properly Address the Unavoidable Conclusion that ProSight Syndicate Cannot Be Said to Have Breached – Anticipatorily or Otherwise –

Any Duties Under the Policies Where There Has Been No Positive, Unconditional

Repudiation of the Contract.................................................................................................. 20

CONCLUSION.......................................................................................................................... 22

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*All Risks, Ltd v. Old White Charities, Inc.*,

    715 F. App'x 274 (4th Cir. 2017) .......................................................................13

*Astellas US Holding, Inc. v. Starr Indem. & Liab. Co.*,

    No. 17 CV 8220, 2018 WL 2431969 (N.D. Ill. May 30, 2018)................................5

*Century Indem. Co. v. Marine Group, LLC*,

    848 F. Supp. 2d 1229 (D. Or. 2012) ...........................................................18, 19

*Gold Tip, LLC v. Carolina Cas. Ins. Co.*,

    Civil No. 2:11–CV–00765–BSJ 2012 WL 3638538 (D. Utah Aug. 23, 2012) .......................3

*Government Employees Ins. Co. v. Group Hospitalization Medical Services, Inc.*,

    322 Md. 645, 589 A.2d 464 (1991) .......................................................................21

*Harford Fire Ins. Co. v. Annapolis Bay Charters, Inc.*,

    117 F. Supp.2d 496 (D. Md. 2000)........................................................................12

*Hiitt Contracting, Inc. v. Harford Fire Ins. Co.*,

    2021 WL 2352281 (D. Md. June 9, 2021)...................................................18, 19

*Holt v. Utica Mut. Ins. Co.*,

    759 P.2d 623 (Ariz. 1988)......................................................................................20

*Horace Mann Ins. Co. v. General Star Nat. Ins. Co.*,

    514 F.3d 327 (4th Cir. 2008) ................................................................................16

*Ins. Co. of N. Am. v. Co.,fman*,

    451 A.2d 952 (Md. Ct. Spec. App. 1982) ...............................................................9

*Macsherry v. Sparrows Point, LLC*,

    973 F.3d 212 (4th Cir. 2020) ...................................................................8

*Mayor and City Council of Baltimore v. Utica Mut. Ins. Co.*,

    145 Md.App. 256, 802 A.2d 1070 (2002)...........................................17

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Rite Aid of S.C., Inc.*,

    210 F.3d 246 (4th Cir. 2000) .................................................................13

*Nationwide Mutual Insurance. Co. v. Regional Electric Contractors, Inc.*,

    680 A.2d 547 (Md. Ct. Spec. App. 1996) ...............................10, 11, 12

*Neuman v. Travelers Indemnity Co.*,

    271 Md. 636, 319 A.2d 522 (1973) ...........................................9, 11, 12

*OneBeacon Ins. Co. v. Metro Ready-Mix, Inc.*,

    242 F. App'x 936 (4th Cir. July 13, 2007) ..........................................12

*Ruebe v. PartnerRe Ireland Insurance DAC*,

    470 F.Supp.3d 829 (N.D. Ill. 2020) ......................................................21

*String v. Steven Dev. Corp.*,

    307 A.2d 713 (Md. 1973) .......................................................................20

*Studio Frames Ltd. v. Standard Fire Ins. Co.*,

    369 F.3d 376 (4th Cir. 2004) .................................................................21

*U.S. Fidelity & Guar. Co. v. U.S. Fire Ins. Co.*,

    90 Md.App. 327, 600 A.2d 1178 (1992).............................................16

*U.S. First Ins. Co. v. Maryland Cas. Co.*,

    52 Md.App. 269, 447 A.2d 896 (1982)...............................................17

*UBS Financial Services, Inc. of Puerto Rico v. XL Specialty Insurance Co.*,

    929 F.3d 11 (1st Cir. 2019) .......................................................................................4

**Other Authorities**

4 Douglas R. Richmond, *New Appleman on Insurance Law Library Edition* §

    24.06[1] (2019) ........................................................................................................17

Fed. R. Civ. P. 56 ...........................................................................................................1

Federal Rule of Evidence 408 ................................................................................7, 8, 9

15 Lee R. Russ & Thomas F. Segalla, *Couch on Ins.* § 220:32 (3d ed. 2005) .............17

14 Steven Plitt, et al., *Couch on Ins.* § 200:39 (2020) .................................................17

Defendants AXIS Surplus Insurance Company ("AXIS"), Endurance American Specialty Insurance Company ("Endurance," and together with AXIS, the "Primary Carriers"), and ProSight Syndicate 1110 at Lloyd's ("ProSight Syndicate," and together with the Primary Carriers, the "Insurers") respectfully submit this joint reply in support of the Insurers' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, no dispute of material fact exists, and this Court should deny Plaintiff's motion and grant summary judgment in favor of the Primary Carriers.

## INTRODUCTION

It is ironic that Plaintiff begins his Reply in Support of Motion for Partial Summary Judgment and Opposition to Cross-Motion for Summary Judgment (the "Opposition," Dkt. No. 41) by accusing the Insurers of "rewrit[ing]" the bases for his claim for coverage, especially given the lengths to which Plaintiff has rewritten the applicable policy language, the Primary Carrier's correspondence, case law, and even history. As just one example, Plaintiff's argument relies heavily on his representation, repeated no fewer than three times in his briefs and correspondence to the Court[1] (and another thirteen times without the quotation marks[2]), that the Primary Carriers "unequivocally" promised to cover fees incurred in his defense of "the investigation *and any related proceedings*." Opposition, Dkt. No. 41 at 11 (emphasis in original). This statement and the quotation marks are clearly intended to lead the Court to believe that the Insurers made such a promise, or at least that they uttered the quoted words - they did not. Nor did Plaintiff ever ask for coverage using such language. Instead, Plaintiff's basis for repeating this assertion over and over is that Plaintiff, in an email to the Primary

---

[1]; Motion for Partial Summary Judgment, Dkt. No. 35 at 29; Opposition, Dkt. No. 41 at 11, 161.

