## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| JEREMY W. SCHULMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 21-cv-1252-LKG |
| v. | ) | |
| | ) | Date:  April 29, 2022 |
| AXIS SURPLUS INSURANCE | ) | |
| COMPANY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

### I.      INTRODUCTION

Plaintiff, Jeremy W. Schulman, brings this action against defendants, Axis Surplus Insurance Company ("Axis"), Endurance American Specialty Insurance Company ("Endurance") and ProSight Syndicate 1110 at Lloyd's ("ProSight"), seeking to recover monetary damages and injunctive relief related to defendants' decision not to cover his defense fees in connection with a criminal indictment (the "Indictment") under certain professional liability insurance policies. *See generally* Compl., ECF No. 2.  The parties have filed cross-motions for summary judgment on, among other things, the issues of:  (1) whether the Indictment constitutes a "Claim" for a "Wrongful Act" under the terms of the insurance policies; (2) whether Axis and Endurance are required to reimburse plaintiff for 70% of his defense fees in connection with the Indictment; and (3) whether plaintiff states a plausible claim for "lack of good faith" under Maryland law, pursuant to Fed. R. Civ. P. 56.  Pl. Mot., ECF No. 35; Def. Mot., ECF No. 40; ProSight Mot., ECF No. 39.[1]  No hearing is necessary to resolve these motions. *See* L.R. 105.6 (D. Md. 2021).  For the reasons that follow, the Court: (1) **DENIES** plaintiff's motion for partial summary judgment; (2) **GRANTS** defendants'

---

[1] In its motion for summary judgment, ProSight also argues that summary judgment should be granted in its favor with respect to plaintiff's anticipatory breach of contract and declaratory relief claims. *See* ProSight Mot. at 1-2.

cross-motions for summary judgment; and (3) **DISMISSES** the complaint.

## II.     FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.     Factual Background

Plaintiff is a former equity partner with the law firm Shulman, Rogers, Gandal, Pordy & Ecker, P.A. (the "Firm"). Compl. at ¶ 2, 9. Defendants are insurance carriers or insuring syndicates that issued lawyers professional liability insurance policies (the "Policies") to the Firm during the period of August 22, 2016, to August 22, 2017. *Id.* at ¶¶ 11-13, 19. Plaintiff asserts six claims in this action against defendants related to the Policies, namely: breach of contract—duty to pay claims against Axis and Endurance (together, the "Primary Carriers") (Count I); breach of contract—advancement agreement against the Primary Carriers (Count II); anticipatory breach against all defendants (Count III); declaratory relief against all defendants (Count IV); detrimental reliance against the Primary Carriers (Count V); and lack of good faith against the Primary Carriers (Count VI). *Id.* at ¶¶ 76-152.

As background, the Primary Carriers co-insured Lawyers Professional Liability Insurance Policy No. EBN 782641/01/2016, which provides the Firm with a $10 million aggregate and per-claim limit of liability (the "Primary Policy"). *Id.* at ¶¶ 21-22. ProSight has also issued a Certificate of Insurance Number PL20160002300, which is subject to a $10 million limit, in excess of the Primary Policy. *Id.* at ¶ 24. Coverage under the ProSight Certificate of Insurance (the "ProSight Policy") follows the lead terms and conditions of the Primary Policy and generally incorporates the Primary Policy. *Id.* at ¶ 25.

Several provisions in the Primary Policy are relevant to this dispute. First, the Primary Policy states that the Primary Carriers "will pay on behalf of the Insureds all Loss, in excess of the applicable Retention, resulting from Claims for Wrongful Acts committed before the expiration of the Policy Period that are first made against any Insured during the Policy Period or the Extended Reporting Period, if exercised." Pl. Mot. Ex. 1 at 6 § I.A, ECF No. 35-1. In this regard, the Primary Policy defines "Loss" as "the amount(s) which the Insureds become

---

[2] The facts recited in this Memorandum Opinion and Order are taken from the complaint ("Compl."); plaintiff's motion for partial summary judgment ("Pl. Mot.") and the exhibits attached thereto ("Pl. Ex."); Axis and Endurances' cross-motion for summary judgment ("Def. Mot.") and exhibits attached thereto ("Def. Ex."); and ProSight's cross-motion for partial summary judgement ("ProSight Mot.").

legally obligated to pay on account of a Claim, including damages, judgments, . . . and Claim Expense." *Id.* at 8 § II.K.