[2] June 1, 2021 Letter, Dkt. No. 13 at 1, 3; Motion for Partial Summary Judgment, Dkt. No. 35 at 13, 15, 28, 31, 33; Opposition, Dkt. No. 41 at 1, 12, 13, 15, 16, 19.

Carriers, identified Akin Gump as "the law firm I have engaged to represent me in connection with the investigation and any related proceedings."  May 20, 2017 Correspondence, Dkt. No. 35- 4.  And in the sentence preceding that one, he identified the matter for which he sought coverage as "a claim … in connection with a certain U.S. Department of Justice investigation," with no mention of any "related proceedings." To quote Tom Sawyer, "saying so don't make it so," but Plaintiff defies that adage over and over in his Reply.

Plaintiff raises little that is new in its Reply, and the Insurers will not repeat the arguments previously made in their opening brief.  Instead, we will briefly certain arguments raised in Plaintiff's Opposition in the order presented.  This Court can read the Primary Policy and decide whether the "written demand" prong refers, as the Primary Carriers argue, to a demand letter that precedes a formal civil proceeding or, as Plaintiff argues, encompasses any civil or criminal proceeding that seeks to punish or penalize an Insured in any way.  And this Court can read the Primary Carriers' coverage correspondence, particularly the letter that Plaintiff describes as the "Advancement Agreement," and decide whether it clearly represents a commitment to provide coverage for the Indictment, the nature of which could not have been known because it did not yet exist.  The Indictment is not a Claim under the Primary Policy, and the Insurers never agreed to cover any portion of it, and therefore this Court should grant summary judgment on behalf of the Insurers.

## ARGUMENT

## I.      ARGUMENTS IN FURTHER SUPPORT OF THE INSURERS' JOINT MOTION

### A.      The Indictment Is Not A Claim Under The Primary Policy's "Written Demand" Prong.

The Insurers have explained why the Primary Policy does not encompass coverage for criminal proceedings, and we will not repeat those arguments here.  Suffice to say that the cases

upon which Plaintiff relies almost universally involve policies that expressly included coverage for criminal proceedings, which the Primary Policy does not.  The "written demand for monetary or nonmonetary relief" prong of the Claim definition is too fine a reed to support the weight of Plaintiff's argument.

In an effort to bolster his nonsensical reading of the Claim definition, Plaintiff asserts repeatedly that court opinions from around the country routinely support the position he takes, or they reject the "exact" argument the Insurers make here, but that is simply not true.  Briefing is now closed, and Plaintiff has not cited *a single court opinion or other legal authority* finding that an indictment can constitute a Claim under the "written demand for … relief" language used here.  Not one.  Nor are the Insurers aware of a single authority supporting that proposition. Plaintiff cites several cases – wrongly decided, in the Insurers' view – finding that *subpoenas* and the related investigations may be considered "claims" under "written demand" language (in policies that expressly included coverage for criminal proceedings), but not a single one finding an *indictment* satisfied this definition.[3]  If the plain language of the phrase "written demand for … relief" really did encompass a criminal indictment, surely one legal authority would have commented on that fact, but none has.

The reason for this dearth of legal authority is simple – even setting aside the criminal vs. civil distinction, reading the Claim definition as a whole and giving meaning to each of its subparts, the "written demand" prong plainly is not intended to encompass formal proceedings of *any kind*.  Sections 1.b. through 1.d. define as Claims a variety of civil proceedings that can

---

[3] In addition to the inapposite opinions cited in his opening brief, Plaintiff's Reply cites *Gold Tip, LLC v. Carolina Cas. Ins. Co.*, Civil No. 2:11–CV–00765–BSJ 2012 WL 3638538, at *4 (D. Utah Aug. 23, 2012), finding that an investigation constituted a "claim" where the policy defined "claim" to include "a written demand for monetary or non-monetary relief including, but not limited to … Any proceeding brought or initiated by a federal state or local government agency," and which expressly included criminal proceedings.

trigger the Claim definition and therefore implicate coverage under the Primary Policy:
complaints in civil proceedings, demands for arbitration or mediation, and notices of charges in
formal administrative or regulatory proceedings.  Some professional liability policies stop there,
but the Primary Policy includes two kinds of written documents that often threaten or precede a
formal proceeding: Section 1.a includes demand letters within the definition of Claim, and
Section 2 adds written requests to toll or waive statutes of limitations.  The clear intent is to
cover a wide variety of civil proceedings and to include coverage for written demands that might,
depending on how the demands are handled, lead to more formal, covered proceedings.  Once a
formal proceeding is initiated, however, the "written demand" prong no longer applies – the
proceeding must constitute a Claim under one of the more specific prongs, or the insuring
agreement is not triggered.

That is the holding of *UBS Financial Services, Inc. of Puerto Rico v. XL Specialty
Insurance Co.*, 929 F.3d 11, 24 (1st Cir. 2019), in which the insured's argument, like Plaintiff's,
turned on the proposition that a "written notice" prong (similar to the "written demand" prong
here) could still apply once a formal proceeding had been initiated.  The court rejected the
insured's argument and held that once a formal proceeding has begun, the "written notice" prong
no longer applied.  In other words, while the "claim" definition applies to "any of the following"
subparts, as Plaintiff repeatedly points out, the "written demand" subpart no longer applies once
a formal proceeding begins because the more specific prongs of the definition take precedence
over the more general.  The *UBS* opinion thoroughly undermines Plaintiff's argument, and his
argument to the contrary is pure fantasy.