The Primary Policy also defines a "Claim" as follows:

1. any of the following:
   a. a written demand against any Insured for monetary or nonmonetary relief;
   b. a civil proceeding against any Insured commenced by the service of a complaint or similar pleading;
   c. a written demand for arbitration or mediation;
   d. a formal civil administrative or civil regulatory proceeding against any Insured, including, but not limited to, a Disciplinary Proceeding, commenced by the filing of a notice or charges or similar document or by the entry of a formal order of investigation or similar document;
2. a written request received by an Insured to toll or waive a statute of limitations related to a matter described in subparagraph 1. above.

*Id.* at 7 § II.B. In addition, the Primary Policy defines a "Wrongful Act" to mean, in relevant part, "any actual or alleged . . . 1. act, error or omission; 2. breach of contract for Professional Services; [or] 3. breach of fiduciary duty," committed or allegedly committed "solely in the performance of or failure to perform Professional Services." *Id.* at 9-10 § II.P.

In this regard, the Primary Policy defines "Professional Services," in pertinent part, as "services provided to others by an Insured . . . in the conduct of any business by or on behalf of the Firm in its professional capacity as an attorney or notary public; . . . [or] as a government affairs advisor or lobbyist, . . . but only if such services are performed in the name or on behalf of the Firm and some or all of the fee, if any, accruing from such services . . . inures to the benefit of the Firm." *Id.* at 9 § II.N. Lastly, the Primary Policy contains an exclusion that bars coverage for any Claim:

based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

a. the gaining of any profit, remuneration, or advantage to which the Insured was not legally entitled; or
b. any criminal, dishonest, malicious or deliberately fraudulent act, error or omission by an Insured;

if evidenced by any judgment, final adjudication, alternate dispute

resolution proceeding or written admission by an Insured. No fact pertaining to, knowledge possessed by or conduct by any Insured Individual shall be imputed to any other Insured Individual or the Firm . . . .

*Id.* at 11 § IV.A.9 ("Exclusion 9").

**The DoJ Subpoena**

In early 2017, the United States Department of Justice ("DoJ") served a grand jury subpoena (the "DoJ Subpoena") on the Firm, in connection with a criminal investigation into the procurement of certain assets of the nation of Somalia. Compl. at ¶ 42; *see also* Pl. Mot. Ex. 2, ECF No. 35-2 (DoJ Subpoena). The DoJ Subpoena sought certain documents and testimony on behalf of the Firm regarding activities of various individuals and entities, including several Somali government officials, and their efforts to retrieve certain frozen assets of the Somali Government. *See* Pl. Mot. Ex. 2 at 7-9.

On or about January 31, 2017, the Firm sought coverage for the DoJ Subpoena under the Policies issued by defendants. Compl. at ¶ 54. The Primary Carriers responded by letter dated February 3, 2017, that coverage under the Primary Policy did not exist, because the DoJ Subpoena did not constitute a "Claim" under the Primary Policy. *See* Def. Mot. Ex. 9 at 2, ECF No. 40-1.

After further discussion between the Firm and counsel for the Primary Carriers, the Primary Carriers sent a letter to the Firm on April 5, 2017, in which the Primary Carriers: (1) re-stated their position that no coverage existed for the DoJ Subpoena; (2) agreed to resolve the dispute over coverage "for defense costs incurred with respect to the DOJ's subpoena" by reimbursing the Firm and plaintiff for 70% of defense fees incurred in connection with the DoJ Subpoena; (3) reserved their rights to deny coverage pursuant to Exclusion 9 and the definition of Loss in the Primary Policy; and (4) reserved all of the insurers' rights and defenses whether specifically asserted or otherwise available. *See* Def. Mot. Ex. 10, ECF No. 40-2.