Plaintiff's argument would result in the "written demand" prong not only expanding the
scope of coverage under the Primary Policy to include criminal proceedings – notwithstanding

the lack of any evidence that this professional liability policy was intended to provide such coverage – but it would make all other provisions of the Claim definition superfluous.  If the "written demand" prong were read to encompass criminal indictments, then it even more clearly would encompass civil proceedings initiated by written complaints (rendering Section 1.b. superfluous), arbitration or mediation proceedings initiated by a written demand (rendering Section 1.c. superfluous), formal civil administrative or regulatory proceedings initiated by a written notice of charges (rendering Section 1.d. superfluous), or written requests to toll or waive a statute of limitations (rendering Section 2 superfluous), meaning that Section 1.a. of the Claim definition would swallow all other parts of the definition whole.  This Court cannot interpret the Primary Policy in a way that renders 80% of the Claim definition superfluous, particularly when the "written demand" prong, read in context, so plainly refers to written demands that have not yet ripened into formal proceedings.

Plaintiff relies on a number of opinions finding that subpoenas could be viewed as Claims under the "written demand for monetary or nonmonetary relief" prong on the grounds that the subpoena was a written document demanding that the insured appear for a deposition and/or produce specified documents.  *See, e.g., Astellas US Holding, Inc. v. Starr Indem. & Liab. Co.*, No. 17 CV 8220, 2018 WL 2431969, at *4 (N.D. Ill. May 30, 2018) (holding that a subpoena satisfied "claim" definition because it was a written document demanding "nonmonetary relief" in the form of testimony and document production).[4]  An indictment is far different – while a subpoena demands testimony or the production of documents from the recipient, an indictment demands nothing of the person named in it.  Rather, an indictment notifies the accused and the

---

[4] In addition, the court in *Astellas* noted that the government had expressly accused the insured in that case of a "Wrongful Act" in connection with serving the subpoena; that does not appear to be the case with respect to Plaintiff's receipt of the Subpoena, and therefore even the Subpoena likely would not be found to constitute a Claim under the logic of the *Astellas* opinion.

court of the wrongdoing alleged against the accused and asks the *court* to impose specified punishment. Even if that punishment might include forfeiture, an indictment does not demand "relief" of the accused – it asks the court to impose that punishment in the criminal proceeding initiated by the indictment. Thus, even if the Subpoena could arguably be viewed as a Claim under the "written demand for … nonmonetary relief" prong, the same logic would not apply to the Indictment.

**B.      The Primary Carriers Have Never Agreed To Provide Coverage For Anything But The Subpoena, And That Was An Offer To Compromise A Disputed Claim.**

Undaunted, Plaintiff repeatedly argues that this litigation is really about coverage for the Subpoena, and that if the Subpoena is covered, the Indictment must be covered, as well. The first part of that argument is easily disposed of – the Primary Carriers, having taken the position that the Subpoena was *not* a covered Claim under the Primary Policy, nevertheless agreed to compromise the coverage dispute – subject to a reservation of all rights – by agreeing to pay 70% of the Insureds' fees incurred *in connection with the Subpoena*.[5] The Primary Carriers have never retracted that compromise or refused to pay any amounts incurred prior to the issuance of the Subpoena, and Plaintiff agreed to the compromise, so no dispute exists regarding coverage for the Subpoena. Plaintiff now asserts that some pre-Indictment amounts remain to be paid, and the Primary Carriers have stated that if that is true, those amounts will be paid. This case is not about whether the Primary Carriers will pay the agreed 70% of Subpoena-related expenses – there is simply no claim or controversy on that point.

---

[5] Plaintiff's effort to differentiate the Subpoena and the related investigation in this regard is specious – the Subpoena was the document that compelled the insured Firm of which Plaintiff was an equity partner to participate in the investigation, and the Primary Carriers agreed, as a compromise and subject to a reservation of all rights, to pay 70% of the legal fees he incurred in that process. Neither the Primary Carriers nor Plaintiff ever differentiated between the Subpoena and the investigation because each was part and parcel of the other.

Plaintiff attempts to extend the Primary Carriers' compromise regarding the Subpoena to encompass the Indictment by arguing that there is no "meaningful (or any) distinction" between the Subpoena and the Indictment.  Opposition, Dkt. No. 41, at 1.  The assertion is absurd on its face, as demonstrated by considering just a few fundamental differences between the two: First, the Subpoena demanded that the insured Firm of which Plaintiff was an equity partner provide documents and information in connection with DOJ's investigation to determine who, if anyone, had engaged in criminal misconduct; the Indictment charges Plaintiff with specific criminal acts and asks the Court to sentence Plaintiff to prison.  Second, the Indictment is a purely criminal proceeding, and Plaintiff has not identified a single legal authority supporting his argument that it can be considered a "written demand for … relief" as he asks this Court to find.  Finally, the Indictment did not even exist at the time the Primary Carriers agreed to compromise the coverage dispute over the Subpoena, and the letter conveying that compromise says nothing about coverage for any indictment that might follow the Subpoena.  Accordingly, the Indictment is a different matter altogether for coverage purposes, and the Primary Carriers have taken only one position regarding coverage for the Indictment – they denied coverage for the same reasons asserted in this litigation.  *See* March 12, 2021 Letter, Dkt. No. 35-7.

Moreover, Plaintiff's entire argument flies in the face of Federal Rule of Evidence 408, which provides in relevant part as follows:

(a) Prohibited Uses. Evidence of the following is not admissible – on behalf of any party – either to prove or disprove the validity or amount of a disputed claim. …

> (1) furnishing, promising, or offering … a valuable consideration in compromising or attempting to compromise the claim; and

> (2) conduct or a statement made during compromise negotiations about the claim. …

The letter upon which Plaintiff relies satisfies all requirements to trigger application of Rule 408. First, there undeniably was a disputed claim. A dispute "need not crystallize to the point of threatened litigation" to implicate Rule 408; rather "a dispute exists for purposes of Rule 408(a) so long as there is an actual dispute or difference of opinion regarding a party's liability for or the amount of the claim." *See Macsherry v. Sparrows Point, LLC*, 973 F.3d 212, 222 (4th Cir. 2020). The letter recites that "the captioned matter involving a subpoena" from DOJ was tendered for coverage, and the Primary Carriers "took the position that no Claim for a Wrongful Act had been made within the meaning of the policy, and thus there was no obligation to indemnify the insured for defense costs incurred with respect to the subpoena." The letter then confirms that "[a] compromise was reached with the insured firm on these issues, whereby [the Primary Carriers] have agreed to cover 70% of defense fees … under a reservation of rights." There can be no debate that Rule 408 precludes Plaintiff from using the fact of this compromise, or any statements made in connection with it, to establish the Insurers' liability in this coverage action.