Thereafter, on May 20, 2017, plaintiff communicated with the Primary Carriers and stated that the Firm had advised him that the Primary Carriers had agreed to "reimburse [him] for 70% of defense fees incurred with respect to Akin Gump, which is the law firm that [he has] engaged to represent [him] in connection with the investigation and any related

proceedings." Pl. Mot. Ex. 4 at 1, ECF No. 35-4.  In their response, the Primary Carriers stated that they had initially determined that the DoJ Subpoena did not constitute a "Claim" for a "Wrongful Act," as those terms are defined in the Primary Policy, and the Primary Carriers also confirmed that a compromise had been reached with the Firm to cover 70% of defense fees and 100% of costs incurred in connection with the DoJ Subpoena, while reserving all rights.  *See* Pl. Mot. Ex. 5 at 1, ECF No. 35-5.  In this action, plaintiff refers to this compromise as an "Advancement Agreement."  Pl. Mot. at 2.

<u>**The Indictment And Denial Of Coverage**</u>

On December 2, 2020, a Grand Jury returned an indictment against plaintiff (the "Indictment").  Compl. at ¶ 69; *see also* Pl. Mot. Ex. 3, ECF No. 35-3.  The Indictment alleges that plaintiff was a member of the Maryland bar who represented individuals or entities in recovering frozen Somali assets based on forged and false documentation and representations.  Pl. Mot. Ex. 3 at 1-2, 4-5.  And so, the Indictment charges plaintiff with multiple counts of conspiracy to commit mail, wire, and bank fraud; conspiracy to commit money laundering; and money laundering.  *Id.* at 22-29.  The Indictment also includes a forfeiture count.  *Id.* at 30.

On March 12, 2021, the Primary Carriers denied coverage under the Primary Policy for plaintiff's defense fees incurred in connection with the Indictment, upon the basis that the Indictment is not a "Claim" as defined in the Primary Policy.  *See* Pl. Mot. Ex. 7, ECF No. 35-7.

**B.     Procedural Background**

Plaintiff commenced this action on April 6, 2021, in the Circuit Court for Montgomery County and defendants removed the case to this Court on May 21, 2021.  *See* Compl.; *see also* Not. of Removal, ECF No. 1.

On June 30, 2021, plaintiff filed a motion for partial summary judgment.  *See* Pl. Mot. On July 28, 2021, the Primary Carriers filed a response in opposition to plaintiff's motion and a cross-motion for summary judgment.  *See* Def. Mot.  On the same date, ProSight also filed a response in opposition to plaintiff's motion and a cross-motion for summary judgment on issues specific to ProSight.  *See* ProSight Mot.

On August 11, 2021, plaintiff filed a response in opposition to defendants' respective cross-motions for summary judgment and a reply in support of his motion for partial summary judgment.  *See* Pl. Reply, ECF No. 41.  Defendants filed a consolidated reply in support of their respective cross-motions for summary judgment on August 25, 2021.  *See* Def. Reply, ECF No. 43.

On October 29, 2021, plaintiff filed a supplemental brief in support of his motion for partial summary judgment.  Pl. Supp. Br., ECF No. 50.  Defendants filed a consolidated responsive supplemental brief on November 19, 2021.  Def. Supp. Br., ECF No. 53.

The parties' cross-motions for summary judgment having been fully briefed, the Court resolves the pending motions.

## III.    LEGAL STANDARDS

### A.        Fed. R. Civ. P. 56

A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56 will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  And so, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co., Inc. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co., Ltd.*, 601 F.2d 139, 141 (4th Cir. 1979).

When ruling on a motion for summary judgment, the Court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Prot. Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  In this regard, the moving party bears the burden of showing that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Catawba Indian Tribe of S.C. v. State of S.C.*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).  But, a party who bears the burden of proof on a particular claim must also factually support each element of his or her claim.  *See*

*Celotex Corp.*, 477 U.S. at 322-23.  Given this, "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id.* at 323.  And so, on those issues on which the nonmoving party will have the burden of proof, it is the nonmoving party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256.