Nor does it matter that the June 22, 2017 letter upon which Plaintiff relies is not a formal settlement agreement – as noted, Rule 408 applies not only to formal settlement agreements, but to any "evidence of … furnishing, promising, or offering" valuable consideration to compromise a claim *or* of any "conduct or a statement made during compromise negotiations," which is precisely what is found in the June 22, 2017 Letter. Plaintiff is now attempting to use evidence that the Primary Carriers "furnished, promised, or offered" valuable consideration in compromise of a disputed claim in order to prove that the Insurers are bound to continue providing coverage, which is exactly what Rule 408 precludes. Plaintiff's argument runs afoul of the "strong public policy" favoring the compromise and settlement of disputes, which Rule

408 serves by ensuring potential litigants that their efforts to resolve controversies out of court will not be used against them if they wind up in court. This Court should not consider such arguments.

Nor did the Insurers concede coverage – even for the Subpoena, but certainly not for the Indictment – by stating in their opening brief that they do not contest their prior agreement to pay an agreed portion of Plaintiff's Subpoena-related defense expenses. Plaintiff is plainly trying to confuse the coverage issues here by making the argument about the Subpoena rather than the Indictment, and the Primary Carriers were merely focusing attention on the real issue in this litigation – whether the Indictment is a covered Claim under the "written demand" prong of the Claim definition.

### C.   There Can Be No Coverage Through Waiver, Estoppel, Or "Detrimental Reliance" Under Maryland Law.

Likewise, Plaintiff's arguments regarding what coverage defenses the Insurers did or did not assert, and which ones were included in letters sent directly to him, are all beside the point. As the Insurers explained in their opening brief, Plaintiff was not entitled to receive any communications directly from the Insurers – we will not repeat that explanation here. But it doesn't matter because Maryland law is abundantly clear that the doctrines of waiver or estoppel cannot create coverage for a claim that doesn't exist in the first place, even if the insurer initially accepts coverage without reserving any rights at all. *See Neuman*, 319 A.2d at 654 (cited in *Ins. Co. of N. Am. v. Coffman*, 451 A.2d 952, 957 (Md. Ct. Spec. App. 1982) (holding that waiver or estoppel cannot create coverage that does not exist under the applicable policy's insuring agreement and exclusions). The Primary Carriers denied coverage here because the Indictment is not a Claim as defined in the Primary Policy, and it therefore does not trigger the Primary Policy's Insuring Agreement –Maryland law could not be more clear that the Insurers could not

have waived, and cannot be estopped from asserting lack of coverage regardless of which coverage defenses they conveyed to their Insureds or whether they conveyed any defenses at all. The lack of coverage through waiver or estoppel is even clearer here since Plaintiff seeks to base waiver or estoppel on the Primary Carriers' compromise over coverage for a different matter – the Subpoena.

Plaintiff has cited what appears to be the only case ever to find coverage through estoppel under Maryland law – *Nationwide Mutual Insurance. Co. v. Regional Electric Contractors, Inc.*, 680 A.2d 547, 558 (Md. Ct. Spec. App. 1996) – notwithstanding that it appears to have been an outlier for the intervening 25 years. Nor does it support coverage here. In *Regional Electric*, the insured sought coverage to pay the cost of repairing a piece of equipment "as quickly as possible" after it was destroyed in an accident, and the insurer advised him "to go ahead and repair the damage as quickly as possible," and the insurer "would take care of it" because "that's why you have insurance." *Id.* at 549, 553. The insured incurred all costs of repairing the equipment, and then the insurer denied coverage on grounds that it already knew were applicable when it promised to pay for the repairs. *Id.* In effect, the court found that the insured had asked "will you pay for these repairs if I incur the cost of repairing it as quickly as possible," the insurer said "yes, go ahead and incur those costs and we will pay for it," and when the insurer reneged, the insured was left holding the bag because it had incurred all of the costs based on the insurer's representation. The Court of Special Appeals first noted that waiver and estoppel generally cannot create coverage under Maryland law and then predicted that, under the unique set of circumstances before it, the Maryland Court of Appeals would find that the insurer was estopped from denying coverage.

Nothing remotely analogous happened here.  The "piece of equipment" for which Plaintiff sought coverage was the cost of complying with the Subpoena, which the Primary Carriers first declined to pay and then compromised the dispute by agreeing to pay on terms agreeable to Plaintiff.  He now seeks coverage for a different "piece of equipment" – his criminal defense costs associated with the Indictment – the nature of which could not have been known from the Subpoena and which didn't come into existence for several years after his earlier communication with the Primary Carriers.  And the justifiable reliance, which was so clear in *Regional Electric*, does not exist here – when the Primary Carriers denied coverage for the Indictment, there was no piece of equipment for which Plaintiff had already paid the costs of repair.  Even if Plaintiff had sought coverage for the Indictment, and even if the Primary Carriers had said "go ahead and defend yourself at our expense – that's why you have insurance," at most *Regional Electric* would support a ruling that the Primary Carriers were estopped from denying coverage for defense costs incurred before they advised Plaintiff of the denial.  But *Regional Electric* is entirely inapposite here because Plaintiff is now seeking coverage for a "piece of equipment" – the Indictment – that did not exist when Plaintiff sought, or when the Primary Carriers compromised their position regarding coverage for the Subpoena.