In this regard, the United States Court of Appeals for the Fourth Circuit has held that, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc*., 108 F.3d 529, 536 (4th Cir. 1997).  And so, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

### B.      Insurance Coverage Claims

Maryland Courts have held that, "when deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself." *Bausch & Lomb Inc. v. Utica Mut. Ins. Co*., 625 A.2d 1021, 1031 (Md. 1993) (citation omitted).  "Unless there is an indication that the parties intended to use words in the policy in a technical sense, they must be accorded their customary, ordinary, and accepted meaning." *Lloyd E. Mitchell, Inc. v. Md. Cas. Co*., 595 A.2d 469, 475 (Md. 1991) (citation omitted).  And so, the Court should apply the "meaning a reasonably prudent layperson would attach to the term." *Pac. Indem. Co. v. Interstate Fire & Cas. Co*., 488 A.2d 486, 488 (Md. 1985); *Nautilus Ins. Co. v. 200 W. Cherry St., LLC*, 383 F. Supp. 3d 494, 510 (D. Md. 2019) ("If the policy's language is clear and unambiguous, the Court will assume the parties meant what they said.") (quoting *Cap. City Real Estate, LLC v. Certain Underwriters at Lloyd's London*, 788 F.3d 375, 379 (4th Cir. 2013)); *see also Dutta v. State Farm Ins. Co*., 769 A.2d 948, 957 (Md. 2001).

In addition, "the insured party bears the burden of proving that coverage exists." *Balt. Scrap Corp. v. RLI Ins. Co.*, 493 F. Supp. 3d 433, 445 (D. Md. 2020) (citation omitted).  In this regard, to determine whether an insurer must defend, or advance defense costs, the Court

must determine:  (1) the scope of coverage available under the policy at issue and (2) whether the allegations of the underlying suit potentially bring the tort claim within the policy's coverage.  *Harleysville Preferred Ins. Co. v. Rams Head Savage Mill, LLC*, 187 A.3d 797, 806 (Md. Ct. Spec. App. 2018).  In addition, Maryland law does not require courts to construe insurance policies against the insurer; rather, the Court should ascertain and give effect to the intentions of the parties at the time of contracting.  *Blissful Enters., Inc. v. Cincinnati Ins. Co.,* 421 F. Supp. 3d 193, 199 (D. Md. 2019) (citations omitted).  And so, when interpreting an insurance policy, the Court "must construe the instrument as a whole, and as much as possible, give effect to each clause of an insurance policy, and avoid treating [any] term as surplusage."  *Id.* (internal citations and quotation marks omitted); *see also Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 546 (2003) (citation omitted) (holding that courts "will give effect to [the] plain, ordinary and usual meaning" of contract language, "taking into account the context in which it is used.").

## IV.    LEGAL ANALYSIS

The parties have filed cross-motions for summary judgment on the issues of:  (1) whether the Indictment constitutes a "Claim" for a "Wrongful Act" under the terms of the Policies; (2) whether the Primary Carriers are required to reimburse plaintiff for 70% of his defense fees in connection with the Indictment; and (3) whether plaintiff may bring a claim for "lack of good faith" against the Primary Carriers under Maryland law.  Pl. Mot. at 1-2; Def. Mot. at 1-2.

In this regard, plaintiff argues that the DoJ Subpoena along with the Indictment constitute a "Claim" for a "Wrongful Act" under the Policies and that defendants are obligated to pay all his claimed expenses in defending against the DoJ Subpoena and the Indictment.  Pl. Mot. at 18-27, 35.  Alternatively, plaintiff argues that the Primary Carriers should be estopped from breaching an agreement to reimburse him for these expenses, because plaintiff detrimentally relied upon their promise to do so.  *Id.* at 28-34.

Defendants do not dispute that they are obligated to cover plaintiff's expenses in connection with the DoJ Subpoena.  *See* Def. Mot. at 20 n.6.  But, they counter that the plain language of the Policies shows that the Indictment is not a "Claim," because the definition of a "Claim" is limited to claims involving civil proceedings.  And so, they argue that the Court

should dismiss Counts I, III and IV of the complaint.  *See id*. at 11-19.