Plaintiff tries to blur the obvious distinction between the Subpoena and Indictment, incorrectly arguing that the Primary Carriers' compromise on coverage as to one necessitates coverage for the other. While Plaintiff's position is flawed for many reasons already discussed, the Primary Carriers' compromise – even if it were a full acceptance of coverage for the Subpoena – does not trigger the doctrines of waiver or estoppel. This case is far more analogous to the Maryland Court of Appeals' opinion in *Neuman v. Travelers Indemnity Co.*, 271 Md. 636, 319 A.2d 522 (1973), in which the court found no coverage by waiver or estoppel where the

11

insurer first assumed the insured's defense of a claim and then withdrew the defense. *See also Harford Fire Ins. Co. v. Annapolis Bay Charters, Inc.*, 117 F. Supp.2d 496, 499 (D. Md. 2000) (finding no coverage by waiver or estoppel where insurer first accepted defense and later withdrew the defense because there was no coverage for the claim under the applicable policy). The lack of coverage is even more apparent here than in *Neuman* and *Annapolis Bay Charters* because the insurers in those cases had initially accepted coverage for the exact same claim in which they withdrew the defense, whereas the Primary Carriers here have denied coverage for a different claim (the Indictment) than the one for which they negotiated a compromise (still subject to a reservation of rights) on coverage (the Subpoena).  As the Fourth Circuit has explained, even if *Regional Electric* does make it theoretically possible to establish coverage by estoppel under Maryland law, it does not do so where, as here, the insured seeks coverage for one incident in reliance on a promise of coverage for a different incident.  *OneBeacon Ins. Co. v. Metro Ready-Mix, Inc.*, 242 F. App'x 936, 940, (4th Cir. July 13, 2007) (finding *Regional Electric* inapposite because the insured sought coverage for a different incident than the one for which the insurer had purportedly promised coverage).

> **D.  The Primary Carriers Are Entitled To Summary Judgment On The "Bad Faith" Count For The Same Reasons As The Other Counts.**

The Primary Carriers explained in their opening brief that because the Primary Carriers properly concluded that no coverage exists for the Indictment, they are entitled to summary judgment on the claim asserting bad faith.  In addition, the Primary Carriers noted that Maryland law does not recognize an independent tort of bad faith, at least in this context.  Having neither the facts nor the law on his side, Plaintiff pounds the table, claiming that the Primary Carriers acted in bad faith by failing to advise him or this Court that they would move for summary judgment on this issue.

But the Primary Carriers did alert the Court and Plaintiff that they would seek summary judgment on all counts. The Primary Carriers stated in their pre-motion letter to the Court that they would seek summary judgment, not partial summary judgment, and they summarized the key arguments they would make. And during both telephonic conferences with the Court to date, counsel for the Primary Carriers confirmed that the Primary Carriers' motion for summary judgment would, if successful, dispose of the litigation entirely. Moreover, it would not be possible for the Insurers to move for summary judgment on coverage without moving for summary judgment on bad faith because the only "bad faith" that was alleged was the Primary Carriers' allegedly wrongful declination of coverage for the Indictment. If there is no coverage for the reasons explained in the Primary Carriers' briefs, there cannot possibly be bad faith. *See, e.g., All Risks, Ltd v. Old White Charities, Inc.*, 715 F. App'x 274, 276 (4th Cir. 2017) (noting that bad faith claim cannot survive if no coverage exists); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 254 (4th Cir. 2000) (holding that if trial court finds no coverage, it need not address bad faith count). Indeed, the only argument in the Insurers' opening brief that was not telegraphed in their pre-motion letter is the straightforward statement that Maryland law does not recognize an independent tort of bad faith failure to provide coverage, which Plaintiff should have known. Having been made aware of the applicable law, Plaintiff's response should be to withdraw the specious bad faith claim, not to double down on it.

By contrast, one of the key arguments on which Plaintiff relies – that the Indictment is interrelated with the Subpoena and thus considered a single Claim for coverage purposes (*see* Plaintiff's Motion for Partial Summary Judgment, Dkt. No. 35 at 4, 19) – is not mentioned at all in his pre-motion letter. Neither is his argument that the Policies require advancement of 100%

of claim expenses on a current basis (*Id.* at 32); that the reservation of rights letters affirm

coverage for the Indictment (*see* Opposition, Dkt. No. 41, at 11-15); or that the Primary Carriers'

offer to pay a portion of defense expenses in connection with the Subpoena was actually a

compromise of defense counsel's billable rates.  *Id.* at 27.  Does that mean that Plaintiff acted

wrongly by concealing those arguments?  Of course not – all parties wrote to the court to explain

the nature of their proposed motions and summarized their key arguments, which they fleshed

out in their ultimate filings as their research and analysis matured.

Accordingly, for the reasons explained in the Insurers' opening brief, the Primary

Carriers are entitled to summary judgment on Plaintiff's bad faith claim and on all claims against

them.

## II.     ARGUMENTS SPECIFIC TO SEPARATE MOTION OF PROSIGHT

### A.     Plaintiff Fails to Acknowledge that If the Court Denies the Insurers' Cross-Motions, ProSight Syndicate Will Remain Entitled to Render Its Own Coverage Determination If and When Its Excess Layer of Coverage is Triggered.