In addition, defendants argue that the Court should dismiss Counts II and V of the complaint, because Maryland law precludes plaintiff from expanding the coverage under the Policies based upon an estoppel or detrimental reliance theory.  *Id.* at 19-28.  Lastly, defendants request that the Court also dismiss Count VI of the complaint, because Maryland does not recognize the tort of bad faith failure to pay defense expenses with regards to insurers.  *Id.* at 28-29.

A plain reading of the Policies and the undisputed material facts in this case show that the Indictment is not a "Claim" as that term is defined in the Primary Policy.  In addition, the undisputed material facts make clear that plaintiff cannot show that defendants promised to cover his defense fees to prevail on his detrimental reliance claim, and that Maryland does not recognize the tort of bad faith failure to pay defense expenses.  And so, the Court:  (1) **DENIES** plaintiff's motion for partial summary judgment; (2) **GRANTS** defendants' cross-motions for summary judgment; and (3) **DISMISSES** the complaint.

A.      **The Indictment Is Not A "Claim" Under The Primary Policy**

As an initial matter, the plain text of the Primary Policy makes clear that the definition of a "Claim" does not include the Indictment.  And so, the Court DISMISSES Counts I, III and IV of the complaint.

"[W]hen deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself."  *Bausch & Lomb Inc.*, 625 A.2d at 1031 (citation omitted).  In doing so, the Court "must construe the instrument as a whole, and as much as possible, give effect to each clause of an insurance policy, and avoid treating [any] term as surplusage." *Blissful Enters.*, 421 F. Supp. 3d at 199.  And so, in interpreting the Policies at issue here, the Court "will give effect to the plain, ordinary and usual meaning of contract language, taking into account the context in which it is used." *Sy-Lene of Wash., Inc.*, 829 A.2d at 546.

The parties agree that the definition of a "Claim," which is set forth in the Primary Policy, is plain and unambiguous.[3]  Pl. Mot. at 18; Def. Mot. at 1.  And so, the Court begins

---

[3] Plaintiff initially argued that the definition of a "Claim" is "clear and unambiguous."  Pl. Mot. at 18;

its analysis by considering this language. *Blissful Enters.*, 421 F. Supp. 3d at 199.

The Primary Policy defines "Claim" as being:

1.  any of the following:
    a.  a written demand against any Insured for monetary or nonmonetary relief;
    b.  a civil proceeding against any Insured commenced by the service of a complaint or similar pleading;
    c.  a written demand for arbitration or mediation;
    d.  a formal civil administrative or civil regulatory proceeding against any Insured, including, but not limited to, a Disciplinary Proceeding, commenced by the filing of a notice or charges or similar document or by the entry of a formal order of investigation or similar document;
2.  a written request received by an Insured to toll or waive a statute of limitations related to a matter described in subparagraph 1. above.

Pl. Mot. Ex. 1 at 007 § II.B.  Defendants convincingly argue that this language does not encompass criminal proceedings—including the Indictment at issue in this case—for several reasons.

First, there is no reference to an indictment, or to any criminal proceedings, in the definition of a "Claim."  *See id.*  In fact, four of the five examples of a "Claim" in the definition clearly describe civil proceedings or matters.  *See id.* (describing a civil proceeding against any Insured commenced by the service of a complaint or similar pleading; a written demand for arbitration or mediation; a formal civil administrative or civil regulatory proceeding against any Insured; and a written request received by an Insured to toll or waive a statute of limitations related, respectively).  And so, the silence in the definition of a Claim as to criminal proceedings casts doubt on plaintiff's argument that the parties intended to cover the Indictment in the Primary Policy.  *See W.F. Gebhardt & Co., Inc. v. Am. European Ins. Co.*, 252 A.3d 65, 74 (Md. Ct. Spec. App. 2021) (explaining that the Court should interpret an insurance policy "based on what a reasonable person in the position of the parties would have understood the language to mean and not the subjective intent of the parties at the time of

---

*see also* Pl. Resp. at 4-5 (failing to argue that the terms are ambiguous).  But, plaintiff suggests for the first time in his supplemental brief that this definition is ambiguous.  *See* Pl. Supp. Br. at 7-11.

formation") (citation and internal quotation marks omitted).