Plaintiff's opposition incorrectly presupposes that if the Subpoena and Indictment are

deemed a "Claim", he is afforded coverage, overlooking the numerous grounds on which

ProSight Syndicate may still disclaim coverage should Plaintiff's action survive summary

judgment and should the primary layer of coverage be exhausted.  Plaintiff's Motion for Partial

Summary Judgment relates to the Primary Carriers' obligations based on the alleged

"Advancement Agreement" and the definition of "Claim" only.  The Insurers' Cross-Motion

relates to the definition of "Claim" only. Therefore, even if the Court found that both the

Subpoena and the Indictment were "Claims", which ProSight Syndicate maintains they are not,

ProSight Syndicate may still form its own coverage determination based on any and all other

relevant terms, conditions, limitations, and exclusions under the Policy – a point clearly lost on

Plaintiff.  For example, although ProSight Syndicate has not yet made any coverage determinations because, as addressed in Section C, *infra*, it is not ripe to do so, potential grounds to disclaim coverage include, but are not limited to the following: neither the Subpoena nor Indictment are Claims ' for ***Wrongful Acts***", as neither is for acts, errors or omissions committed or attempted *solely in the performance of or failure to perform* ***Professional Services***", as those terms are defined (Dkt. No. 35-1, at 10-11); "Loss" excludes, among other things, the return, withdrawal, or reduction of any fees or receivables paid to an insured (*id.* at pg. 10); the Indictment itself alleges that Plaintiff acknowledged in writing the very dishonesty and deliberately fraudulent act for which he seeks coverage (Dkt. No. 35-3, ¶¶ 56-57), implicating Exclusion 9.b without the need for any judgment, final adjudication or alternate dispute resolution proceeding; the Policy excludes coverage for Loss arising from any Claim against an insured based upon, arising out of, or in consequence of the gaining of any profit, remuneration, or advantage to which the insured was not legally entitled, as well as any criminal, dishonest, malicious or deliberately fraudulent act, error or omission if evidenced by judgment, final adjudication, alternate dispute resolution proceeding, or, as indicated above, written admission (Dkt. No. 35-1, at 11-12); and insurers are not obligated to cover any Claim, Claim Expense, liability, or contractual obligation that an insured assumed without the insurer's prior written consent (Dkt No. 35-1, at 7, 14, 34), and ProSight Syndicate never consented to Plaintiff's retention of counsel or to counsel's rates. (*See also* Dkt. No. 16).

Again, even if the Court found that both the Subpoena and the Indictment were "Claims", which ProSight Syndicate maintains they are not, ProSight Syndicate may still form its own coverage determination based on any and all other relevant terms, conditions, limitations, and exclusions under the Policy, in the event the primary layer of coverage is exhausted.

**B.  As Excess Carrier, ProSight Syndicate Is Not Bound by Coverage Determinations of the Primary Carriers, Nor Is ProSight Syndicate's Excess Layer Triggered Unless and Until the Primary Limit of Insurance is Exhausted.**

As a preliminary matter, ProSight Syndicate addresses the fundamentally flawed premises on which Plaintiff's opposition is based: that, on one hand, ProSight Syndicate must somehow be bound by the Primary Carriers' disclaimer (it cannot), yet that, on the other hand, ProSight Syndicate should essentially be required to provide its coverage position before its policy's attachment point (it cannot).  Opposition, Dkt. No. 41 at 27-28.

Plaintiff fails to counter the general principle recognized in courts throughout the country, as set forth *infra*, which is that a follow-form excess carrier is not bound by the decisions made by the primary carrier; the intent to incorporate the same words used in the primary policy does not imply an intent to accept the primary carrier's decisions, nor does it serve to bind the excess carrier to the primary carrier's decisions, whether those decisions involve disclaiming coverage, compromising coverage, accepting coverage in whole or in part, or settling.  (*See* Dkt. No. 39, at 16-17) (citing cases from courts across the country)).  Plaintiff also fails to challenge that the law is equally clear that an excess carrier owes no duties until the primary layer of coverage is exhausted. (*See id.*); *see also U.S. Fidelity & Guar. Co. v. U.S. Fire Ins. Co.*, 90 Md.App. 327, 600 A.2d 1178 (1992), *rev'd on unrelated grounds* (citing *Fireman's Fund Ins. C. v. Rairigh*, 59 Md.App. 305, 475 A.2d 509 (1984)) ("an excess insurer's duty to defend, and thus its 'potentiality' of coverage, does not arise until the full amount of the primary policy is actually exhausted"; exhaustion is a prerequisite to an excess carrier's duties, which do "not arise simply where the claims asserted against the insured exceed the policy limits of the primary insurer"); *Horace Mann Ins. Co. v. General Star Nat'l. Ins. Co.*, 514 F.3d 327 (4th Cir. 2008) (excess liability policies, unlike primary liability insurance, do not provide first-dollar

coverage for insured losses, but instead provide an additional layer for losses that exceed the limits of a primary liability policy; coverage under an excess policy thus is triggered when the liability limits of the underlying primary insurance policy have been exhausted.  "In keeping with the reasonable expectations of the parties, including the insured, which paid separate premiums for its primary and excess policies, excess coverage generally is not triggered until the underlying primary limits are exhausted . . .");  15 Lee R. Russ & Thomas F. Segalla, *Couch on Ins.* § 220:32 (3d ed. 2005) ("it is only after the underlying primary policy has been exhausted does the excess . . . coverage kick in."); *Mayor and City Council of Balt. v. Utica Mut. Ins. Co.*, 145 Md.App. 256, 802 A.2d 1070 (2002)[6] ("[t]he exhaustion of all of the primary policies on the risk should occur prior to the requirement that any excess policy respond to the loss . . ."); *U.S. First Ins. Co. v. Md. Cas. Co.*, 52 Md.App. 269, 447 A.2d 896 (1982) (citation omitted) ("'[e]xcess' or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted"); 14 Steven Plitt, et al., *Couch on Ins.* § 200:39 (2020) ("As a general rule, a true-excess insurer is not obligated to defend its insured until all primary insurance is exhausted or the primary insurer has tendered its policy limits."); 4 Douglas R. Richmond, *New Appleman on Insurance Law Library Edition* § 24.06[1] (2019) ("Generally, the primary insurer must pay its policy limits . . . for an excess insurer to have any obligation to its insured.").