Defendants also persuasively argue that the portion of the definition of a Claim that refers to a "written demand for monetary or non-monetary relief" is intended to capture informal civil disputes, rather than written demands in criminal proceedings. In this regard, the definition of a Claim refers to two types of written demands that can be a "Claim:" (1) a written demand for monetary or non-monetary relief and (2) a written request to toll or waive a statute of limitations. Pl. Mot. Ex. 1 at 007 § II.B. Both of these written demands arise within the context of civil disputes, making these provisions consistent with the other parts of the definition of a Claim which involve civil proceedings. And so, the Court reads the phrase "a written demand for monetary or non-monetary relief" within the context of the definition of a "Claim," to describe civil disputes that are reflected in a written demand prior to the commencement of a formal civil proceeding. *See id.*[4]

Plaintiff's reliance upon an exclusion in the Primary Policy involving claims arising from criminal acts by an Insured, to show that the definition of a "Claim" is intended to cover the Indictment, is also misplaced. *See* Pl. Mot. at 26-27. The relevant language in the Primary Policy provides that the policy bars coverage for any Claim:

> based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving: . . . *any criminal*, dishonest, malicious or deliberately fraudulent act, error or omission by an Insured . . . *if evidenced by any judgment, final adjudication, alternate dispute resolution proceeding or written admission by an Insured.*

Pl. Mot. Ex. 1 at 11 § IV.A.9 (emphasis added). The Court reads this exclusion to exclude certain civil proceedings that would otherwise fall within the definition of a Claim, but arise out of a criminal, dishonest, malicious or deliberately fraudulent act, error or omission by an insured. *Id.*

Plaintiff's argument that this exclusion *creates* coverage for the Indictment under the

---

[4] Plaintiff's argument that the Indictment could be a "written demand for monetary or non-monetary relief" is also unconvincing. An indictment is a charging document in a criminal proceeding, not a demand for relief. In addition, reading this portion of the definition of a Claim to broadly encompass criminal proceedings would require the Court to also read this language to encompass all civil proceedings that involve a written demand. Such a reading would render other parts of the definition of a Claim as surplusage. *See Blissful Enters.*, 421 F. Supp. 3d at 199 (stating that a court must "avoid treating [any] term as surplusage").

Primary Policy is also unpersuasive for two reasons.  First, it is well-established under Maryland law that "a basic legal precept concerning insurance coverage is that exclusions do not create coverage." *Md. Auto. Ins. Fund v. Baxter*, 973 A.2d 243, 252-53 (Md. Ct. Spec. App. 2009) (citations omitted).  Second, the exclusion at issue here specifically refers to claims that arise out of a criminal act by an insured, "*if evidenced by any judgment, final adjudication, alternate dispute resolution proceeding or written admission by an Insured*." Pl. Mot. Ex. 1 at 11 § IV.A.9 (emphasis supplied).  And so, by its terms, the Primary Policy requires that the evidence of a criminal act involve a civil proceeding, such as a civil judgment, or alternate dispute resolution proceeding.  Again, this requirement is consistent with a reading of the Primary Policy to cover only civil matters.  Given this, the exclusion relied upon by plaintiff does not show that the parties intended to cover the Indictment under the terms of the Primary Policy.

Plaintiff's argument that the Indictment is a "Wrongful Act" under the Primary Policy is similarly belied by the plain language of the policy.  *See* Pl. Mot. at 23-24.  The Primary Policy defines a "Wrongful Act" as "any actual or alleged . . . 1. act, error or omission; 2. breach of contract for Professional Services; 3. breach of fiduciary duty; or 4. personal injury; committed or attempted . . . solely in the performance of or failure to perform Professional Services by any Insured . . . ."  Pl. Mot. Ex. 1 at 9-10 § II.P.  By comparison, the Indictment alleges that plaintiff engaged in criminal conduct—by conspiring to recover frozen Somali Government assets—not that plaintiff made an error or mistake in providing professional legal services.  *See generally* Pl. Mot. Ex. 3 (Indictment).  Given this, the Indictment does not fall within the Primary Policy's definition of a "Wrongful Act."