The premium on a primary policy is typically higher than the premium charged for an excess policy because the risks insured against are different for the different carriers.  Were an

---

[6] *Mayor and City Council of Balt. v. Utica Mut. Ins. Co.*, 145 Md.App. 256, 802 A.2d 1070 (2002) involved the question of pro rata allocation in an action involving long-term environmental pollution claims. Even in these cases, with varying layers of coverage under various policies spanning years, the same principle – that all relevant underlying policies must be exhausted before an excess carrier's duties are triggered – still applied. *Id.*

excess carrier required to respond, investigate, or take any other action before its layer of coverage was triggered, there would be no sense in having different layers of coverage and premiums on excess policies would be adjusted accordingly.

Plaintiff offers no relevant legal authority in opposition to the above principles on which the ProSight Syndicate-specific Cross-Motion is grounded. He cannot. The ProSight Syndicate Policy is irrefutably an excess Policy with coverage excess to the Primary Carriers' $10 million limit. Unless ProSight Syndicate elected to participate in the investigation and defense of any claims, which ProSight Syndicate did not do here, its excess layer is triggered only upon reduction or exhaustion of the Primary Policy's limit as set out in the Policy. Plaintiff cites to inapposite case law and suggests without reason that ProSight Syndicate may have waived its right to disclaim, but this circular argument again ignores applicable law discussed herein. ProSight Syndicate cannot be deemed to have waived its rights by not fulfilling a duty that never existed in the first instance. Plaintiff's purported opposition is simply in conflict with reason, with the terms of the Policies, and with the law.

### C. Plaintiff's Claims as to ProSight Syndicate Are Not Yet Ripe, and Plaintiff's Supposed Authority in Opposition to this Argument on Summary Judgment Is Unavailing.

Plaintiff contends in its Opposition that his claim for declaratory relief as to ProSight Syndicate is ripe because, according to Plaintiff, there is a greater immediacy here than in two other coverage cases where courts have considered imposing declaratory relief as to an excess carrier. The two cases on which Plaintiff relies are distinguishable in critical respects. In *Hiitt Contracting, Inc. v. Harford Fire Insurance Co.*, 2021 WL 2352281 (D. Md. June 9, 2021), the insurers owed a duty to defend and the insured's total exposure in the underlying litigation was $70 million, well above the primary layer of $4 million and the two excess layers of $25 million each. In *Century Indemnity Co. v. Marine Group, LLC*, 848 F. Supp. 2d 1229 (D. Or. 2012), it

was substantially likely that excess policies would be triggered in an action brought against the insureds by the Environmental Protection Agency and the insureds' declaratory judgment action thus presented a sufficient case or controversy where potential exposure was more than $2 billion and the excess layers were triggered at $20.5 million. *Id.* It was specifically *"[i]n light of the enormity of the potential liability at issue, and the relative smallness of the triggering coverage amount"* that the court concluded that it was substantially likely that the excess policies would be triggered and that the claims asserted presented a genuine case or controversy with respect to the excess insurers. *Id.* at 1237 (emphasis added).

Here, Plaintiff is missing the "sufficient immediacy and reality" to warrant the issuance of a declaratory judgment, and the case law on which he relies fails to adequately challenge this argument made in the ProSight-Syndicate-specific brief. Here, it is *Plaintiff's* duty to investigate and defend a covered Claim (Dkt. No. 35-1, at 7), the insurer will, only upon written request, pay Claim Expense owed under the Policy (*id.*), and the insurer "will have no obligation to pay any Loss before the final disposition of a Claim (*id.*). More importantly, the Plaintiff's potential exposure and liability compared to the amount of coverage and attachment point is nowhere near those in *Hiitt* or *Century Indemnity Co.* After nearly four years, the cost of complying with the Subpoena has cost approximately $2 million, leaving approximately $8 million before the primary limit is exhausted.[7] Plaintiff simply alleges that defense fees and expenses in connection with the Indictment are expected to exceed $18 million. (Dkt. No. 2 ¶ 114). It is unclear how that figure was reached. What is clear is that Plaintiff's bald assertion falls drastically short of establishing a substantial likelihood that the ProSight Syndicate Policy will be triggered. Absent

---

[7] Though ProSight Syndicate has not yet made a coverage determination, it remains that ProSight Syndicate has not consented to Plaintiff's counsel or rates.

the sufficient immediacy and reality, issuance of a declaratory judgment as to ProSight Syndicate

is not warranted.

**D. Plaintiff's Purported Opposition Fails to Properly Address the Unavoidable Conclusion that ProSight Syndicate Cannot Be Said to Have Breached – Anticipatorily or Otherwise – Any Duties Under the Policies Where There Has Been No Positive, Unconditional Repudiation of the Contract.**

Not one case that Plaintiff relies on in opposition to the ProSight Syndicate-specific

Cross-Motion on the anticipatory breach claim stands for the proposition Plaintiff suggests it

does. *Holt v. Utica Mutual Insurance Co.*, 759 P.2d 623, 628-29 (Ariz. 1988), for example,

involved a dispute between an insured and its *primary* insurer; thus, the question of whether the

primary carrier in that case anticipatorily breached its duty to defend is starkly different from the

instant matter, where ProSight Syndicate owes no present duty to defend and, as ProSight

Syndicate maintains, no such duty (nor a duty to indemnify) will ever arise. Another case

Plaintiff misguidedly relies on is *String v. Steven Dev. Corp.*, 307 A.2d 713 (Md. 1973), which is

not even an insurance coverage case. Rather, it stems from a builder's failure to complete

construction within the time specified in the contract. *Id.* Regardless, in that case, a mere delay

in preparing for construction or in its commencement, unaccompanied by any other words or acts

reflecting a repudiation of the contract was insufficient to establish an anticipatory breach. *Id.* at

719-720. Quoting *Weiss v. Sheet Metal Fabricators*, 206 Md. 195, 203-204, 110 A.2d 671, 675

(1955), the court in *String* noted:

> "'. . . It was said in *Friedman v. Katzner*, 139 Md. 195, 201, 114 A.
> 884 (1921); 'A breach of contract is a failure without legal excuse
> to perform any promise which forms the whole or part of a contract
> . . ., and may be inferred from the 'refusal of a party to recognize
> the existence of a contract, or the doing of something inconsistent
> with its existence' . . ., and when 'in anticipation of the time of
> performance one definitely and specifically refuses to do
> something which he is obliged to do, so that it amounts to a refusal
> to go on with the contract, it may be treated as a breach by

> anticipation, and the other party may, at his election, treat that
> contract as abandoned, and act accordingly. This principle is well
> settled and applied in many cases. . . .' *But refusal to perform must
> be positive and unconditional*, (citations omitted)."