In short, the plain language of the Primary Policy makes clear that this policy does not cover the Indictment.  Given this, the undisputed material facts in this case show that defendants are not obligated to cover plaintiff's defense fees associated with the Indictment under the terms of the Policies.  And so, the Court DENIES plaintiff's motion for partial summary judgment and GRANTS defendants' cross-motions for summary judgment on this issue, and DISMISSES Counts I, III and IV of the complaint.

**B.      Defendants Are Not Obligated To Pay Plaintiff's
Defense Fees For The Indictment Under The Advancement Agreement**

The Court next considers plaintiff's breach of contract claim related to the so-called

"Advancement Agreement," which is reflected in:  (1) the Primary Carriers' April 5, 2017,

email to the Firm; (2) plaintiff's May 20, 2017, correspondence with the Primary Carriers; and

(3) the Primary Carriers' June 22, 2017, response to plaintiff.  *See* Compl. at Count II.  To the

extent that this Advancement Agreement can be read to create a contract between plaintiff and

defendants, the undisputed material facts make clear that defendants are not obligated to cover

plaintiff's defense fees associated with the Indictment under the Advancement Agreement for

several reasons.

First, the undisputed material facts show that the Advancement Agreement only

addresses defense fees incurred in connection with the DoJ Subpoena.  In this regard, the

Primary Carriers' letter to the Firm dated April 5, 2017, clearly states that the Primary

Carriers agree to resolve the dispute over coverage under the Primary Policy "*for defense

costs incurred with respect to the DOJ's subpoena.*"  *See* Def. Mot. Ex. 10 (emphasis added).

Plaintiff correctly observes that he sent an email to the Primary Carriers on May 20, 2017,

which states that the Firm had advised him that the Primary Carriers agreed to "reimburse

[him] for 70% of defense fees incurred with respect to Akin Gump . . . which is the law firm

that [he has] engaged to represent [him] in connection with the investigation *and any related

proceedings.*"  Pl. Mot. Ex. 5 (emphasis added).  But, there is no indication in the Primary

Carriers' response to plaintiff's email, or elsewhere in the evidence before the Court, that the

Primary Carriers agreed to cover any defense fees beyond those incurred for the DoJ

Subpoena.  *See* Pl. Mot. Ex. 6 (Primary Carriers confirming that they had reached a

compromise with the Firm to cover 70% of defense fees and 100% of costs incurred in

connection with the DoJ Subpoena, while reserving all rights under the Primary Policy).

In fact, there is no mention of the Indictment in the correspondence between the

Primary Carriers and plaintiff.  *See* Pl. Mot. Exs. 6-7.  This is of course unsurprising, because

it is undisputed that the "Advancement Agreement" predates the issuance of the Indictment by

almost four years.  *See* Pl. Mot. Ex. 3 (showing that the DoJ served the DoJ Subpoena on the

Firm in 2017, and that a Grand Jury returned an indictment against plaintiff on December 2,

2020).  The Court's reading of the Advancement Agreement to be limited the DoJ Subpoena

is reinforced by the fact that the Primary Carriers expressly reserved their rights under the Primary Policy to not cover criminal proceedings. *See* Def. Mot. Ex. 9 (stating that Primary Carriers were compromising coverage for the DoJ Subpoena while reserving their "rights pursuant to [Exclusion 9]"); *see also* Pl. Mot. Ex. 5 (stating that the Primary Carriers agreed to cover costs related to the DoJ Subpoena "under a reservation of rights"); Pl. Mot. Ex. 6 at 2 (supplemental reservation of rights letter).