*String*, 307 A.2d at 719 (quoting *Weiss*, 110 A.2d at 675) (emphasis added).

Plaintiff's reliance on *Studio Frames Ltd. v. Standard Fire Insurance Co.*, 369 F.3d 376

(4th Cir. 2004) is also woefully misplaced but does highlight Plaintiff's misguided conflation of

equitable and legal concepts.  Specifically, Plaintiff baselessly suggests that ProSight Syndicate

may have waived its right to disclaim coverage through inaction and consequently anticipatorily

breached duties.  (Dkt. No. 41, at 28).  Waiver[8] and anticipatory breach are separate and distinct

concepts. The equitable concepts of waiver and estoppel prevent a party from asserting a legal

right that is otherwise valid, while the legal doctrine of repudiation, also known as anticipatory

breach, provides that when one party repudiates its contractual obligations, the unperformed

contractual rights and duties of the contract cease to be binding on the non-repudiating party

altogether.  *Studio Frames*, 369 F.3d at 380-381.  Essential to an anticipatory breach is that the

refusal to perform be positive and unconditional.  In *Ruebe v. PartnerRe Ireland Insurance DAC*,

470 F.Supp.3d 829 (N.D. Ill. 2020), relying on the same principles subscribed to in Maryland,

where the first layer of coverage had not been exhausted, a third-layer excess carrier could not be

said to have breached a duty to provide coverage – even when the insureds tendered their claim

to the excess carriers and alleged in their complaint that the first layer of coverage was nearing

exhaustion.  470 F.Supp.3d at 839  Similarly, declining to attend a mediation did not constitute a

breach of the insuring agreement since the underlying layers had not been exhausted and thus the

---

[8] It is worth repeating that ProSight Syndicate cannot be said to have waived any rights by not
fulfilling a duty that never existed in the first instance.  Additionally, coverage cannot be
established by waiver.  *Go't Emps. Ins. Co. v. Grp Hospitalization Med. Servs., Inc.*, 322 Md.
645, 589 A.2d 464 (1991).

excess carriers owed no duty to participate.  *Id.* at 840.  Likewise, the third-layer excess carrier could not be said to have anticipatorily breached any duties by waffling or refusing to provide a coverage position.  *Id.*  In Illinois, as in Maryland, an anticipatory breach must be "definite and unequivocal".  In refusing to make a coverage determination, the third-layer excess carrier equivocated.  *Id.*

Here, the concept of anticipatory breach, or repudiation, is inapplicable given there has been no positive and unconditional conduct tantamount to a refusal to go on with the contract. Further, since an anticipatory breach must be a definite and specific refusal to do something that the purported breaching party *is obligated to do* and ProSight Syndicate maintains that its duty to indemnify has not risen (and will never rise), the unavoidable conclusion is that Plaintiff's anticipatory breach claim as to ProSight Syndicate fails as a matter of law and must therefore be dismissed.

## CONCLUSION

For the reasons explained above and in the Insurers' opening brief, the Indictment is not a Claim as defined in the Primary Policy, and therefore coverage is not implicated.  And the Primary Carriers' prior compromise agreement regarding coverage for defense costs associated with the Subpoena (i) cannot be used to establish the validity of Plaintiff's coverage claim for the Indictment, and (ii) did not even arguably promise coverage for the Indictment, which was handed down some four years later.  Accordingly, the Court should deny Plaintiffs' motion, grant the Insurers' cross-motion, enter a judgment declaring that the Policies do not afford coverage to Plaintiff in connection with the Indictment, and that the Insurers – AXIS, Endurance, and ProSight Syndicate – are entitled to judgment in their favor as a matter of law.

Dated: August 25, 2021                    Respectfully submitted,


    /s/ Charles C. Lemley
    Charles C. Lemley
    clemley@wiley.law
    D. Md. Bar No. 15205
    WILEY REIN LLP
    1776 K Street, NW
    Washington, DC  20006
    Telephone: (202) 719-7000
    Facsimile: (202) 719-7049

    *Attorneys for Defendants AXIS Surplus*
    *Lines Insurance Company and Endurance*
    *American Specialty Insurance Company.*

    /s/ John J. Murphy
    John J. Murphy, Esq. Bar No. 14407
    WALKER, MURPHY & NELSON, LLP
    9210 Corporate Boulevard, Suite 320
    Rockville, MD 20850
    Phone: 301.519.9150
    Fax: 301.519.9152
    jmurphy@walkermurphy.com

    /s/ Marc R. Kamin
    Marc R. Kamin, Esq. PHV Bar No. 815831
    STEWART | SMITH
    300 Four Falls Corporate Center, Suite 670
    300 Conshohocken State Rd.
    West Conshohocken, PA 19428
    (T) 484.589.5506 (F) 484.534.9470
    MKamin@StewartSmithLaw.com

    *Counsel for Defendant*
    *ProSight Syndicate 1110 at Lloyd's*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served electronically on all counsel of record via operation of the Court's electronic filing system and by electronic mail on August 15, 2021.

/s/ Charles C. Lemley
Charles C. Lemley (Bar # 15205)