Given this, the undisputed material facts show that the Advancement Agreement does not contractually obligate the Primary Carriers to cover plaintiff's defense fees for the Indictment. And so, the Court DENIES plaintiff's motion for partial summary judgment and GRANTS defendants' cross-motions for summary judgment on plaintiff's breach of contract claim based upon the Advancement Agreement, and DISMISSES Count II of the complaint.

### C.     The Court Must Dismiss Plaintiff's Detrimental Reliance Claim

For similar reasons, the Court must also dismiss plaintiff's detrimental reliance claim in Count V of the complaint. In this count, plaintiff alleges that the Primary Carriers should be estopped from denying coverage for the Indictment, because the Primary Carriers made a clear and definite promise in the Advancement Agreement to cover his defense fees and he relied upon this promise to his detriment. *See* Compl. at ¶¶ 136-40. But, as discussed above, plaintiff cannot show that the Primary Carriers made such a clear and definite promise. *Pavel Enters., Inc. v. A.S. Johnson Co., Inc.*, 674 A.2d 521, 532 (Md. 1996) (explaining that, to succeed upon this claim, plaintiff must show (1) a clear and definite promise; (2) where the Primary Carriers had a reasonable expectation that their offer would induce action or forbearance on the part of plaintiff; (3) which did induce actual and reasonable action or forbearance by plaintiff; and (4) that caused a detriment which can only be avoided by the enforcement of the promise). The Advancement Agreement does not obligate the Primary Carriers to cover plaintiff's defense fees associated with the Indictment and there is no mention of the Indictment in that agreement. Given this, plaintiff simply cannot succeed on his detrimental reliance claim. And so, the Court must DENY plaintiff's motion for partial summary judgment and GRANT defendants' cross-motions for summary judgment on this

claim, and DISMISSES Count V of the complaint.[5]

### D.     The Court Must Also Dismiss Plaintiff's Lack Of Good Faith Claim

As a final matter, the Court must also dismiss Count VI of the complaint, because plaintiff fails to state a plausible claim for lack of good faith related to the defendants' denial of coverage under the Primary Policy. *See* Def. Mot. at 28-29. In Count VI of the complaint, plaintiff alleges that the Primary Carriers failed to honor their obligations to him as an insured with regards to the Indictment and refused to honor his demands for reimbursement of defense fees on a current basis. *See* Compl. at ¶¶ 144-47. But, it is well-established that Maryland law does not recognize the tort of bad faith with regards to an insurer's decision to deny coverage under a policy. *See Mesmer v. Md. Auto. Ins. Fund*, 725 A.2d 1053, 1063 (Md. 1999). This is precisely the tort that plaintiff asserts in Count VI of the complaint. *See* Compl. at ¶¶ 144-47. And so, the Court GRANTS defendants' cross-motions for summary judgment on plaintiff's lack of good faith claim and DISMISSES Count VI of the complaint.

## V.     CONCLUSION

In sum, the undisputed material facts in this case show that the Primary Policy does not require the defendants to cover plaintiff's defense fees associated with the Indictment and that defendants did not otherwise promise or agree to cover these costs. The undisputed material facts also make clear that plaintiff cannot succeed on his lack of good faith claim under Maryland law. And so, for the foregoing reasons, the Court:

1.     **DENIES** plaintiff's motion for partial summary judgment;

2.     **GRANTS** defendants' cross-motions for summary judgment; and

3.     **DISMISSES** the complaint.

---

[5] Even if plaintiff could show that the Primary Carriers made a clear and definite promise to cover the Indictment, he would have difficulty showing that he relied upon that promise. It is undisputed that plaintiff retained Akin Gump to represent him in connection with the DoJ Subpoena before the Primary Carriers agreed to cover costs associated with the DoJ Subpoena on April 5, 2017. *See* Def. Mot. Ex. 10 (showing that plaintiff had retained Akin Gump "to assist in responding to the [DoJ] Subpoena" prior to the Primary Carriers' April 5, 2017, email to the Firm).

The Clerk is directed to enter judgment accordingly.

Each party to bear its own costs.

**IT IS SO ORDERED.**

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge

16